No. 2024-1137

# United States Court of Appeals
# for the Federal Circuit

INSULET CORPORATION,

*Plaintiff-Appellee*,

v.

EOFLOW CO., LTD .; EOFLOW, INC.,

*Defendants-Appellants,*

—and—

STEVEN DIIANNI; LUIS J. MALAVE; IAN G. WELSFORD; JESSE J. KIM; FLEXTRONICS MEDICAL SALES AND MARKETING LTD.;

*Defendants*.

On Appeal from the United States District Court
for the District of Massachusetts (No. 1:23-cv-11780-FDS) (Saylor, J.)

## DEFENDANTS-APPELLANTS' OPENING BRIEF

LOWELL D. MEAD
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304


ELIZABETH M. FLANAGAN
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

ADAM S. GERSHENSON
KIMBERLEY A. SCIMECA
COOLEY LLP
500 Boylston Street
Boston, MA 02116
(617) 937-2300


PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001


*Counsel for Defendants-Appellants EOFlow Co., Ltd. and EOFlow, Inc.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for EOFlow defendants, Adam S. Gershenson, certifies the following:

1.    **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.  Fed. Cir. R. 47.4(a)(1).

    EOFlow Co., Ltd.; EOFlow, Inc.

2.    **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  Fed. Cir. R. 47.4(a)(2).

    Not applicable.

3.    **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  Fed. Cir. R. 47.4(a)(3).

    EOFlow Co., Ltd.

4.    **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

    Michael Sheetz; Quinn Emanuel Urquhart & Sullivan; Patrick Daniel Curran; Nathaniel Andrew Hamstra; Stacylyn May Doore; William D. Weinreb.

5.    **Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not including the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).

Not applicable.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated: December 4, 2023          */s/ Adam S. Gershenson*
_____
Adam S. Gershenson

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................1

JURISDICTIONAL STATEMENT .......................................................3

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE...............................................................4

I.   Factual Background .....................................................................4

    A.   Insulet Produces an Insulin Pump Called the Omnipod. .....4

    B.   EOFlow Produces an Insulin Pump Called the EOPatch......5

    C.   Despite Knowing EOFlow Had Designed a Patch Pump and Hired Former Insulet Employees, Insulet Failed to Take Any Steps to Protect Its Alleged Trade Secrets for Over Five Years.......................8

II.  Procedural Background .............................................................13

SUMMARY OF THE ARGUMENT ...................................................17

STANDARD OF REVIEW ................................................................19

ARGUMENT .....................................................................................20

I.   The District Court Erred in Analyzing Success on the Merits Because It Ignored and Misapplied Trade Secret Law. ................................................20

    A.   Reversal Is Warranted Because Insulet's Claim Is Untimely, and the District Court Failed to Analyze the Statute of Limitations. ..............21

    B.   The District Court Erred in Concluding That the Information at Issue Qualified for Trade Secret Protection. ..................................................25

    C.   The District Court Erred in Finding Misappropriation. .....................42

II.  Insulet Failed to Show a Significant Risk of Irreparable Harm. ...................46

    A.   Insulet Is Not Entitled to Emergency Relief Because It Did Not Treat

# TABLE OF CONTENTS
(continued)

                                                                    **Page**

      the Alleged Theft of Its Trade Secrets as an Emergency. ...................47

    B.     Insulet Does Not Face Any Imminent Harm Warranting Preliminary
            Relief. ................................................................................51

III.   The Balance of the Equities and the Public Interest Weigh Against
    Preliminary Injunctive Relief. ........................................................55

CONCLUSION ........................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Lab'ys v. Andrx Pharm., Inc.*,
  452 F.3d 1331 (Fed. Cir. 2006) ...........................................................52

*Abbott Lab'ys v. Brennan*,
  952 F.2d 1346 (Fed. Cir. 1991) .............................................................4

*Abbott Lab'ys v. Selfcare, Inc.*,
  17 F. Supp. 2d 43 (D. Mass. 1998)......................................................50

*Abrasic 90 v. Weldcote Metals*,
  364 F. Supp. 3d 888 (N.D. Ill. 2019)...................................................36

*Aggreko, LLC v. Koronis*,
  2013 WL 6835165 (D. Mass. Dec. 19, 2013)......................................44

*Allscripts Healthcare, LLC v. DR/Decision Res., LLC*,
  386 F. Supp. 3d 89 (D. Mass 2019).....................................................42

*Alpha Pro Tech, Inc. v. VWR Int'l, LLC*,
  2017 WL 3671264 (E.D. Pa. Aug. 23, 2017) ......................................38

*Am. Inst. for Foreign Study, Inc. v. Fernandez-Jimenez*,
  468 F. Supp. 3d 414 (D. Mass. 2020)..................................................32

*Am. Sci. & Eng'g, Inc. v. Kelly*,
  69 F. Supp. 2d 227 (D. Mass. 1999)....................................................44

*Amgen Inc. v. Sanofi*,
  872 F.3d 1367 (Fed. Cir. 2017) ...........................................................57

*AnywhereCommerce, Inc. v. Ingenico Inc.*,
  2023 WL 2694043 (D. Mass. Mar. 29, 2023) ...............................24, 25

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*,
  794 F. 3d 168 (1st Cir. 2015)...............................................................55

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Arconic Corp. v. Novelis Inc.*,
2021 WL 4479484 (W.D. Pa. Sept. 30, 2021)....................................29

*Beane v. Beane*,
856 F. Supp. 2d 280 (D. Mass. 2012)...............................................29

*Blake v. Pro. Coin Grading Serv.*,
898 F. Supp. 2d 365 (D. Mass. 2012)...............................................40

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)....................................................................37, 38

*Bos. Heart Diagnostics Corp. v. Health Diagnostics Lab'y, Inc.*,
2014 WL 2048436 (D. Mass. May 16, 2014)....................................57

*Bos. Parent Coal. For Acad. Excellence Corp. v. Sch. Comm. Of City of Bos.*,
996 F.3d 37 (1st Cir. 2021)..............................................................56

*Bridgeview Bank Grp. v. Meyer*,
49 N.E.3d 916 (Ill. App. 2016).........................................................53

*Broad-Ocean Techs., LLC v. Lei*,
2023 WL 145001 (E.D. Mich. Jan. 9, 2023) .....................................31

*Cablevision of Bos., Inc. v. Pub. Imp. Comm'n of City of Bos.*,
38 F. Supp. 2d 46 (D. Mass. 1999)...................................................59

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) ..............................................................53

*Channing Bete Co., Inc. v. Greenberg*,
2021 WL 4691597 (D. Mass. July 12, 2021) .....................................49

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004)..................................................47, 49, 54

*Cinebase Software, Inc. v. Media Guar. Tr., Inc.*,
1998 WL 661465 (N.D. Cal. Sept. 22, 1998)....................................45

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*City of Lowell v. Enel N. Am., Inc.*,
  705 F. Supp. 2d 116 (D. Mass. 2010)....................................................41

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
  920 F.3d 560 (8th Cir. 2019) ......................................................24, 25

*Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*,
  843 F.2d 600 (1st Cir. 1988).........................................................20

*CVD, Inc. v. Raytheon Co.*,
  769 F.2d 842 (1st Cir. 1985).....................................................33, 40

*Dynamics Rsch. Corp. v Analytic Scis. Corp.*,
  400 N.E.2d 1274 (Mass. App. Ct. 1980) ......................................29, 35

*Epstein v. C.R. Bard, Inc.*,
  460 F.3d 183 (1st Cir. 2006).........................................................25

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*,
  983 F.2d 509 (3d Cir. 1992) ..........................................................42

*Flotec, Inc. v. S. Rsch., Inc.*,
  16 F. Supp. 2d 992 (S.D. Ind. 1998)................................................45

*Freeman Inv. Mgmt. Co. v. Frank Russell Co.*,
  2016 WL 5719819 (S.D. Cal. Sept. 30, 2016)...................................30

*Fritz v. Arthur D. Little, Inc.*,
  944 F. Supp. 95 (D. Mass. 1996).....................................................52

*Gonzalez v. Real Time Resols., Inc.*,
  2019 WL 7596277 (D.N.H. Aug. 29, 2019).......................................22

*Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.*,
  24 F. Supp. 2d 120 (D. Mass. 1998)................................................57

*Green Earth Energy Photovoltaic Corp. v. KeyCorp*,
  2020 WL 1816379 (D. Mass. Jan. 10, 2020)......................................32

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Hardwire, LLC v. Freyssinet Int'l Et Cie*,
2023 WL 1819321 (E.D.N.Y. Feb. 8, 2023) ........................................22

*Harvard Apparatus, Inc. v. Cowen*,
130 F. Supp. 2d 161 (D. Mass 2001) ...................................................43

*HiRel Connectors, Inc. v. United States*,
2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) ........................................34

*I.P. Lund Trading ApS v. Kohler Co.*,
163 F.3d 27 (1st Cir. 1998) ...........................................................19, 27

*iAlamar Biosciences, Inc. v. Difco Lab'ys, Inc.*,
1995 WL 912345 (E.D. Cal. Oct. 13, 1995) ........................................34

*ICU Med. Inc. v. Alaris Med. Sys., Inc.*,
2004 WL 1874992 (C.D. Cal. July 30, 2004) ......................................58

*IDX Sys. Corp. v. Epic Sys. Corp.*,
285 F.3d 581 (7th Cir. 2002) ..............................................................29

*Imax Corp. v. Cinema Techs., Inc.*,
152 F.3d 1161 (9th Cir. 1998) .......................................................26, 39

*Kerrissey v. Com. Credit Grp., Inc.*,
359 F. Supp. 3d 151 (D. Mass. 2019) ..................................................54

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) .....................................................................37, 38

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
654 F.3d 1179 (11th Cir. 2011) ..........................................................24

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*,
2021 WL 2982866 (D. Mass. July 15, 2021) ......................................21

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ..............................................................53

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Loc. 507, Transp. Workers Union of Am., AFL-CIO v. Transp. Workers Union of Am., AFL-CIO,*
2001 WL 92161 (D. Mass. Jan. 12, 2001) ........................................................... 50

*Macchione v. Coordinator Adm'r,*
591 F. App'x 48 (3d Cir. 2014) (unpublished) ............................................. 51, 54

*Matos v. Clinton Sch. Dist.,*
367 F.3d 68 (1st Cir. 2004) ...................................................................................... 51

*McDonough v. Trs. of Univ. Sys. of New Hampshire,*
704 F.2d 780 (1st Cir. 1983) .................................................................................... 41

*Media3 Techs., LLC v. Mail Abuse Prevention Sys., LLC,*
2001 WL 92389 (D. Mass. Jan. 2, 2001) ........................................................... 50

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.,*
2008 WL 11338115 (C.D. Cal. May 14, 2008) ................................................ 58

*MGA Ent., Inc. v. Mattel, Inc.,*
41 Cal. App. 5th 554 (2019) ................................................................................. 24

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.,*
686 F.3d 1348 (Fed. Cir. 2012) ........................................................................... 20

*Neural Magic, Inc. v. Facebook, Inc.,*
2020 WL 13819257 (D. Mass. May 29, 2020) ............................................. 41, 42

*Neural Magic, Inc. v. Meta Platforms, Inc.,*
2023 WL 2383172 (D. Mass. Mar. 6, 2023) ................................................ 26, 33

*Nova Design Techs. v. Walters,*
875 F. Supp. 2d 458 (E.D. Pa. 2012) .............................................................. 44

*Nutrition 21 v. United States,*
930 F.2d 867 (Fed. Cir. 1991) ........................................................................... 19

*NuVasive, Inc. v. Day,*
954 F.3d 439 (1st Cir. 2020) .............................................................................. 46

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Oxford Immunotec Ltd. v. Qiagen, Inc.*,
   271 F. Supp. 3d 358 (D. Mass. 2017) .................................................................51

*Pie Dev., LLC v. Pie Ins. Holdings, Inc.*,
   2023 WL 2707184 (5th Cir. Mar. 30, 2023) (per curiam)
   (unpublished) ........................................................................................................34

*RE/MAX of New England, Inc. v. Prestige Real Estate, Inc.*,
   2014 WL 3058295 (D. Mass. July 7, 2014) .......................................................57

*Respect Maine PAC v. McKee*,
   622 F.3d 13 (1st Cir. 2010) ..................................................................................56

*In re Search Warrant Issued June 13, 2019*,
   942 F.3d 159 (4th Cir. 2019), *as amended* (Oct. 31, 2019) ...............................42

*Sierra Club v. Larson*,
   769 F. Supp. 420 (D. Mass. 1991) ......................................................................51

*Skarzynski v. U.S. Bank NA*,
   2018 WL 2247240 (D. Mass. May 16, 2018) .....................................................22

*SoClean, Inc. v. Sunset Healthcare Sols., Inc.*,
   52 F.4th 1363 (Fed. Cir. 2022) ...........................................................................19

*Spencer Cos., Inc. v. Armonk Indus., Inc.*,
   489 F.2d 704 (1st Cir. 1973) ...............................................................................41

*Sutra, Inc. v. Iceland Exp.*,
   *ehf*, 2008 WL 2705580 (D. Mass. July 10, 2008) .............................................40

*Synopsys, Inc. v. Risk Based Sec., Inc.*
   70 F.4th 759 (4th Cir. 2023) ...............................................................................30

*Teradata Corp. v. SAP SE*,
   2023 WL 4882885 (Fed. Cir. Aug. 1, 2023) ....................................30, 32, 43

*TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*,
   966 F.3d 46 (1st Cir. 2020) ..........................................................26, 31, 42

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
556 F. Supp. 3d 222 (S.D.N.Y. 2021) ..................................................45

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
587 F.3d 1339 (Fed. Cir. 2009) ...........................................................40

*United States v. Booz Allen Hamilton Inc.*,
2022 WL 16553230 (D. Md. Oct. 31, 2022) ........................................53

*United States v. Hooe*,
7 U.S. (3 Cranch) 73 (1805) ................................................................32

*United Steelworkers of Am., AFL-CIO-CLC v. Auchter*,
763 F.2d 728 (3d Cir. 1985) ................................................................38

*Vascular Sols. LLC v. Medtronic, Inc.*,
2020 WL 1809195 (D. Minn. Apr. 9, 2020)..........................................58

*Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*,
984 F.2d 113 (4th Cir. 1993) ...............................................................56

*Vita Int'l, Inc. v. Foro Energy, Inc.*,
2022 WL 350195 (S.D. Tex. Jan. 4, 2022)...........................................31

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
645 F.3d 26 (1st Cir. 2011)...........................................................46, 47

*Walker Mfg., Inc. v. Hoffmann, Inc.*,
261 F. Supp. 2d 1054 (N.D. Iowa 2003) ..............................................38

*Warren Freedenfeld Assocs., Inc. v. McTigue*,
531 F.3d 38 (1st Cir. 2008)..................................................................22

*Welter v. Med. Pro. Mut. Ins. Co.*,
2023 WL 2988627 (D. Mass. Feb. 23, 2023) .......................................28

*Winnett v. Caterpillar, Inc.*,
609 F.3d 404 (6th Cir. 2010) ..........................................................1, 22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)....................................................................19, 51, 55

*World Gym, Inc. v. Baker*,
    474 F. Supp. 3d 426 (D. Mass. 2020)...............................................59

*Zirvi v. Flatley*,
    433 F. Supp. 3d 448 (S.D.N.Y. 2020) ...............................................26

*Zirvi v. Flatley*,
    838 F. App'x 582 (2d Cir. 2020) .......................................................25

**Statutes**

18 U.S.C.
    § 1836....................................................................................20, 21
    § 1839.....................................................................................*passim*

28 U.S.C.
    § 1292..........................................................................................4
    § 1331..........................................................................................3
    § 1338..........................................................................................3
    § 1367..........................................................................................3

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    *Federal Practice and Procedure* (3d ed. 2023)................................46

## **STATEMENT OF RELATED CASES**

No other appeal from the same underlying proceeding was previously before this or any other appellate court.

Appellants are unaware of any case that will directly affect or be directly affected by this Court's decision in the present appeal.

## PRELIMINARY STATEMENT

This is an interlocutory appeal of a preliminary injunction awarded in a Defend Trade Secrets Act ("DTSA") case that contravenes first principles of injunctive relief and trade secret law. The district court committed multiple legal errors, any one of which independently warrants reversal.

*First*, the district court erred in holding that Plaintiff-Appellee Insulet Corp. ("Insulet") was likely to succeed on the merits without performing the analysis required by law. This case should have been easily resolved on statute of limitations grounds alone: the DTSA has a three-year statute of limitations, and Insulet was indisputably on inquiry notice that Defendants-Appellees EOFlow Co., Ltd. and EOFlow, Inc. ("EOFlow") had developed a "strikingly similar" product more than *five years* before Insulet filed this suit. Appx97. "[T]ime-barred claims necessarily have no chance of success." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). Remarkably, the district court did not even address this dispositive issue—it "express[ed] no opinion about the accrual of the statute of limitations" and announced, "[t]hat's not the issue here." Appx15. Ignoring the clear untimeliness of Insulet's claim, the district court focused almost exclusively on a set of old, ostensibly "confidential" materials retained by ex-employees, and proceeded to make a series of other legal errors—including by failing to adequately assess whether Insulet had actually demonstrated the existence of any trade secrets, or

whether any of those secrets had been misappropriated.

*Second*, the district court erred in holding that Insulet faced imminent irreparable harm simply because another company, Medtronic plc, was poised to invest in EOFlow and could one day compete with Insulet—a commercial development distinct from any misappropriation that might have occurred half a decade before. But Insulet could not claim any imminent irreparable harm, including because it had known for *years* that EOFlow had developed a competing product and hired several of its former employees, held discussions with EOFlow about collaborations, and received EOFlow's materials comparing the companies' two products. The harm that Insulet now invokes, and which the district court improperly deemed irreparable, is not the acquisition, use, or disclosure of trade secrets—which Insulet alleges happened years ago—but instead merely a commercial transaction that might cost Insulet money if Medtronic were to one day sell EOFlow's product. But neither fear of a larger competitor nor any theoretical, far-off sales that would come (if ever) after this case concludes and could be readily calculated and remedied with money damages, is cognizable irreparable harm.

*Third*, the district court failed to analyze, much less balance, the harm an injunction would inflict on EOFlow—a threat to its very existence—and neglected the public's interest in choosing between competing medical devices and promoting access to essential medical treatments. Any one of these errors warrants reversal.

This is not a case of a thorough, written opinion containing a stray or harmless mistake. The district court issued *no* written opinion and cited *no* trade secrets case law. Instead, the district court gave a bench ruling that remarkably embraced the view that a trade secret claimant need not take any timely action to protect its purported secrets—not even a cease-and-desist letter, or a reminder-of-obligations to former employees—but can instead lie in wait and secure emergency relief *many years* after the duty kicks in to investigate a potential trade secret claim, all to eliminate the purported threat of increased competition.

If left to stand, the district court's ruling would turn trade secret law on its head and render injunctive relief an ordinary remedy rather than the extraordinary remedy that the law deems it. The district court's order should be reversed.

## **JURISDICTIONAL STATEMENT**

The district court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 & 1338(a), and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

On October 6, 2023, the district court entered the preliminary injunction order. Appx35–37. EOFlow's Motion for Modification or Clarification of Preliminary Injunction followed. ECF No. 130.[1] On October 24, 2023, the district court

---

[1] "ECF No." refers to docket entries in the district court proceeding, Case No. 1:23-cv-11780-FDS (D. Mass.).

amended the preliminary injunction. Appx38–41. On November 6, 2023, EOFlow timely filed a notice of appeal. Appx7873.

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) & (c)(1); *see also Abbott Lab'ys v. Brennan*, 952 F.2d 1346, 1349-50 (Fed. Cir. 1991) ("The path of appeal is determined by the basis of jurisdiction in the district court, and is not controlled by the district court's decision or the substance of the issues that are appealed.").

## STATEMENT OF THE ISSUES

Should this Court reverse the district court's decision granting Insulet a preliminary injunction, where the district court's analysis was marred by legal errors, including the failure to evaluate the applicable statute of limitations, consider the factors relevant to determining what constitutes a trade secret, and meaningfully evaluate the balance of harms and public interest?

## STATEMENT OF THE CASE

### I.     Factual Background

Insulet and EOFlow are both medical device manufacturers. Both companies have developed their own insulin pump patches, which deliver life-saving insulin to diabetes patients.

### A.     Insulet Produces an Insulin Pump Called the Omnipod.

In 2002, Insulet began developing the Omnipod, a disposable, wearable insulin pump.  Roughly three years later, in 2005, Insulet received FDA 510(k) premarket approvals and began marketing the Omnipod.  Appx228, Appx952–67, Appx941–42, Appx944.  Insulet then decided to update the Omnipod to a version called "Eros" in 2008, obtained 510(k) approval for the product in December 2012, and commercially launched it in the United States in 2013.  Appx202–03.

The Omnipod device and all its components are, and have always been, publicly available.  The device is sold with no End User License Agreement or any other restriction on use.  Accordingly, the Omnipod has been "torn down" many times, with multiple parties posting videos and publishing detailed analyses of its inner workings.  Appx822.  And as early as 2010, Insulet itself published details on Omnipod's schematics, "under-the-hood" photographs, and technical specifications. Appx974–89.

## B.    EOFlow Produces an Insulin Pump Called the EOPatch.

In 2011, Jesse Kim, a graduate of MIT and an engineer by trade and training, founded EOFlow.  Kim had licensed a patent for electro-osmotic pump technology and set forth to harness it to create a superior insulin pump for diabetes patients. Appx1747; Appx1753.  EOFlow initially raised $70 million, which it poured into R&D.  Appx1747.  Kim recruited a team of sophisticated engineers to begin developing the Company's flagship product, the "EOPatch" diabetes pump.  *Id.*;

Appx710.  The most essential and complex aspect of any diabetes patch pump is the actuator, which controls the component parts' movement and the delivery of insulin. Appx1747.  EOFlow's actuator is (a) indisputably *unlike* the Omnipod's, and (b) based on in-licensed technology.  *See, e.g.*, Appx16 (district court recognizing that EOFlow's "actuator [] is different from Insulet's actuator"); Appx25 (Insulet seeking an injunction only on "those components sort of downstream from the actuator").

In 2017, EOFlow won regulatory approval for its first wearable insulin pump patch, the EOPatch 1, which was developed by its Korea-based team.  Appx1712; Appx1125.  EOFlow's engineers then began developing the next-generation EOPatch, Version 2. Appx942.  Those engineers, who came from leading consumer electronics companies, leveraged existing components from EOPatch 1, including the electro-osmotic pump, a part of the reservoir sub-assembly, and polycarbonate housing material.  Appx1826–27; Appx833.  They also designed anew other components based on lessons learned from EOPatch 1 and incorporated certain design plans initially meant for EOPatch 1.  Appx943; Appx1712.

At all stages, EOFlow's design efforts used publicly available information on competing products like Omnipod.  Starting in 2014, EOFlow purchased, tore down, and reverse engineered multiple Omnipod devices.  *See* Appx4555–600.  This

informed the design of EOFlow components such as its gear module shaft, rotational spring sensors, and fill sensing mechanism. *See, e.g.*, Appx4556–600.

In addition, during the development of EOPatch 2, in 2017 and 2018, Defendants Luis Malave, Ian Welsford, and Steven DiIanni each joined EOFlow, bringing their years of industry experience, including at Insulet, to help EOFlow expand its business. Appx804. These Individual Defendants provided business development and regulatory advice, as well as their general knowledge and expertise in the medical device industry; none of them drove the design or manufacturing processes for EOPatch 2. Appx215–16; Appx1852; Appx2013; Appx2017; Appx1879–80.

In June 2019, EOFlow won a second regulatory approval for EOPatch 2. Appx1747. But even with the benefit of reverse engineering, this was not a swift, cheap, or overnight process; more work ensued before commercial launch. Instead, and contrary to the one-sided portrayal by the district court, EOFlow's team in Korea diligently developed the product for years separate from the limited input provided by the ex-Insulet individuals in the United States. EOFlow revised its technical specifications at least ten times before launching in April 2021—almost three-and-a-half years after EOPatch 2 work began. *Id.*

EOFlow is currently distributing EOPatch 2 in select Asian and European markets. Any distribution in the United States is, at a minimum, several years in the future, and requires FDA approval as a predicate. Appx1750.

In February 2023, industry news outlets reported that Medtronic had started a diligence process to acquire EOFLow. Appx1072–75. On May 23, 2023, Medtronic and EOFlow formally announced an agreement to acquire EOFlow stock on the Korean stock exchange. Appx1080–84.

## C.     Despite Knowing EOFlow Had Designed a Patch Pump and Hired Former Insulet Employees, Insulet Failed to Take Any Steps to Protect Its Alleged Trade Secrets for Over Five Years.

Given the value trade secrets may impart, both law and logic dictate that businesses must act swiftly to protect any such secrets from potential misappropriation. Insulet did nothing of the kind. Over five years elapsed after Insulet first learned in 2018 that EOFlow had developed an insulin patch pump and employed at least Insulet's former head of R&D, yet Insulet did not act to protect its supposed trade secrets until 2023. Over those five years, Insulet communicated frequently with EOFlow; tracked EOFlow's progress online; received presentations directly from EOFlow about its competing product; and contemplated buying EOFlow; but never even *mentioned* to EOFlow or any Individual Defendant any concern about any trade secret. Insulet never raised any such concern until 2023,

when after years of hard work and investment, EOFlow stood on the verge of being acquired by Medtronic.

### 1.     2018 Trade Show

In 2018, an Insulet engineer (and now VP of Product), Jason O'Connor, spoke to Luis Malave, Insulet's former head of R&D, at an American Diabetes Association ("ADA") conference and learned Malave was working for EOFlow. Appx2104. At that same conference, EOFlow displayed EOPatch devices, including a transparent version of the EOPatch 2. *See* Appx2038–39; Appx1750; Appx1752. Insulet's head of R&D, Eric Benjamin, visited EOFlow's booth at the conference and concluded the EOPatch and Insulet's Omnipod shared a "stunning resemblance." Appx1059–61. Yet Insulet took no action to investigate any potential trade secret misappropriation.

### 2.     2019 Overview of EOFlow

In March 2019, Insulet's then-VP of Strategy and Corporate Development contacted Malave requesting a further "overview of EOFlow." Appx1065–68. This discussion did not involve Insulet requesting an EOPatch or asserting a trade secret claim; instead, Insulet raised an opportunity for "potential collaboration between the two companies" and inquired about "the plans that [EOFlow] ha[d] for the company." Appx2110–11.

### 3.    2021–2022 Technical Analyses, Collaboration Discussions, and Investor Presentations

In March and April 2021—within three years after learning of EOPatch—Insulet conducted detailed technical analyses of the EOPatch and Omnipod, comparing them across 24 parameters, including size, weight, cannula material, and insertion mechanism, and noting the similarities and differences in the length and thickness of the products' component parts.   Appx2272; Appx2290; Appx2307. And, despite learning around this time that EOPatch 2 could be purchased online in Korea without a prescription, Insulet made no attempt to purchase it or to obtain one directly from EOFlow, and took no action against potential trade secret misappropriation.  Appx2317; Appx1751; Appx2272; Appx2079.

In May 2021, Insulet and EOFlow renewed their discussions on potential collaboration.   Malave shared with Insulet EOFlow's 2021 Investor Relations presentation showing the Insulet and EOFlow patches side-by-side, noting their similar dimensions, revealing EOPatch 2's internal components, contrasting certain elements such as Insulet's SMA wire mechanism with EOFlow's electro-osmotic actuator, and identifying EOPatch 2's internal designs—which plainly showed Insulet the design similarities between these patches:



Appx1024; Appx1028.  Within three years of the ADA conference, Insulet had these

materials in hand—but only now claims the EOPatch 2's internal components were

designed using its "trade secrets."

EOFlow's 2021 presentation further characterized EOPatch 2 as the "sole

competitor to Insulet . . . the monopolistic market leader," Appx1021; disclosed

EOFlow's global marketing plans and distribution agreements; recounted EOPatch

2's competitive advantages, Appx1027–30; and provided R&D and

commercialization timelines, Appx1039.  Insulet still took no steps whatsoever to

protect any purported trade secrets.  No cease-and-desist to EOFlow, not even a note

to its ex-employees reminding them of any prior obligations.

In September 2021, EOFlow posted a video to its YouTube channel showing

the EOPatch 2's internal layout and components.  Appx2394.  A week later, Insulet

made a presentation with screenshots from EOFlow's video, labeling EOPatch's

internal components, including the needle mechanism, gear-driven piston, helical spring, and fill port—some or all of which Insulet later claimed as trade secrets. *Id.*

Throughout the balance of 2021 and 2022, Insulet created more internal presentations tracking EOFlow's commercialization, collaborations, investments, and expansion. *See, e.g.*, Appx2406; Appx2428. As one example, a December 2022 internal presentation contained an "[a]nalysis" of the EOPatch 2—again confirming that Insulet remained well aware that EOFlow had developed a similar product and hired former Insulet employees. Appx2465. At the same time, Insulet employees and Insulet's outside counsel were frequenting EOFlow's website, dozens of times per month. Appx2468. Yet Insulet still said nothing to EOFlow.

Late in 2022 or in early 2023, Insulet obtained and tore down an EOPatch. Appx2079. Benjamin claims Insulet felt "gutted," "numb," and "violated" by the pictures, deeming EOPatch 2 a "copy" of Omnipod. Appx2608; Appx2080–81; Appx2090. The tear-down prompted Insulet to file a patent infringement lawsuit in Germany in only three weeks' time. *See* Appx1480. By contrast, even after the February 2023 tear-down of the EOPatch 2—the product Insulet had deemed "strikingly similar" to its Omnipod five years earlier—Insulet did not proceed to a U.S. courthouse or raise claims anywhere about any purported "trade secrets." Insulet instead contemplated purchasing EOFlow. *See* Appx2517.

In February 2023, industry outlets reported that Medtronic began diligence to acquire EOFlow; a public announcement followed in May.   Appx1071–75; Appx1076–79; Appx1080–84.  Only well after this announcement, in August 2023, did Insulet file this trade secret case demanding "emergency" relief.  Appx94.

## II.    PROCEDURAL BACKGROUND

Insulet sued EOFlow, including for infringement of "trade secrets related to the development, design, manufacturing, production of the Omnipod," on August 3, 2023.  Appx114.

Fifteen days later, Insulet filed its "emergency" motion for a temporary restraining order and preliminary injunction to enjoin all technical communications between EOFlow and Medtronic.  Appx156–51.  This motion was based solely on Insulet's trade secrets claim.  *See id.*; Appx162.

On August 29, 2023, the district court temporarily restrained EOFlow from "disclosing product or manufacturing technical information related to the EOPatch or Omnipod products."  Appx1256; Appx2377.  It then ordered expedited discovery even beyond what Insulet had requested, including depositions, production of thousands of technical documents, and the exchange of expert reports.  ECF No. 63. During this expedited discovery period, although Insulet served no document requests whatsoever on the Individual Defendants, EOFlow of its own accord searched the Individual Defendants' devices, found old Insulet confidential

documents retained on DiIanni's and Welsford's non-EOFlow devices, and voluntarily produced them.  *See* Appx1654–55.

In its opposition to Insulet's motion for a preliminary injunction, EOFlow addressed all four factors relevant to a preliminary injunction.  EOFlow argued that Insulet failed to demonstrate a likelihood of success or irreparable harm, and that both the balance of potential harms and the public interest favored denying the motion.  *See* Appx1610–90.

Specifically, EOFlow argued that Insulet failed to demonstrate a likelihood of success on the merits because Insulet's DTSA claim was time-barred and because Insulet had failed to show that its numerous asserted trade secrets qualified for trade secret protection.  Appx1649–54; Appx809–11.  EOFlow further argued that Insulet could not rely solely upon Insulet documents found on the Individual Defendants' devices to prove misappropriation against *EOFlow*, as these documents, confidential or otherwise, do not equate to trade secrets, and Insulet failed to demonstrate that EOFlow knowingly benefitted from them.  Appx1654–59.  EOFlow also argued that there was no significant risk of irreparable harm because: (i) Insulet delayed filing this lawsuit for years after notice of misappropriation, (ii) EOFlow did not and could not soon sell its EOPatch product in the United States, (iii) Insulet's alleged trade secrets were stale and not in continuous use, and (iv) Insulet had adequate remedies at law.  Appx1636–49.

On October 4, 2023, the district court ruled from the bench and granted Insulet's preliminary injunction motion. Appx1–34. The district court "express[ed] no opinion about the accrual of the statute of limitations," but nonetheless proceeded to conclude that Insulet was likely to succeed on the merits of its claim. Appx15. The district court opined that there was "strong evidence of misappropriation," mostly because "EOFlow hired four . . . former Insulet employees," who retained "Insulet's confidential documents." Appx5. The district court stated, *with no analysis*, that these "confidential documents" "fall[] within the statutory definition of trade secret." Appx6. The statutory definition invoked by the court, however, delineates only the types of information that *may* qualify as trade secret "if" other requirements are met, and those requirements were neither established by Insulet nor addressed by the district court. 18 U.S.C. § 1839(3).

Given its (erroneous) conclusion on likelihood of success, the district court believed "less in the way of irreparable harm" was required, and that such harm to Insulet crystallized when EOFlow announced the Medtronic transaction, which "would be a source of capital for EOFlow" and increase competition for Insulet. Appx20–21. In a cursory pronouncement, the district court determined the balance of equities "favors the issuance of a preliminary injunction" based solely on the fact that "Insulet, according to the evidence, appears to have been a victim of the theft of

its trade secrets," and opined there was "little impact one way or the other" on the public interest.  Appx22.

The district court then issued a sweeping order (the "Order") that went far beyond prohibiting the transfer of information to third parties that Insulet requested. Appx38–41.  In addition, the district court enjoined EOFlow "from manufacturing, marketing, or selling any product that was designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet."  Appx38.  The Order then equated purported "Confidential Information" with Trade Secrets.  The district court held that "any and all Confidential Information of Insulet, as defined in this Order, (a) that was copied, downloaded, removed, or otherwise taken from Insulet by Luis J. Malave, Steven DiIanni, Ian Welsford, or Robert Strand, or any other present or former employee or agent of Insulet, or (b) any information that contains, derives from, or incorporates such Confidential Information" was now a Trade Secret.  Appx39.  Rather than provide a bounded or reasonably particularized definition of the alleged Trade Secrets, the Order also proceeded to expansively include as "Confidential Information"—and thus "Trade Secret"—"(a) any and all information or materials that were marked 'confidential' by Insulet and (b) any and all CAD files, drawings, or specifications created by Insulet, whether or not they were marked 'confidential.'"  *Id.*

16

Defendants sought reconsideration, arguing that the Order would not only extinguish EOFlow as an existing business well before any trial could occur, but would also deprive patients, and in particular children, of their existing diabetes treatment.  ECF No. 130.  After a hearing, and over Insulet's objection, the district court amended the preliminary injunction and added limited carveouts for certain ex-U.S. patients and clinical trials, but otherwise left the Order intact.  Appx40–41.  This appeal timely followed.  Appx7873.

## SUMMARY OF THE ARGUMENT

The district court's decision granting Insulet a preliminary injunction was marred by legal error and should be reversed.

*First*, the district court erred in finding a likelihood of success on the merits while failing to address EOFlow's dispositive statute of limitations defense.  The DTSA's statute of limitations is three years after a plaintiff is on inquiry notice.  Here, Insulet indisputably learned that EOFlow had developed a "strikingly similar" product and hired several of its key employees or consultants five years before this suit was filed.  That should have been the end of the matter:  by definition, a time-barred claim cannot succeed on the merits.  Instead of stopping there, the district court skipped this analysis entirely, explicitly *disavowed* the required analysis, and then proceeded to make additional, downstream legal errors.  For example, the district court (a) wrongly assumed that all materials marked "confidential" (along

17

with other, unmarked materials) automatically constituted trade secrets; and (b) wrongly held that a product may be claimed as a trade secret even though it can be reverse engineered. These conclusions and others run headlong into decades of black-letter trade secrets law, which should have foreclosed any finding that Insulet would likely succeed on the merits.

*Second*, the district court erred in finding that Insulet faces a significant risk of irreparable harm. Insulet's prolonged delay precludes a finding of such harm, particularly where (a) the information at issue was, by Insulet's account, misappropriated years ago; (b) the purported threat is merely EOFlow's potential acquisition by Medtronic, whose diligence Insulet knew about for months before filing suit; and (c) the competitive harm Insulet claimed could easily be compensated with damages, rather than extraordinary injunctive relief.

*Third*, the district court failed to meaningfully weigh the balance of harms or the injury to the public interest. Instead, the district court issued a sweeping order that imperils EOFlow's existence and restricts patient access to essential treatments.

When the district court's legal errors are corrected, the record does not support a finding that Insulet would likely succeed on its claim that its purported trade secrets were protectible or misappropriated; that the district court's extraordinary remedy was justified by a meaningful threat of irreparable harm; or that such an order balances harm, fosters competition, or protects the public interest. The ruling should

be reversed.

## STANDARD OF REVIEW

This Court will "review a preliminary injunction order under the law of the regional circuit"—here, the First Circuit. *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 52 F.4th 1363, 1367 (Fed. Cir. 2022). While the First Circuit reviews preliminary-injunction decisions for abuse of discretion and questions of fact for clear error, "it reviews underlying questions of law de novo." *Id.*

"[A]buse of discretion occurs . . . when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 33 (1st Cir. 1998) (quotation omitted). A district court may not reject a defense against a preliminary injunction motion *sub silentio*. *See Nutrition 21 v. United States*, 930 F.2d 867, 870–72 (Fed. Cir. 1991) (vacating preliminary injunction where the district court failed to make any findings on defense). Here, where the district court made several legal errors and repeatedly ignored material factors, the injunction should be reversed under any standard.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997) (per curiam)).   As the moving party, "the burden is on [the plaintiff] to establish it is entitled to this extraordinary relief."   *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 686 F.3d 1348, 1352 (Fed. Cir. 2012).   This requires the claimant to demonstrate all of the following: "(1) the plaintiff has a likelihood of success on the merits of his claim; (2) the plaintiff does not have an adequate remedy at law such that it will suffer irreparable harm without the injunction; (3) this harm is greater than the injury the defendant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest."   *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611 (1st Cir. 1988).

## **ARGUMENT**

## I.    **THE DISTRICT COURT ERRED IN ANALYZING SUCCESS ON THE MERITS BECAUSE IT IGNORED AND MISAPPLIED TRADE SECRET LAW.**

DTSA claims must be asserted within three years after any misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered," which should bar Insulet's claim.   18 U.S.C. § 1836(d).   But here, the district court failed to analyze the statute of limitations altogether.   Indeed, the district court's oral order led with:   "I express no opinion about the accrual of the statute of limitations."   Appx15.   This error is one of several, but standing alone is grounds for reversal, as the error infected and undermined any analysis as to whether Insulet's untimely claim was somehow likely to succeed.

20

Even if Insulet's suit had been timely filed, "[t]o establish a claim for misappropriation of trade secrets under [the DTSA], a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it took reasonable steps to preserve the secrecy of the information, and (3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 2021 WL 2982866, at *12 (D. Mass. July 15, 2021) (quotations omitted).  The district court, hedging that it had "a great deal of information coming at [it] very quickly," Appx4, erred on each element of this substantive analysis.  Among other things, the court did not (a) meaningfully analyze whether Insulet's purported confidential information was a protectible trade secret; (b) examine whether Insulet took reasonable measures to guard the secrecy of the information at issue, even after it learned of potential misappropriation; or (c) follow the law holding that information that can be reverse engineered is "readily ascertainable," and thus not trade secret.  18 U.S.C. § 1839(3).

## A.    Reversal Is Warranted Because Insulet's Claim Is Untimely, and the District Court Failed to Analyze the Statute of Limitations.

Insulet's claim should be barred under the DTSA's statute of limitations, which requires that claims be asserted within three years after any misappropriation "is discovered ***or by the exercise of reasonable diligence should have been discovered***."  18 U.S.C. § 1836(d) (emphasis added).  As the district court recognized, "a cause of action accrues when a party is put on inquiry notice of a

possible claim." Appx13; *see, e.g.*, *Hardwire, LLC v. Freyssinet Int'l Et Cie*, 2023 WL 1819321, at *3 (E.D.N.Y. Feb. 8, 2023) (the DTSA "incorporate[s] the concept of inquiry notice"); *see also Warren Freedenfeld Assocs., Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008) (defining inquiry notice as when "a reasonably diligent person, similarly situated, would have made such a discovery," and explaining that "a plaintiff can be charged with inquiry notice, sufficient to start the limitations clock, once he possesses information fairly suggesting some reason to investigate whether he may have suffered an injury" (citations omitted)).

Here, as noted, the district court explicitly declined to analyze whether that statute of limitations had run, summarily stating: "I express no opinion about the accrual of the statute of limitations." Appx15. This error, standing alone, is grounds for reversing the injunction order because "time-barred claims necessarily have no chance of success." *Winnett*, 609 F.3d at 408; *accord, e.g.*, *Gonzalez v. Real Time Resols., Inc.*, 2019 WL 7596277, at *7 n.4 (D.N.H. Aug. 29, 2019) ("Plaintiffs have no likelihood of success on the merits of a claim that is time barred."); *Skarzynski v. U.S. Bank NA*, 2018 WL 2247240, at *1 (D. Mass. May 16, 2018) ("[T]he court is compelled to find Plaintiffs have failed to demonstrate a substantial likelihood of success of the merits of their underlying claims because their allegations relate to actions occurring well outside the statute of limitations period.").

Had the district court examined the timeliness issue, this motion would have been easy to decide:  Insulet's claim is barred by the DTSA's three-year limitations period because Insulet was on inquiry notice of the alleged misappropriation *five years* before filing suit.  In 2018, Insulet's head of R&D, Eric Benjamin, saw the EOPatch device at the ADA trade show and concluded the EOPatch "bore a stunning resemblance to the Omnipod."  Appx216; Appx2062; *see also* Appx97 (alleging that "in 2018, EOFlow started advertising its . . . strikingly similar" product).  This 2018 trade-show viewing gave rise to textbook inquiry notice under the law, and sparked Insulet's "technical curiosity," such that Insulet "constantly watched" EOFlow's operations and press releases.  Appx217.

Accordingly, in 2019, Insulet reached out to EOFlow and obtained an "overview" of the EOPatch 2 product, learned that EOFlow had obtained regulatory approval in Korea, and learned that EOFlow had entered a distribution agreement to "commercialize the Insulin Patch Pump product."  Appx1065–68; Appx1123–24; Appx1229–31.  In 2021, Insulet's knowledge deepened:  Insulet continued these discussions with EOFlow, conducted its own internal review of the EOPatch, *see* Appx1628; Appx2272; Appx2290; Appx2307, and watched EOFlow commercially launch and begin selling its EOPatch in Korea, *see* Appx1747; Appx1751; Appx2317; Appx2272.  Yet only in 2023—long after the limitations period expired—did Insulet finally examine EOFlow's product and file this action.

Appx98.

Courts in the First Circuit and across the country have consistently held that seeing a potentially infringing product at a trade show—as Insulet did more than five years ago—provides inquiry notice and starts the clock on a DTSA claim.   For example, in *AnywhereCommerce, Inc. v. Ingenico Inc*., the court held a trade secret claim untimely because the plaintiff, like Insulet, "saw the [defendant's] product at the [] trade show" and recognized it as "very similar" more than three years before filing suit.  2023 WL 2694043, at *12 (D. Mass. Mar. 29, 2023); *see also, e.g.*, *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019) (affirming trade secret claim was time-barred because "exhibits at an [industry] trade show" put plaintiff "continuously on notice" with "a duty to investigate, regardless of [its] exact knowledge"); *MGA Ent., Inc. v. Mattel, Inc.*, 41 Cal. App. 5th 554, 563–64 (2019) (holding trade secret claim untimely because an industry event provided inquiry notice, and a party "cannot don blinders to avoid the accrual of the statute of limitation"); *cf. Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1184 (11th Cir. 2011) (affirming trade secret claim time-barred where even the plaintiff admitted the statute of limitations started as soon as it "first viewed [the] competing device at a trade show").  As these courts have recognized, seeing a "very similar product" at a trade show, as Insulet did here, triggers inquiry notice and starts the clock on the DTSA limitations period.  *AnywhereCommerce*, 2023 WL 2694043,

at *12.

Moreover, such claims accrue "[r]egardless of when" in the future a defendant's product comes "on the market." *Id.*; *see, e.g.*, *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 188 (1st Cir. 2006) (affirming dismissal of trade secret claim under Massachusetts law because "[c]ritically, knowledge of 'every fact necessary to prevail on the claim' is not required to put the plaintiff on inquiry notice and trigger the accrual period"); *CMI Roadbuilding*, 920 F.3d at 565–66 (affirming dismissal of DTSA claim on statute of limitations grounds because plaintiff "was on inquiry notice that a problem with possible misappropriation of its trade secrets might exist well before" filing suit); *Zirvi v. Flatley*, 838 F. App'x 582, 586 (2d Cir. 2020) (summary order) (affirming dismissal of time-barred DTSA claim because the "circumstances surely put a 'person of ordinary intelligence' on at least inquiry notice").

Since the 2018 trade show viewing, Insulet "reasonably knew" EOFlow was developing a similar product (and had hired ex-Insulet personnel) "such that [Insulet] was on notice by then of the potential claim." *AnywhereCommerce*, 2023 WL 2694043, at *12 (holding DTSA claim time-barred). Insulet's failure to timely file suit within a three-year period dooms its DTSA claim and mandates reversal.

**B.    The District Court Erred in Concluding That the Information at Issue Qualified for Trade Secret Protection.**

Even if Insulet's suit had been timely filed, which it was not, the district

court's likelihood-of-success determination still could not stand because the district court erroneously applied trade secret protection when essential trade secret qualifications were not even addressed, much less established.

### 1. The District Court Erred by Failing to Analyze Whether Insulet Had Identified Actual Trade Secrets

Trade secret claims cannot succeed merely by pointing to categories of information that meet the definition of the *types* of information that can qualify for trade secret protection. *See, e.g.*, *Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1167 (9th Cir. 1998) (holding insufficient trade secret identification that "does not clearly refer to tangible trade secret material. Rather, it refers to [a system] which *potentially* qualifies for trade secret protection."). That is because trade secrets must be identified "with specificity" in a way that "separate[s] the purported trade secrets from the other information . . . [that was] known to the trade." *TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020); *see also, e.g.*, *Neural Magic, Inc. v. Meta Platforms, Inc.*, 2023 WL 2383172, at *14 (D. Mass. Mar. 6, 2023) (collecting cases requiring claimants to "define [the] trade secrets with clarity . . . and to distinguish what is protectable from that which is not" (quotations omitted)); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y. 2020) (rejecting "allegations [that] resemble broad categories of information and are vague, which, by itself, constitutes a reason to dismiss the claims" (cleaned up)), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).

Rather than analyze whether the specific, asserted trade secrets qualified for protection, the district court erroneously concluded that some Insulet "information falls within the statutory definition of trade secret" and expressly refused even to find the "number and contours of the trade secrets at issue." Appx6. That is insufficient as a matter of law. While the definition of what *can qualify* as a trade secret is extraordinarily capacious, *see* 18 U.S.C. § 1839(3), it is merely an outer boundary of what *can be* a trade secret. It is not the case that "all forms and types of financial, business, scientific, technical, economic, or engineering information" *are* trade secrets, *id.*, and invoking this definition is no substitute for evaluating whether the information at issue is indeed protectible as a trade secret. As the DTSA itself explicitly provides, such materials may qualify as trade secrets only "*if*" statutory criteria are satisfied. *Id.* (emphasis added). The district court never performed this essential analysis, which alone is reversible error. *See I.P. Lund Trading ApS*, 163 F.3d at 33 (holding that "a preliminary injunction . . . decision must be supported by adequate findings of fact and conclusions of law, which compels reversal when, *inter alia*, "a material factor deserving significant weight is ignored . . . or when . . . the court makes a serious mistake in weighing them" (quotations omitted)).

Instead, the district court purported to redefine the term "trade secret" in a sweeping, indefensible manner. In entering the preliminary injunction, the court

defined "Confidential Information" as "(a) any and all information or materials that were *marked* 'confidential' by Insulet and (b) any and all CAD files, drawing, or specifications created by Insulet, *whether or not they were marked 'confidential.'*" Appx35 (emphasis added). The court went on to define "Trade Secrets" as "any and all Confidential Information of Insulet" retained by any "present or former employee or agent of Insulet," or "any information that contains, derives from, or incorporates such Confidential Information." *Id.*

In other words, while deciding Insulet had a likelihood of success on a DTSA claim, the court did not require Insulet even to establish what actually constitutes a "Trade Secret" under the DTSA. This legal error is grounds for reversal for two primary reasons.

***First***, the district court improperly conflated "confidential" information with trade secrets. "[T]he mere fact that information is pertinent to someone's trade or business and that it may also be 'confidential,' or 'secret,' does not mean it constitutes a 'trade secret' within the specific definitions of the . . . DTSA." *Welter v. Med. Pro. Mut. Ins. Co.*, 2023 WL 2988627, at *15 (D. Mass. Feb. 23, 2023) (dismissing DTSA claim). The district court's order erases this well-established distinction and holds that any information marked "confidential" that is held by any current or former Insulet employee, plus a set of documents with no markings, plus any information derived from such information, is deemed a protectible trade secret.

In effect, the district court converted a claim for breach of a confidentiality agreement (which Insulet did not bring) into one for misappropriation of trade secrets.

That was error: trade secret claims are *not* commensurate with claims that a party breached a confidentiality agreement. *See, e.g.*, *Dynamics Rsch. Corp. v. Analytic Scis. Corp.*, 400 N.E.2d 1274, 1288 (Mass. App. Ct. 1980) (explaining that a confidentiality agreement "cannot make secret that which is not secret, and it remains for the court to determine whether an alleged trade secret is in fact such"); *Arconic Corp. v. Novelis Inc.*, 2021 WL 4479484, at *2 (W.D. Pa. Sept. 30, 2021) ("[C]onfidential information claims were different, both substantively and procedurally, than trade secret claims [because] the substantive law governing confidential information claims is less demanding." (quotations omitted)). Trade secrets comprise a specifically defined subset of confidential information that meet specific statutory requirements. The court's order labeling all "confidential" information as trade secret was wrong as a matter of law.

***Second*** and relatedly, the district court impermissibly construed Insulet's trade secrets to encompass virtually all aspects of its product. Assertions "that all information in or about [a product] is a trade secret," are "both too vague and too inclusive." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002); *see also Beane v. Beane*, 856 F. Supp. 2d 280, 305 (D. Mass. 2012) ("Needless to

say, [trade secret] protections . . . are considerably narrower[.]"). Thus, courts routinely reject such efforts to "categorize [as trade secret] every piece of information or know-how that could potentially have value to the company." *Freeman Inv. Mgmt. Co. v. Frank Russell Co.*, 2016 WL 5719819, at *11 (S.D. Cal. Sept. 30, 2016), *aff'd*, 729 F. App'x 590 (9th Cir. 2018). Insulet, however, pointed only to the product's entire manufacturing process as its commercial advantage, and could not identify any specific secret that provided "independent economic value" as a result of its secrecy. *Teradata Corp. v. SAP SE*, 2023 WL 4882885, at *10 (Fed. Cir. Aug. 1, 2023) (unpublished) (quoting 18 U.S.C. § 1839(3)); *Synopsys, Inc. v. Risk Based Sec., Inc.*, 70 F.4th 759, 771–72 (4th Cir. 2023) ("Permitting evidence of the value of the whole entity to substitute as value of a *particular* component part (the trade secrets) would defeat the obligation of proving that the alleged trade secrets themselves have independent economic value." (emphasis added)); *see also* Appx2047; Appx2088; Appx2093 (Insulet's declarant testifying he "can't help" to identify "which of the[] trade secrets . . . gives Insulet the ability to manufacture the product at scale"); Appx2125 ("[A]ll of the[]" steps in the assembly process were the source of "Insulet's competitive advantage").

The district court's order went even further than claiming the entire product was secret, and purported to define as an Insulet trade secret every CAD file, drawing, or specification *and* any information "derived" in any way from those

sources.  Appx39.  Materials such as CAD drawings and specifications, however, have repeatedly been held *not* to qualify as trade secrets for commercially available products because they are mere blueprints for features that become "readily ascertainable."  18 U.S.C. § 1839(3)(B); *see, e.g.*, *Broad-Ocean Techs., LLC v. Lei*, 2023 WL 145001, at *7 (E.D. Mich. Jan. 9, 2023) (rejecting the "circular argument that its computer-aided design files are secret" because a plaintiff must "explain with greater specificity" which information is secret); *Vita Int'l, Inc. v. Foro Energy, Inc.*, 2022 WL 350195, at *16–17 (S.D. Tex. Jan. 4, 2022) (holding that plaintiff's "conceptual drawing"—an AutoCAD file depicting a mechanical part—was not a trade secret because "all critical features of the conceptual drawings . . . would inevitably have been visually observable").

To the extent the district court assumed the combination of information was protectible as a trade secret "soup," Appx30, the record does not show—and the district court did not say—*what* combination of information was allegedly a trade secret.  *See TLS Mgmt. & Mktg. Servs.,* 966 F.3d at 54 ("[S]imply to assert [that] a trade secret resides in some combination of otherwise known data is not sufficient . . . the combination itself must be delineated with some particularity[.]" (quoting *Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007))).

And, if the district court meant to say that Insulet's invocation of an

undifferentiated mass of information shifted the burden to defendants, that too was legal error. *Compare* Appx30 ("[I]t becomes a soup where it's hard to, you know, break out the individual agreements, and it's all put together, *and the case law is that that wrongdoer, you know, has to demonstrate at some point, you know, why what he did was, in fact, not wrongful conduct*" (emphasis added)), *with, e.g.*, *Green Earth Energy Photovoltaic Corp. v. KeyCorp*, 2020 WL 1816379, at *8 (D. Mass. Jan. 10, 2020) ("[W]ith all elements for a preliminary injunction, the burden is on Plaintiffs . . . ."); *Am. Inst. for Foreign Study, Inc. v. Fernandez-Jimenez*, 468 F. Supp. 3d 414, 426 (D. Mass. 2020) ("An injunction is never awarded as of right and it is the burden of the moving party to establish that all four preliminary injunction factors are met"), *aff'd*, 6 F.4th 120 (1st Cir. 2021). It has long been established that where plaintiffs come "in equity for an injunction, [] the burden is on them to prove *all* the material allegations." *United States v. Hooe*, 7 U.S. (3 Cranch) 73, 88 (1805).

The district court had no grounds to deviate from this law merely because neither the court nor Insulet could "break out"—that is, identify with particularity— any actual trade secrets. Appx30.

### 2. The Record Does Not Demonstrate That Insulet Took the Requisite "Reasonable Measures" to Protect the Asserted Trade Secrets

Information cannot qualify for trade secret status unless "the owner thereof has taken reasonable measures to keep [such information] secret." *Teradata*, 2023

WL 4882885, at *10 (quoting 18 U.S.C. § 1839(3)); *see also CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985) ("[T]o be protected by law, a trade secret must be kept in secret."). The district court erred in analyzing whether Insulet took these "reasonable measures" in two critical respects.

*First*, the district court ignored the rule that failure to take actions *after* discovering potential misappropriation undermines a party's claim that it took "reasonable measures" to guard the alleged secrets. "[A]ctions taken after the alleged misappropriation are relevant to whether information can be properly categorized as a trade secret." *Neural Magic*, 2023 WL 2383172, at *22 (citing *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 260 N.E.2d 723, 730–31 (Mass. 1970) (holding that if a party "wishes to have . . . exclusive use" of information, it "must exercise eternal vigilance"))). Yet here, the district court addressed *only* steps taken before the alleged misappropriation and performed no analysis whatsoever of whether Insulet took reasonable measures after it saw EOFlow's strikingly similar product promoted by its ex-employee in 2018, and received presentations showing the EOPatch 2's inner workings, regulatory approvals, commercialization plans, and distribution agreements in 2019, 2020, and 2021. The district court even suggested that trade secret claims "are different" from trademark infringement claims, suggesting that "[i]f you become aware that your company's name . . . is being used, you're required to take action immediately,"

including by sending "cease and desist letters," but that no such diligence is needed to protect trade secrets. Appx13–14.

Yet that is precisely what courts require, at a minimum, of a trade secret claimant. For example, the Fifth Circuit recently affirmed the dismissal of a DTSA claim because the plaintiff "waited two years without sending any cease-and-desist letter or requesting any preliminary injunctive relief." *Pie Dev., LLC v. Pie Ins. Holdings, Inc.*, 2023 WL 2707184, at *3 (5th Cir. Mar. 30, 2023) (per curiam) (unpublished). Other courts have imposed the same requirement on parties asserting trade secret claims. *See, e.g.*, *HiRel Connectors, Inc. v. United States*, 2005 WL 4958547, at *4–5 (C.D. Cal. Jan. 4, 2005) (holding that trade secret protection is lost "despite many years of diligent efforts to maintain confidentiality if, through voluntary action or inadvertence, [the owner] ceases those efforts" for "months or years," allowing "competitors to locate and use these secrets"); *iAlamar Biosciences, Inc. v. Difco Lab'ys, Inc.*, 1995 WL 912345, at *6 (E.D. Cal. Oct. 13, 1995) (plaintiff's failure to "even approach and warn" the defendant promptly when suspicions arose "establishes that [party] did not take reasonable steps to protect its trade secrets"). The district court failed to perform this essential inquiry into the "reasonable measures" required to assert, much less succeed on, a DTSA claim.

*Second*, the district court erred in holding that "at least as to some substantial set of information, Insulet took reasonable steps to protect the information.

Documents were marked confidential, employees were required to sign nondisclosure or confidentiality agreements, systems were password protected, and the like." Appx5–6. Finding a likelihood of success based on these conclusions is legal error.

To start, finding that Insulet took measures to protect some unidentified "set of information" is *not* the same as finding that Insulet took "reasonable measures" to protect the specific, asserted trade secrets, as the DTSA requires. 18 U.S.C. § 1839(3)(A). And, of course, some documents the district court deemed trade secret were *not* marked confidential. Appx39 (holding that the "Trade Secrets" included "any and all CAD files, drawings, or specifications . . . whether or not they were marked 'confidential.'"). Moreover, merely imposing a nondisclosure agreement on an employee—as virtually all companies do today—does not, as the district court believed, render information a protectible trade secret. *See, e.g.*, *Dynamics Rsch.*, 400 N.E.2d at 1287–90 (affirming that "inadequate precautions did not warrant relief . . . though the defendant had signed an agreement not to disclose trade secrets" because such an agreement "can only affirm the intent of the parties to be bound by the [] law of trade secrets . . . [that] does not aid the plaintiff").

Plus, the record lays bare how little Insulet did to guard the secrecy of its information even before learning of potential misappropriation. For example, there is no dispute that DiIanni was allowed to maintain and use Insulet "confidential"

materials on his personal laptop or that Insulet failed to even ask him to return or destroy those documents when he left the company. *See* Appx1915. As in *Abrasic 90 v. Weldcote Metals*, Insulet did not ask the departing employees "what information they possessed, admonish[] them about the confidentiality of certain information, or demand[] that they return any specific information." 364 F. Supp. 3d 888, 900 (N.D. Ill. 2019). Nor did testimony support the district court's statement that relevant systems were password protected. *See* Appx2085–86 (Insulet employee admitting he did "not have personal knowledge" of "any security measures that Insulet had in place" during the ex-employees' tenure); Appx2139 (Insulet employee testifying that, on the subject of measures used to "control access to [Insulet's] drawings," he could not "speak to [the] IT infrastructure" or who could access the materials, except that "we have to have log-ins and stuff like that"). Insulet's lack of signed contracts, its willingness to let the employees use the information at issue on personal devices without ever requesting their return, and its failure to do anything after seeing a similar product promoted by its own ex-employees, are all relevant factors the court failed to consider in analyzing the required "reasonable measures."

Each of these mistakes in the analysis of reasonable measures, standing alone, constitutes reversible error. Without a demonstration that Insulet took "reasonable measures" to protect the specific information at issue both before and after the

alleged misappropriation, there are no established trade secrets, and no trade secret claim that is likely to succeed.  18 U.S.C. § 1839.

### 3.    The District Court Erred in Holding That Information That May Be Reverse Engineered Constitutes a Trade Secret

Under the DTSA, information cannot qualify for trade secret protection if it is "readily ascertainable through proper means," including "reverse engineering." 18 U.S.C. § 1839(3)(B), 6(B).  The Supreme Court has long recognized that the "public at large remain[s] free to discover and exploit the trade secret through reverse engineering of products in the public domain or by independent creation." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155 (1989); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("[T]rade secret law [] does not offer protection against discovery by . . . reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.").

Here, there is no dispute that the information claimed as trade secrets could be reverse engineered.  Insulet's own witness, for example, testified that "yes," it is "possible to deconstruct an Omnipod and eventually build a prototype copy of the Omnipod."  Appx2087.  Insulet also admitted to the district court that "of course" the Omnipod "can be broken down and to some extent reverse engineered."  Appx8.

In finding a likelihood of success, the district court held that "*the mere possibility that something could be reverse engineered without more is not enough to defeat a trade secret claim*." Appx8–9 (emphasis added).

That conclusion contradicts the DTSA itself and a mountain of case law holding that information that *can be* reverse engineered is not a trade secret. *See, e.g.*, *Bonito Boats*, 489 U.S. at 155; *Kewanee Oil*, 416 U.S. at 476; *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 WL 3671264, at *8 (E.D. Pa. Aug. 23, 2017) (explaining that a "product is not entitled to trade secret protection . . . if it is susceptible to reverse engineering, regardless of whether [defendants] in fact went through such an exercise" (quotation omitted)); *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054, 1081 (N.D. Iowa 2003) ("[Defendant] may properly assert that certain matters are not 'trade secrets,' if they can be discovered by 'reverse engineering,' even if [Defendant] does not assert, as a defense to a claim of misappropriation of trade secrets, that it in fact obtained those matters by reverse engineering."); *see also United Steelworkers of Am., AFL-CIO-CLC v. Auchter*, 763 F.2d 728, 740 (3d Cir. 1985) (information "determinable by reverse engineering . . . has not traditionally been afforded trade secret protection" under *Kewanee* and applicable state law). These common law decisions track the language of the DTSA, which does not ask whether information was readily "ascertained

through proper means," as the district court held, but rather is "ascertainable" through such means, like reverse engineering.  18 U.S.C. § 1839(3)(B), (6)(B).

In sum, the district court's agreement with Insulet's admissions and EOFlow's position that (at least) the Omnipod's physical features "could be reverse engineered," Appx8–9, should have ended the matter.  The information the Omnipod embodies does not qualify for trade secret protection, and the district court's contrary conclusion is legal error.[2]

> ### 4. The District Court Failed to Consider Extensive Evidence That Insulet's Purported Trade Secrets Are Public Knowledge or Generally Known in the Industry.

"A plaintiff seeking relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist," including by "separat[ing]" the trade secret "from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax*, 152 F.3d at 1164–

---

[2] Even under the district court's incorrect view that product features are entitled to trade secret protection unless they were "actually reverse engineered," Appx9, the evidence established that EOFlow both performed its own extensive development efforts and reverse engineered the Omnipod.  EOFlow's CEO testified that his team of engineers performed this reverse engineering "at least since 2014 every year." Appx1733–34 (testifying that EOFlow "reverse engineered" and "studied" the Omnipod); *see also* Appx1995 (2015 teardown photo); Appx1999 (2016 teardown photo); Appx2001 (2016 teardown photo); Appx2013 (2018 teardown photo); Appx4869 (2018 teardown photo).  This reverse engineering allowed EOFlow to ascertain precisely the Omnipod features that Insulet now claims as its trade secrets. *See, e.g.*, Appx4667–98; Appx4708–32; Appx4787–4801; Appx4842–52; Appx4878–4902.

65 (quotations omitted).    Thus, "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at *3 (D. Mass. July 10, 2008). Accordingly, there is no trade secret protection for information that has been disclosed in "published papers," "a film," or "photographs." *CVD*, 769 F.2d at 852. Similarly, "disclosure of a trade secret in a patent places the information comprising the secret into the public domain," such that "the trade secret is extinguished." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009); *see also Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 380 (D. Mass. 2012) (dismissing attempt to claim trade secret protection over materials disclosed in publication and patent applications because information "readily known or knowable to the interest of the public cannot . . . be made confidential simply by slapping it with a restrictive label.").

EOFlow thoroughly addressed this issue.    Across dozens of exhibits and voluminous briefing and expert declarations, EOFlow provided ample evidence that Insulet's asserted trade secrets were disclosed in published papers, photographs, videos, and patents. *See, e.g.*, Appx838–41; Appx1661–77; Appx1367–1451.

This evidence established that the purported trade secret information Insulet identified is indeed public knowledge or generally known in the industry.    At the very least, EOFlow's experts provided "conflicting evidence" as compared to

Insulet's on this issue, which was enough to defeat Insulet's motion. *See, e.g.*, *McDonough v. Trs. of Univ. Sys. of New Hampshire*, 704 F.2d 780, 783–84 (1st Cir. 1983) (affirming denial of preliminary injunction because "unresolved factual disputes [were] abundant" and recognizing that "it is difficult to obtain preliminary injunctive relief in cases, like this one, that involve intensely fact-oriented disputes"); *Spencer Cos., Inc. v. Armonk Indus., Inc.*, 489 F.2d 704, 707 (1st Cir. 1973) (affirming denial of preliminary injunction in light of "major factual dispute"); *City of Lowell v. Enel N. Am., Inc.*, 705 F. Supp. 2d 116, 121 (D. Mass. 2010) ("The [plaintiff] has not demonstrated a likelihood of success on the merits because too many factual disputes and uncertainties remain."). Where, as here, a defendant "provided substantial evidence to suggest that these concepts were widely known by those of skill in the field and that any one of them or the combination of them, were not [] proprietary trade secrets," an injunction should not issue. *Neural Magic, Inc. v. Facebook, Inc.*, 2020 WL 13819257, at \*4 (D. Mass. May 29, 2020) (denying preliminary injunction).

The district court addressed none of this evidence. The closest the district court came was an acknowledgement that "because Insulet has patents, it necessarily disclosed information in those patents or patent applications," but went no further to determine what, if anything, remained secret. Appx9. Instead, the district court waved off the issue of prior disclosures by fiat, stating "[t]hat's true, but that's, of

course, not what we're talking about here." *Id.*

In awarding the extraordinary remedy of a preliminary injunction, the district court's refusal to address evidence necessary to "separate the [purported] trade secrets" from other information "known to the trade" was legal error. *TLS Mgmt. & Mktg. Servs.*, 966 F.3d at 54; *see, e.g.*, *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 172 (4th Cir. 2019) (reversing order granting preliminary injunction where district court "failed to address [party's] unrebutted evidence" and "ignored evidence" related to irreparable harm), *as amended* (Oct. 31, 2019); *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 530–32 (3d Cir. 1992) (reversing preliminary injunction due to "district court's failure to consider" significant evidence).

This district court erred in ignoring and dismissing this key factor, which is a baseline requirement for any likelihood of success on a trade secret claim.

### C.    The District Court Erred in Finding Misappropriation.

To establish "misappropriation" under the DTSA, Insulet must show "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." *Allscripts Healthcare, LLC v. DR/Decision Res., LLC* , 386 F. Supp. 3d 89,

94 (D. Mass 2019) (quoting 18 U.S.C. § 1839(5)(B)); *accord Teradata*, 2023 WL 4882885, at *10. Even if Insulet had demonstrated the existence of trade secrets, the district court's finding of misappropriation constituted legal error in at least three respects.

*First*, the district court erred in assuming that EOFlow's decision to "hire or engage[] former Insulet employees" or consultants demonstrated misappropriation. Appx5; *see also, e.g.*, Appx7 ("And, again, this was done by the former Insulet employees[.]"); Appx9 ("It appears that EOFlow itself was unable to do so before hiring Insulet's former employees and using its documents."). There is nothing wrong with recruiting former employees: "It is well settled that an employee's general skill and knowledge is the type of information that he can carry away and use after termination of his employment." *Harvard Apparatus, Inc. v. Cowen*, 130 F. Supp. 2d 161, 175 (D. Mass 2001). Indeed, "[t]he principle of allowing the employee to carry away and use his general knowledge and skill acquired during his employment 'effectuates the public interest in labor mobility, promotes the employee's freedom to practice a profession, and freedom of competition.'" *Id.* at 175 n.31 (quoting *CVD*, 769 F.2d at 852). The district court's apparent belief that hiring former employees or consultants amounted to "improper means" simply has no basis in trade secrets law.

*Second*, the district court erred in assuming that these former employees'

mere retention of confidential documents—absent evidence that EOFlow actually knew of or relied upon them—established misappropriation. The notion that the employees retained documents and the company relied on those employees, as any company would, does not establish misappropriation by EOFlow. To the contrary, courts have long explained that, where the evidence is "just as consistent" that a company like EOFlow is an "innocent beneficiary of trade secret information" it receives from an employee or contractor, it "does not follow that [the company] knew that this is what [the employee or contractor] was doing," and the company cannot be liable for trade secret misappropriation. *Am. Sci. & Eng'g, Inc. v. Kelly*, 69 F. Supp. 2d 227, 233–34, 239 (D. Mass. 1999) (denying preliminary injunction). That is precisely the case here—indeed, EOFlow specifically sought and received contractual assurances before engaging DiIanni that he would *not* breach any "prior" obligations to protect any "Proprietary Information." Appx1985. The district court's failure to determine whether EOFlow relied upon—or even knew about— the confidential documents retained by Insulet's former employees was error. *See, e.g.*, *Aggreko, LLC v. Koronis*, 2013 WL 6835165, at *4–5 (D. Mass. Dec. 19, 2013) (denying preliminary injunction even though "at least some of the information accessed and taken by [plaintiff's former employee] constitutes trade secrets" because "[plaintiff] has not yet met its burden of showing it is likely that [defendants] acquired or used any of this information"); *Nova Design Techs. v. Walters*, 875 F.

Supp. 2d 458, 473-74 (E.D. Pa. 2012) ("the record contain[ed] no evidence that a corporate defendant was aware that any information it allegedly misappropriated was improperly obtained").

*Third*, despite voluminous expert submissions from the parties, the district court did not even attempt to assess the numerous differences between the Insulet and EOFlow products. It is well settled that differences between a defendant's product and a plaintiff's may defeat a claim of misappropriation. *See, e.g.*, *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 283 (S.D.N.Y. 2021) (rejecting misappropriation claim where, *inter alia*, defendants' "final product alleged to be a copy is *not* substantially similar in many respects"); *Cinebase Software, Inc. v. Media Guar. Tr., Inc.*, 1998 WL 661465, at *11 (N.D. Cal. Sept. 22, 1998) (denying preliminary injunction on the grounds that "the evidence of similarity is insufficient to establish threatened misappropriation," in light of differences that made clear that defendant's "planned product will not be an exact replica" of plaintiff's); *Flotec, Inc. v. S. Rsch., Inc.*, 16 F. Supp. 2d 992, 1003 (S.D. Ind. 1998) (finding that, "where one one-thousandth of an inch is supposed to make a big difference," a difference of 0.001 inches precludes finding of misappropriation).

EOFlow devoted dozens of exhibits and extensive briefing to explaining the clear and crucial differences between the products—all of which should defeat a

preliminary injunction finding of misappropriation. *See, e.g.*, Appx802–03; Appx1621–24; Appx1660–77. But here again the district court did not address any of this evidence—or even identify specific similarities between the products that might support a finding of misappropriation. The district court's award of extraordinary relief absent such a finding and absent consideration of the evidence before it was error. *See supra* pp. 40–42.

*    *    *

Accordingly, the district court's analysis of the likelihood of success prong was marred by reversible legal errors.

## II. INSULET FAILED TO SHOW A SIGNIFICANT RISK OF IRREPARABLE HARM.

"[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Weinberger v. Romero-Barceló*, 456 U.S. 305, 312 (1982)); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948 (3d ed. 2023) (recognizing irreparable harm as "[p]erhaps the single most important prerequisite"). A plaintiff cannot satisfy its burden by showing merely *some* risk of irreparable harm; the risk must be "*significant*." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (emphasis added).

Here, the district court failed to identify any cognizable harm that was imminent or irreparable. The harm Insulet claimed was not tied to the acquisition or use of any asserted "secrets" that had left Insulet years before, and had already been the subject of Medtronic's publicized, extensive due diligence for many months. Instead, the alleged harm was simply that Medtronic, a larger commercial player, might, at some future date, compete for insulin patch-pump sales that, if proven wrongful, could be compensated by money damages. None of that potential harm was imminent or irreparable, and the district court erred in concluding otherwise.

## A.    Insulet Is Not Entitled to Emergency Relief Because It Did Not Treat the Alleged Theft of Its Trade Secrets as an Emergency.

A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Voice of the Arab World, Inc.*, 645 F.3d at 35; *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) ("[A party's] cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief."). The district court ignored this standard, both diminishing and excusing Insulet's delay. That was error.

As discussed, the record is clear that Insulet waited ***over five years*** to assert its trade secrets. *Supra* § I.A. Insulet lay in wait, allowing EOFlow to invest tens of millions of dollars and years of engineering work on its competitive product, and

struck only once its competitor was at its most vulnerable, on the eve of being acquired.

By 2018, Insulet had not only seen EOFlow's "stunningly similar" product, but also knew that EOFlow had hired Insulet's "senior executives and critical employees," Mr. Malave and Mr. Welsford, who allegedly knew "details of every aspect of [Insulet's] research and development efforts" and had access to "every record regarding the Omnipod product." Appx97; Appx109–10; *see also* Appx2345 (Insulet arguing for emergency relief five years later, on the grounds that "really core to a lot of this is the hiring of former Insulet top executives. That's Luis Malave, Steven DiIanni, Ian Welsford."). And over the next five years, Insulet received (directly from EOFlow) materials that disclosed EOPatch's dimensions and components, described the roles of Malave and Welsford at EOFlow, and noted EOFlow's regulatory approvals, "commercialization," and distribution agreements; and proclaimed EOFlow as "the sole competitor to Insulet." Appx1021–22; Appx1024; Appx1029; Appx1039.

Yet during this half decade, Insulet failed to take even the most basic measures—it sent no cease-and-desist letter to EOFlow, nor any letter asking Malave or Welsford to return or destroy confidential information or reminding them of their continuing obligations to Insulet. Having failed for "years" to take such low-cost, standard measures, Insulet's sudden claim of urgency rings hollow. Appx2580.

48

The district court stated that "the lawsuit [could] have been filed more quickly," Appx20, but viewed that delay as "not so undue in my opinion as to completely undercut the sense of urgency," Appx22.  The law stands otherwise: using *any* of the plausible dates from which a court can measure delay leads to the same conclusion—Insulet delayed too long to claim irreparable harm.  That is true whether the delay is measured from:

- The 2018 date of inquiry notice, *see* Appx2104; Appx2038–39; Appx1750; Appx1752; Appx1059–61;

- Insulet's receipt in 2019 of EOFlow's "overview," Appx1065–68;

- Insulet's March 2021 internal review of EOFlow (when even the district court opined "events really begin"), Appx2272; Appx2290; Appx2307;

- The 2021 Investor Relations presentation Insulet received from EOFlow, Appx1010;

- The December 2022 Insulet documents demonstrating Insulet's suspicion of copying, Appx2465;

- The February 2023 tear-down of the product, Appx2079; or

- The May 2023 public confirmation of the Medtronic acquisition, Appx1071–75.

All of these events preceded Insulet's filing by months, if not years.

Courts have routinely held that such delays—often far shorter than Insulet's—defeat any claim that urgent intervention is needed to avoid irreparable harm.  *See, e.g.*, *Charlesbank Equity Fund*, 370 F.3d at 163 (one-year-long delay); *Channing Bete Co., Inc. v. Greenberg*, 2021 WL 4691597, at *7 (D. Mass. July 12, 2021)

(same) (collecting circuit court cases)); *Media3 Techs., LLC v. Mail Abuse Prevention Sys., LLC*, 2001 WL 92389, at *9 (D. Mass. Jan. 2, 2001) (six-months-long delay); *Loc. 507, Transp. Workers Union of Am., AFL-CIO v. Transp. Workers Union of Am., AFL-CIO*, 2001 WL 92161, at *6 (D. Mass. Jan. 12, 2001) (same). The same should have been true here.

The district court's conclusion is not only legal error, but sets a dangerous precedent. As Insulet admitted, this case was not about urgently protecting trade secrets at the time they were allegedly misappropriated, but rather about timing a lawsuit to most effectively thwart a merger: "[i]t is one thing for EOFlow to have misappropriated Insulet's trade secrets," but "quite another to have that in the hands of Medtronic." Appx2355. That argument persuaded the district court, but it wrongly divorces the alleged misconduct from the purported irreparable harm. The law stands otherwise for good reason—where trade secret law requires "eternal vigilance," the district court's approach invites claimants to ignore misappropriation until a clear and concrete commercial threat materializes. This would encourage inefficiency, gamesmanship, and waste. Where a company like Insulet was "surely aware of" for months if not years of the allegedly infringing "products—and at least generally how they worked— . . . it would seem manifestly unfair to be quick to enter a preliminary injunction against the defendants[.]" *Abbott Lab'ys v. Selfcare, Inc.*, 17 F. Supp. 2d 43, 50 (D. Mass. 1998).

**B.    Insulet Does Not Face Any Imminent Harm Warranting Preliminary Relief.**

"Absent something that indicates a need for *immediate* relief, a plaintiff's request for a preliminary injunction ordinarily ought to be rejected." *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 74 (1st Cir. 2004); *see also Macchione v. Coordinator Adm'r*, 591 F. App'x 48, 50–51 (3d Cir. 2014) (unpublished) (a plaintiff cannot show irreparable harm through an injury that "will occur only in the indefinite future" but "must make a clear showing of *immediate* irreparable harm") (emphasis in original)); *Winter*, 555 U.S. at 21–22 (rejecting argument that party need only demonstrate "a possibility" of irreparable harm as "too lenient" a standard); *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) ("[A]n injunction will not be issued to prevent the possibility of some remote future injury.").

Here, the district court erred in finding irreparable harm because: (1) EOFlow's acquisition by a larger company is not a proper basis for finding irreparable harm; and (2) Insulet has not shown EOFlow will imminently launch any product in the United States.

**1.    A Competitor's Potential Acquisition Does Not Constitute Irreparable Harm.**

To secure an injunction, a plaintiff "must do more than demonstrate that it might lose market share as a result of defendant's infringement." *Oxford Immunotec Ltd. v. Qiagen, Inc.*, 271 F. Supp. 3d 358, 368 (D. Mass. 2017) (citing *Apple, Inc. v.*

*Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012)). The district court acknowledged that, to issue an injunction, it would need to find "something that is immediate that would cause harm that is irreparable." Appx20. The court held the Medtronic acquisition would qualify because it would provide EOFlow extra capital and expertise. Appx21. But plaintiffs cannot prove irreparable harm by contending they would have to "compete effectively against a giant corporation," particularly where they "should have been aware" earlier of the potential claim. *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996). No irreparable harm arises on such facts because the competitive shift from a "smaller company" to a larger one "is not necessarily any more irreparable," as the infringement "is not qualitatively different." *Id.* (citing *Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 102 (2d Cir. 1992) (no irreparable harm exists where "the quality of the new harm" was "foreseeable")); *Abbott Lab'ys v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) ("[W]e do not doubt that generic competition will impact Abbott's sales of Biaxin XL, but that alone does not establish that Abbott's harm will be irreparable.").

Insulet's argument, and the district court's decision—that it would be "one thing" to have trade secret misappropriation (which could be safely ignored indefinitely) and "quite another" to have a defendant be acquired by another company (which must be stopped immediately)—is misguided. The purpose of

"[a]n injunction in a trade secret case" is "to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Here, it was publicly announced *months ago*, in February 2023, that Medtronic and EOFlow had undertaken significant technical diligence on EOPatch Version 2. Appx945; Appx1071–75. Thus, even if Insulet's desire to prevent future information-sharing with Medtronic were a valid basis for showing irreparable harm, "that ship has sailed." *United States v. Booz Allen Hamilton Inc.*, 2022 WL 16553230, at *2 (D. Md. Oct. 31, 2022) (denying preliminary injunction that aimed "to pause [an] acquisition"); *Bridgeview Bank Grp. v. Meyer*, 49 N.E.3d 916, 923 (Ill. App. 2016) (holding that injunctive relief is forward-looking and "cannot remedy misconduct, such as the improper acquisition of trade secrets, that occurred in the past" (quotation omitted)).

## 2. Insulet Has Not Shown Any Imminent Product Launch in the United States.

As for imminence, the undisputed record shows that even if the Medtronic acquisition proceeded, EOFlow was not "close to marketing a product" in the United States, and any such competitive sales would occur, at the very soonest, years in the future. Appx1750. FDA approval would have to predate any such activity, and EOFlow does not even have a pending application before the FDA, or plans to resubmit one. *Id.*; *see Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir.

1992) (holding that plaintiff failed to show "immediate irreparable harm based on the marketing of a competing product using the alleged trade secret" because "[t]here was no evidence that [the Defendant] was close to marketing a product based on that technology"); *see also Macchione*, 591 F. App'x at 50–51 (harms that "occur only in the indefinite future" cannot be the basis for preliminary injunctive relief).[3]

### C. Insulet Has Adequate Alternative Remedies at Law.

"To demonstrate irreparable harm, plaintiff must establish that monetary damages would be insufficient." *Kerrissey v. Com. Credit Grp., Inc.*, 359 F. Supp. 3d 151, 156 (D. Mass. 2019); *see also, e.g.*, *Charlesbank Equity Fund*, 370 F.3d at 162 (similar). EOFlow presented ample expert evidence on this point, but the district court did not even consider this requirement, and Insulet came nowhere close to satisfying it. Expert testimony demonstrates that any harm suffered by Insulet would be quantifiable through a standard damages analysis, such as evaluating any head start gained, development costs avoided, or a reasonable royalty on sales. Appx2028; Appx2032. This is particularly true given the age and lack of continuous use of the information at issue—at most, some of that old information saved EOFlow some time or money, which would be calculable. Insulet does not even contend that

---

[3] In the meantime, the market is shifting away from such devices like Insulet's Eros and EOFlow's EOPatch 2, and toward devices that are more compatible with smartphone applications. *See* Appx2029–30; Appx2874 (noting that Insulet will discontinue use of its device on December 31, 2023).

such damages would be impossible to calculate; Insulet's Executive Vice President testified that Insulet tracked and calculated lifetime value per customer and received monthly prescription data for itself and other competitive companies, conceding that any damages are calculable.  Appx2088.

*     *     *

For all these reasons, the district court committed reversible error in its analysis of irreparable harm.

## III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF.

Courts may not issue preliminary injunctions without analyzing "a balance of equities . . . [and] the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements*, 794 F. 3d 168, 171 (1st Cir. 2015).  In half a sentence, the district court concluded—based almost entirely on its (erroneous) likelihood-of-success determination—that the balance of equities "favors the issuance of a preliminary injunction," and that there was "little impact" on the "public interest . . . one way or the other."  Appx22; *cf. Winter*, 555 U.S. at 26 (holding that district abused discretion in granting preliminary injunction by "addressing [the balance of equities and the public interest] in only a cursory fashion," as "[t]he court's entire discussion of these factors consisted of one (albeit lengthy) sentence").  The district court not only erred in failing to meaningfully consider these factors—conflating likelihood of success on the merits with an assessment of the equities—but also erred in the result: the

equities and public interest weigh *against* preliminary relief, for three primary reasons.

*First*, the district court failed to consider Insulet's delay in acting to protect its alleged trade secrets when considering the equities. *See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021) (affirming denial of injunction because plaintiff was "sitting on its collective hands" and exacerbated potential harm to others when it "waited over four months"); *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010) (denying preliminary injunction due to the balance of the harms and public interest because plaintiff waited "six months" and then filed suit shortly before the challenged event, such that the "'emergency' [was] largely one of their own making").

*Second*, the district court consistently and expressly disregarded harm to EOFlow. *See, e.g.*, Appx7871 ("I am disinclined to give much weight to whatever the financial impact on EOFlow may or may not be under the circumstances from the decision."). Predictably, the injunction imperiled the Medtronic acquisition, leaving EOFlow with under a year's capital to operate at its current burn rate. Appx1748. This type of preliminary injunction that would effectively force a company out of business should not issue. *See, e.g.*, *Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113 (4th Cir. 1993) (affirming denial of preliminary injunction barring sale of defendant's business, where injunction might

have "driven [defendant] to insolvency" whereas harm to plaintiff if the sale went through consisted of "highly speculative and largely economic injuries," such as the "loss of distributor agreements, loss of sales, expenses incurred in relocation, injury to reputation, loss of profits, and loss of volume discounts"); *RE/MAX of New England, Inc. v. Prestige Real Est., Inc.*, 2014 WL 3058295, at \*4 (D. Mass. July 7, 2014) ("[T]he balance of the hardships and the public interest both weigh heavily in favor of the defendants. . . . If enjoined, they would effectively have to go out of business."); *Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.*, 24 F. Supp. 2d 120, 125 (D. Mass. 1998) (denying preliminary injunction that would "shut down [the competitor's] . . . operations").

*Third*, the district court's unorthodox approach—imposing a manufacturing and production injunction that was neither briefed nor requested in either party's proposed order—deprived the parties of the opportunity to brief a key issue that no one expected to be relevant: the public's interest in having a choice of medical devices. "[C]ourts are generally reluctant to enjoin the sale of allegedly infringing medicines and medical devices because of the public's interest in having access to medical treatment." *Bos. Heart Diagnostics Corp. v. Health Diagnostics Lab'y, Inc.*, 2014 WL 2048436, at \*2 (D. Mass. May 16, 2014). Accordingly, while there is no "categorical" rule barring injunctions for "life-saving goods," *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017), courts have repeatedly declined to impose

preliminary injunctions that would cut off the public's use of a medical device. *See, e.g.*, *ICU Med. Inc. v. Alaris Med. Sys., Inc.*, 2004 WL 1874992, at *26 (C.D. Cal. July 30, 2004) (denying preliminary injunction because "[p]lacing the public health in jeopardy, by removing potentially life-saving medical devices . . . from the marketplace, is a legitimate factor supporting denial of a preliminary injunction"); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2008 WL 11338115, at *4 (C.D. Cal. May 14, 2008) (denying preliminary injunction against "manufacturing, marketing, promoting, or distributing" an allegedly infringing blood glucose meter for an insulin pump because the court would not remove "potentially lifesaving medical devices . . . from the marketplace"); *Vascular Sols. LLC v. Medtronic, Inc.*, 2020 WL 1809195, at *7 (D. Minn. Apr. 9, 2020) (denying preliminary injunction because "the public interest weighs against limiting competition and in favor of permitting the sale of potentially lifesaving medical devices").

While the district court later made a modest adjustment such that its final, modified order allowed current EOFlow patients in specific jurisdictions to continue treatment, the damage had been done. Had the district court indicated its intent to issue such an injunction when Insulet had proposed only enjoining further technology transfer to Medtronic, *see* ECF No. 123 (proposed preliminary injunction order), the issue of the public interest would have been front and center, informing the decision to impose any injunction at all. And even as modified, the final order

not only restricts access to the EOFlow device that exists today, but also prevents EOFlow and Medtronic's joint development of a next generation of products premised on EOFlow's patented actuator and Medtronic's sensors and algorithms. Appx2036.  In all of these ways, the district court's final order limits patient choice and prevents new diabetes patients from enjoying the relief to which they would otherwise be entitled.

"The public interest" favors outcomes that promote "the public health." *World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 434 (D. Mass. 2020).  And the public is served by advancing "the benefits of fair competition [that] include more choices, better service and the prospect of lower prices."  *Cablevision of Bos., Inc. v. Pub. Imp. Comm'n of City of Bos.*, 38 F. Supp. 2d 46, 63 (D. Mass. 1999) (denying emergency motion for preliminary injunction), *aff'd*, 184 F.3d 88 (1st Cir. 1999). The district court's order—especially at this preliminary stage—promotes neither competition nor the public health and for this reason, too, the order should be reversed.

## CONCLUSION

For the foregoing reasons, this Court should reverse the amended preliminary injunction order below.

Dated:   December 4, 2023              COOLEY LLP

                                       */s/ Adam S. Gershenson*
                                       ADAM S. GERSHENSON

KIMBERLEY A. SCIMECA
500 Boylston Street
Boston, MA 02116
(617) 937-2300
agershenson@cooley.com
kscimeca@cooley.com

LOWELL D. MEAD
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
lmead@cooley.com

ELIZABETH M. FLANAGAN
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@cooley.com

PATRICK J. HAYDEN
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com

*Counsel for Defendants-Appellants*
*EOFlow Co., Ltd. and EOFlow, Inc.*

ADDENDUM

1

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4    INSULET CORPORATION,              )
                          Plaintiff,   )
5                                      )
                                       )
6    vs.                               )  Civil Action
                                       )
7                                      )  No. 23-11780-FDS
     EOFLOW CO., LTD.; EOFLOW, INC.;   )
8    FLEX, LTD.; FLEXTRONICS           )
     CORPORATION; FLEXTRONICS          )
9    MEDICAL SALES AND MARKETING,      )
     LTD.; LUIS J. MALAVE; STEVEN      )
10   DIIANNI; and IAN G. WELSFORD,     )
                          Defendants.  )
11

12

     BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR
13

14
                      STATUS CONFERENCE
15

16

17

           John Joseph Moakley United States Courthouse
18                      Courtroom No. 10
                        1 Courthouse Way
19                      Boston, MA 02210

20

21                      October 4, 2023
                        9:00 a.m.
22

23                    Valerie A. O'Hara
                    Official Court Reporter
24       John Joseph Moakley United States Courthouse
                      1 Courthouse Way
25                    Boston, MA 02210
                E-mail: vaohara@gmail.com

2

1    APPEARANCES:

2    For the Plaintiffs:

3        Goodwin Procter LLP, by ROBERT D. CARROLL, ESQ., ROBERT
     FREDERICKSON, III, ESQ., and SCOTT T. BLUNI, ESQ., 100 Northern
4    Avenue, Boston, Massachusetts 02210;

5        Goodwin Procter LLP, by JENNY ZHANG, ATTORNEY, and
     MATTHEW GINTHER, ESQ., 1900 N Street NW, Washington D.C. 20036;
6
         Goodwin Procter LLP, by JAMES P. BREEN, ESQ., 620 Eighth
7    Avenue, New York, New York 10018;

8    For the Defendants:

9        Cooley LLP, by ADAM S. GERSHENSON, ESQ., and
     MICHAEL SHEETZ, ESQ., 500 Boylston Street, Boston,
10   Massachusetts 02116;

11       K&L GATES, by CHRISTOPHER CENTURELLI, ESQ., and
     MICHAEL R. CRETA, ESQ., 1 Congress Street, Suite 2900,
12   Boston, Massachusetts 02114-2023.

13       Quinn Emanuel Urquhart & Sullivan, LLP, by WILLIAM D.
     WEINREB, ESQ., and PATRICK D. CURRAN, ESQ., 111 Huntington
14   Avenue, Suite 520, Boston, Massachusetts 02199.

15

16

17

18

19

20

21

22

23

24

25

3

PROCEEDINGS

1

2         THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is now in session in the matter of Insulet Corporation

4    vs. EOFlow Co. Ltd, et al, Civil Action Number 23-11780.

5         Would counsel please identify themselves for the

6    record, starting with the plaintiff.

7         MR. CARROLL:  Good morning, your Honor, Rob Carroll

8    from Goodwin Procter.

9         MR. FREDERICKSON:  Robert Frederickson also from

11:00AM 10   Goodwin Procter.

11        MR. BLUNI:  Scott Bluni from Goodwin Procter.

12        THE COURT:  Good morning.

13        MR. WEINREB:  Good morning, your Honor,

14   William Weinreb from Quinn Emanuel on behalf of the EOFlow

15   defendants.

16        MR. GERSHENSON:  Good morning, your Honor,

17   Adam Gershenson, Cooley LLP on behalf of the EOFlow defendants

18   and the individual defendants.

19        MR. CURRAN:  And Patrick Curran, Quinn Emanuel on

11:00AM 20   behalf of the EOFlow defendants and the individuals.

21        THE COURT:  Good morning.  All right.  This conference

22   was convened for the purpose of me rendering my ruling on the

23   motion for a preliminary injunction.  To cut to the chase, I'm

24   going to grant the preliminary injunction, grant the motion in

25   a specific form to be discussed.

4

1        I'm not going to issue a written opinion.  This

2   transcript will serve as my statement of reasons.  As I'm sure

3   you can appreciate, I had a great deal of information coming at

4   me very quickly, and I don't want to delay proceedings any

5   further in terms of rendering my decision, which, obviously,

6   will be an appealable order.

7        As I'm sure you're aware, under Rule 65, in order to

8   obtain a preliminary injunction, the moving party must satisfy

9   a four-part test:  It must demonstrate that it has a reasonably

11:01AM 10   likelihood of success on the merits of its claims; that

11   immediate irreparable harm will result if the injunction is not

12   issued; that the balance of equities favors issuance of an

13   injunction; and that the public interest favors it as well.

14        As is normally the case, here, the principal focus is

15   on likelihood of success on the merits and immediate

16   irreparable harm.  I'll turn first to the question of whether

17   Insulet, the moving party, has established a reasonable

18   likelihood of success.

19        The principal issue, really, the only issue for

11:01AM 20   present purposes is whether Insulet has established a

21   likelihood of success on its claim for misappropriation of

22   trade secrets under the Defend Trade Secrets Act.  There are

23   other claims asserted here, including patent infringement,

24   breach of contract, Chapter 93A, false designation of origin

25   and so on.  I'm only going to consider, as I think the parties

5

1    have, the ETSA claim for these purposes.

2            Here there is very substantial, indeed, strong

3    evidence of misappropriation.  EOFlow hired four or engaged

4    four former Insulet employees beginning in June of 2017 with

5    the hiring of Luis Malave, the former chief operating officer

6    and head of R & D at Insulet, followed by Ian Welsford, the

7    former director of regulatory affairs, Steve DiIanni, the

8    former director of mechanical engineering, and Bob Strand, a

9    former senior product development engineer.

11:03AM 10            Those individuals used not only their expertise but

11    also confidential information of Insulet, including what appear

12    to be hundreds, if not more, of Insulet's confidential

13    documents, including CAD file drawings, failure modes and

14    effects analyses, manufacturing protocols and instructions,

15    testing protocols, algorithms, and the like to develop a

16    product for EOFlow, the EOPatch 2 in a very short period of

17    time for very little research and development outlay.

18            Insulet took 20 years and spent, according to its

19    testimony, approximately a billion dollars to develop its pump

11:04AM 20    patch.  EOFlow's development time was measured in months and in

21    a relatively small amount of money.

22            There is a dispute as to what precisely are the trade

23    secrets, which I'll return to in a moment, but at least as to

24    some substantial set of information, Insulet took reasonable

25    steps to protect the information.  Documents were marked

6

1    confidential, employees were required to sign nondisclosure or

2    confidentiality agreements, systems were password protected,

3    and the like.

4         The standard for protection, of course, is

5    reasonableness, not perfection, and based on the record, and

6    it's not particularly challenged, I think Insulet took

7    reasonable steps to protect the information in question.

8         I also think there's little doubt that that

9    information falls within the statutory definition of trade

11:05AM 10    secret.  Again, it involves CAD drawings, specifications,

11    models, testing, protocols and data, manufacturing

12    instructions, protocols, and so on.

13         Discovery has only been preliminary at this point.  I

14    think it would be unfair to require at this stage perfection as

15    to the precise number and contours of the trade secrets at

16    issue.

17         Insulet has focused on eight categories as example.

18    For present purposes, I will do the same.  The eight categories

19    are failure modes and effects analyses; cannulus seal design

11:05AM 20    and manufacturing; reservoir; bubble channel; spin coating of

21    the silicon or a lubricant; leak testing of the housing; field

22    sensing occlusion algorithm; and exterior surface finish of the

23    tube nut.

24         As to each of these, some combination of design or

25    manufacturing instructions, manufacturing process, or testing

7

1    process based on Insulet's confidential information was used.

2    The algorithms presumably were embodied in software.

3    Insulet goes through the specific evidence of misappropriation

4    as to those eight categories in its supplemental brief at pages

5    26 to 28.  I won't repeat it here.  To a substantial extent,

6    some of that is unchallenged.

7    There is also very substantial evidence that Insulet

8    documents were copied verbatim or nearly verbatim.  They may

9    have been reformatted or customized, but they were still

11:07AM 10    essentially identical.

11    And, again, this was done by the former Insulet

12    employees, and, in fact, when Mr. DiIanni needed assistance for

13    assembly processes and automation, having gotten past the

14    design stage, he hired Bob Strand, another former Insulet

15    employee to assist with that.

16    I think it's fair to say that trade secrets for

17    products such as this are not limited to things like design and

18    dimensions and materials, that is something you can measure.

19    It is critical to know why the design and manufacturing is done

11:07AM 20    in a particular way, what happens if you do it differently,

21    what failures and experiments have brought you to this point.

22    Copying something blindly takes you to a certain point

23    but no more, and, of course, it's not just the design but the

24    manufacture, how do you make it, in this case, how do you make

25    it at large scale and at a low price, since the product is

8

1    intended to be disposable and maintain quality.

2         The quality of the finished product in a medical

3    device is critical.  If you don't manufacture it properly, it

4    isn't simply an inferior product, it's a product that can make

5    people sick or kill them.

6         It is, of course, true that a final physical product

7    is intended to be revealed to others.  It's true that it can be

8    broken down and to some extent reverse engineered, but there is

9    much more to the product than that, more than mere dimensions.

11:09AM 10    One of the focuses here has been the tolerance

11    requirements of a manufactured product.  The product appears to

12    be manufactured entirely out of metal and plastic or some form

13    of polymer.

14         The tolerances for molding a milk jug or a wiffle ball

15    are, of course, quite different from a sophisticated and

16    complex medical device, and as near as I can make out, that's

17    true for virtually every component.

18         And even at the most basic level, things like CAD

19    files, specifications, you can say that you want to copy the

11:09AM 20    dimensions of a particular object, but you would still have to

21    pay someone to do that, to draw and design the product and to

22    develop a manufacturing process, and if you steal the drawings,

23    that's one more way in which you have saved time and money.

24         EOFlow does note that physical features can be reverse

25    engineered, and, of course, that is true to some extent.  The

9

1   mere possibility that something could be reverse engineered

2   without more is not enough to defeat a trade secret claim.

3         There is some evidence, but it's relatively little in

4   the scheme of things as near as I can make out that any of this

5   was actually reverse engineered, and certainly that is not true

6   as to a number of critical components.

7         Reverse engineering is difficult for a sophisticated

8   product such as this.  It appears that EOFlow itself was unable

9   to do so before hiring Insulet's former employees and using its

11:10AM 10   documents.  Other companies had apparently tried to do so and

11   failed, and, of course, reverse engineering doesn't tell you

12   anything about algorithms, procedures, protocols, and the like.

13         EOFlow notes that because Insulet has patents, it

14   necessarily disclosed information in those patents or patent

15   applications.  That's true, but that's, of course, not what

16   we're talking about here.

17         They point out that particular individual components

18   are not novel.  That may be true.  That's not the standard in a

19   patent case.  This is not a patent case.  It's how those

11:11AM 20   components taken together as a whole create the product and how

21   it's designed, assembled, and tested.

22         They contend that the information in question is

23   stale.  Certainly it could be in the abstract.  Some of it was

24   generated considerably a long time ago, but the information is

25   still used.  The product is still being manufactured with that

10

1    information.

2         One might ask if it was not valuable, why was it

3    stolen?  It's hardly useless, and even if the product was

4    substantially improved upon over the years, it's a huge start

5    to have the basic information in hand.

6         Similarly, the fact that all of these employees left

7    Insulet long ago could be an issue in terms of the staleness of

8    what they know, but they did take information with them, it was

9    valuable, it was marked confidential, and they used it.

11:12AM 10         And, of course, as has been pointed out, EOFlow

11    engineers did not have medical device experience.  A medical

12    device is not the same as a mobile phone, and, again, failure

13    of a phone is not likely to lead to illness or death.

14         EOFlow notes that the fact that the documents may have

15    been on DiIannii's or Welford's computers doesn't necessarily

16    mean that they weren't used or that it could not be attributed

17    to EOFlow unless EOFlow had knowingly benefited from that

18    information.  It may be true as to some subset of information.

19    It's hard to tell at this point.

11:13AM 20         Again, the standard for a preliminary injunction is

21    not proof beyond a reasonable doubt.  It is certainly possible

22    that there are innocent explanations for some of this.  It's

23    certainly possible that DiIanni took documents but never used

24    them, but certainly the evidence to date strongly suggests the

25    contrary, at least in some instances, and the question, again,

11

1   on a preliminary basis, is there a reasonable likelihood of

2   success on the merits?

3           Again, the specific trade secrets are not only

4   important as of themselves, but because they add up to a whole,

5   this is a medical device, a complex machine.  It has to be

6   built to rigorous standards.  The value of a small number of

7   secrets that solve critical problems can be greater than the

8   sum of its parts.  If this device cannot be made to work

9   reliably or safely, if it can't be built to scale for a

11:14AM 10   competitive price, it isn't worth anything.  Again, you don't

11   wind up with a product that is not as good, you wind up with a

12   product that has no value at all.

13           EOFlow appears to have taken the information because

14   it needed it, and having established that a very substantial

15   number of trade secrets were, in fact, misappropriated and

16   were, in fact, used to develop the EOFlow patch pump, it's, I

17   think, unfair under the circumstances to demand a high level of

18   exactitude from Insulet as to precisely what was taken and

19   precisely how it was used that can await further discovery.

11:15AM 20           In short, there is strong evidence that Insulet is

21   likely to succeed on the merits of its trade secrets claim at

22   least in part, and that factor weighs heavily in favor of an

23   injunction.

24           There is substantial evidence, I should add, that the

25   misappropriation was knowingly.  Certainly it's true as to the

12

1   four individuals, and whether they were employees or

2   consultants, they're agents of EOFlow, their conduct is

3   attributable to the principal, and as to Mr. Kim and others at

4   EOFlow, a strong inference can be drawn under the circumstances

5   that they were very much aware that the company was taken

6   advantage of the trade secrets of Insulet.

7        So I find that the first requirement, reasonable

8   likelihood of success on the merits, has been satisfied.

9        The second requirement is immediate irreparable harm.

11:15AM 10   This is the most disputed of the four factors or requirements.

11   Those four factors do not necessarily carry equal weight.

12   Under the case law, when likelihood of success on the merits is

13   great, a movant can show somewhat less in the way of

14   irreparable harm.  That's *EEOC vs. Astra USA, Inc.*, 94 F.3d

15   738, (1st Cir. 1996).

16        The irreparable harm test is not applied rigidly.

17   It's often referred to as a sliding scale analysis working in

18   conjunction with the first factor, likelihood of success, and

19   likelihood of success on the merits is always the foremost

11:16AM 20   consideration and weighs most heavily in the analysis.

21        As an initial point in the analysis, the defendants

22   conflate two distinct although at least somewhat overlapping

23   concepts.  One is when does a cause of action accrue for

24   purposes of calculating when the limitations period begins to

25   run, and the second is what is undue delay in the context of

13

1    seeking a preliminary injunction?

2         A cause of action accrues when a party is put on

3    inquiry notice of a possible claim.  That does not mean that

4    there are enough facts to file a complaint but sufficient to

5    trigger an inquiry, and from that point forward, you have three

6    or four or five years, whatever the statutory period is, to

7    file a complaint.

8         Immediate irreparable harm is a standard that looks to

9    the immediate future, what is about to change that will cause a

11:17AM 10  harm that cannot be repaired, and what is the immediacy, the

11   urgency?  If that state of affairs has existed for some period

12   of time, it undercuts the argument that this is indeed an

13   urgent matter requiring extraordinary relief, or to put it more

14   bluntly, if you didn't think the matter was urgent, why should

15   the Court?

16        In some instances, that casts doubts on the motive of

17   the moving party if such a motion might be interposed for

18   strategic or business reasons, and intertwined with that, I

19   think, is the issue of possible harm or unfairness to the

11:18AM 20  defendant, who -- I'm sorry, to the defendant when the

21   plaintiff sat on its rights.  It's a form of laches perhaps,

22   perhaps better analyzed under the balance of equities test, but

23   it's a different inquiry.

24        I also note that not all intellectual property cases

25   are alike for these purposes.  Use of a trade name, for

14

1   example, is obvious as soon as you see it.  If you become aware

2   that your company's name is or a same or similar name is being

3   used by another company in a same or similar market, normally

4   you're required to take action immediately.  That's why cease

5   and desist letters are used to put the other side on notice,

6   and, in fact, sometimes the conduct is perfectly innocent in

7   the sense that the offending user of the name was not aware

8   another company existed or there was no intent to create

9   customer confusion.

11:19AM 10          Patent cases are also different.  It's typical, the

11   company's attempt to design new patents, but a patent is public

12   information, and usually the comparison of the accused product

13   to the claims can be done fairly quickly.

14          Trade secrets, particularly ones that are stolen, are

15   different.  It's normally a clandestine matter.  You can't file

16   a lawsuit based on mere suspicion or speculation.  Inquiry

17   notice is not enough.  At some point that has to crystalize

18   into actual evidence sufficient to support a claim, and,

19   obviously, the subsequence is important, the sequence of

11:19AM 20   events.  It's important here, and I want to turn to that next

21   and walk through that with some degree of detail.

22          The first event is the American Diabetes Association

23   Trade Show in 2018.  According to the evidence, Eric Benjamin,

24   who is the head of R & D at Insulet visited a booth of EOFlow's

25   where one or more devices were displayed.

15

1        There was certainly evidence that there was a glass

2    case with at least one device with an opaque cover.  According

3    to EOFlow, there was also a device with a transparent cover

4    that was available for viewing.  There's no photo of that in

5    the record and no actual transparent cover.  And, in addition,

6    Jason O'Connor, who was then a senior engineer at Insulet said

7    that he saw Luis Malave, again, the former head of R & D at

8    Insulet, at the conference and learned he was working for

9    EOFlow.

11:21AM 10        Mr. O'Connor says, and it's disputed, that Insulet

11    employees attempted to obtain information from EOFlow

12    unsuccessfully.  EOFlow says he was answering questions to

13    anyone who asked, and I think it was O'Connor who said that

14    there was a stunning resemblance to his product.  He was, of

15    course, referring to the exterior design, not the interior

16    configuration of the product.

17        According to EOFlow, that put Insulet on inquiry

18    notice, and, that, therefore, the relative time frame for

19    measuring delay begins in 2018.  I express no opinion about the

11:21AM 20    accrual of the statute of limitations.  That's not the issue

21    here.  The question is could Insulet at that point have filed

22    for preliminary injunction?  I think the answer to that is no.

23    What would it say?  This product looks like ours from the

24    outside and our former R & D head is working there?

25        That is certainly not enough to state a claim.  One

16

1    wonders what inquiry could it have undertaken?  The product was

2    not for sale, it was likely a prototype.  A prototype is very

3    different from a final product that's available for sale.

4           EOFlow says Insulet should have asked us questions.

5    It's hard to imagine that the likely response would have been,

6    we've taken your trade secrets, or we've hired Mr. Malave in

7    order to get your trade secrets from you, and for that reason,

8    I place very little weight, if any, on the trade show

9    disclosure.

11:22AM 10          I think events really begin at the end of March 2021.

11    There is an Insulet document.  I think it's Exhibit 22.  There

12    may be more than one Exhibit 22, but it's marked as Exhibit 22,

13    which was basically a technical analysis performed on what

14    appeared to be EOFlow's product.  It seems clear to me they did

15    not have a device.  It was not available for purchase for

16    another three days and then only in Korea, so it appears to

17    have been based on publicly-available information, whatever was

18    posted online or patent information.

19          It was focused on the actuator, which is different

11:23AM 20   from Insulet's actuator, but throughout the document, which

21    might be expected an examination of where EOFlow seemed to be

22    in terms of producing a product.

23          You see comments like it's at a very early stage,

24    there are manufacturing challenges, safety challenges, design

25    challenges, considerable capital to be required.  There's no

17

1    evidence of depth and customer care support, little development

2    beyond basic availability.  Scaling, manufacturing would

3    require a substantial investment and time-consuming automation

4    lasting more than a year.

5        There are things that EOFlow may struggle with,

6    assembly of the actuator will require manufacturing and

7    engineering innovations, and so on.

8        I think the bottom line at that point is Insulet was

9    skeptical that this was a real product that was anywhere near

11:24AM 10   to being placed on the market.  It was analyzing not the

11   product but really technical specifications from a distance,

12   that it was a long way from being any kind of meaningful

13   competitor, and, most importantly, there's nothing in the

14   document that suggests an awareness on even a suspicion that

15   Insulet's trade secrets were being used, and there's no real

16   reason for Insulet to have thought otherwise.

17       One of the affidavits, I think it's Mr. Benjamin's,

18   indicated that he learned that the R & D budget was on the

19   order of $10 to $15 million.  Insulet again says it spent more

11:25AM 20   than a billion dollars.  It says that Medtronic spent hundreds

21   of millions of dollars without success to develop a similar

22   product, and there's an exhibit, I think it's Exhibit 40, if

23   I'm reading my notes correctly, that in the second quarter of

24   2022, there were 350 users in Korea, and by the end of 2022,

25   only 1,000 users, all suggesting something that had progressed

18

 1   little beyond a prototype.

 2           Insulet, again, as would be expected, monitors the

 3   products of its competitors.  There are competitive

 4   intelligence reports and briefing talking about the design

 5   where Insulet thinks EOFlow is.  Again, the patch becomes

 6   available for purchase on March 29, 2021 only in Korea.

 7           Insulet says that they made efforts to obtain one

 8   unsuccessfully, that it had no connection to Korean suppliers

 9   or physicians.  EOFlow disputes that and said it would have

11:26AM 10   been easy to obtain one.  I think Insulet also has suggested it

11   may be unlawful to import the product.  I don't know whether

12   that's true or not, but, in any event, Insulet did not have a

13   physical copy of the product for at least another few months.

14           In December 2022, this is Exhibit 35, Insulet prepares

15   a competitive intelligence presentation.  It talks about

16   EOFlow, says that production is in the early stages with

17   multiple barriers to overcome, that it was an unproven product

18   in the marketplace, there were minimal sales in Korea and

19   Europe.

11:27AM 20           There is one line in that document that says, "The

21   drive and reservoir designs are taken from OPS, EOFlow employs

22   several ex-Insulet employees."  That is the first indication or

23   document that says that there was a suspicion of copying, at

24   least among the exhibits that I have seen.

25           And then three or four months later or so, Insulet

19

1    obtains a physical copy of the product or obtains the physical

2    product.  It inspects it in Acton, Massachusetts, and it

3    concludes that it has multiple features that were copied from

4    Insulet.

5            Alter that month, Insulet files a patent suit in

6    Germany.  It becomes aware that EOFlow is looking for a

7    partner.  There's a dispute about who instigated some very

8    preliminary communications between EOFlow and Insulet.  Insulet

9    says that EOFlow was looking to be acquired or looking for a

11:29AM 10    business deal with Insulet, not the other way around, but, in

11    any event, on May 25th, 2023, Medtronic announces an intent to

12    acquire EOFlow for $735 million, and this lawsuit is filed on

13    August 3rd.

14            According to Insulet, the critical date is May 25th,

15    2023, when Medtronic announced the acquisition.  It says that

16    at the time that deal was expected to close in October.

17    Medtronic was a source not only of capital funding but other

18    corporate support, regulatory expertise, manufacturing

19    expertise, customer service capability, and all the other

11:29AM 20    things that come with having a product of this nature on the

21    market.

22            EOFlow contends that the date, obviously, was much

23    earlier, but overall the picture I think is this, that EOFlow

24    had a product at the end of 2022 that was manufactured in very

25    small quantities, apparently to some extent by hand, that it

20

1   had many technical hurdles to overcome, particularly in

2   developing on a large scale, safely, reliably and cheap enough

3   to be disposable.

4          Again, this is not just any widget.  If it doesn't

5   work properly, it can cause injury or death.  Insulet believed

6   correctly, I think, that huge amounts of capital and a long

7   time would be required to achieve that, and certainly the

8   product had a number of resemblances to the Insulet product but

9   not until the February 2023 tear-down in Acton is it clear that

11:31AM 10   it's a copy in multiple critical respects.

11          Even then, without a source of funding and other

12   corporate support, it's unclear how imminent the threat was,

13   and the Medtronic purchase obviously crystallized that.  This

14   lawsuit was filed on August 18th, after at least a week or two

15   of meeting and conferring.

16          Even then in its initial iteration, much of it was

17   based on circumstantial evidence and reasonable inferences.

18   Discovery has since produced substantial evidence that trade

19   secrets were, in fact, misappropriated, but, as filed, the

11:31AM 20   lawsuit was based largely on circumstantial evidence.

21          Could the lawsuit have been filed more quickly?  Sure.

22   That's not really the standard, whether the lawyers should have

23   worked more weekends expediting the suit.  The question is is

24   there something about to happen, that is, something that is

25   immediate that would cause harm that is irreparable?

21

1        What is immediate or reasonably immediate is the

2   acquisition by Medtronic that would be a source of capital for

3   EOFlow, and, again, not just money but all the other things

4   that come with it, regulatory expertise, marketing expertise,

5   manufacturing expertise, customer support networks, the panoply

6   of things that are required to be a real competitor.

7        Put another way, that it's necessary to take a product

8   like this from the bit player or major competitor to go from

9   making devices by hand for the Korean market to being a

11:32AM 10   worldwide competitor.

11        Is that harm irreparable?  It would have a variety of

12   competitive impacts.  There's a great deal of case law to the

13   effect that losing market share and having your pricing

14   undercut by a competitor who did not have to spend the same

15   time and money on research and development is, in fact,

16   irreparable harm.

17        I note EOFlow argues that there's no real immediacy

18   and no likelihood of -- because there is no likelihood of near

19   term sales in the U.S., they haven't even applied for FDA

11:33AM 20   approval, but as Insulet pointed out, EOFlow is defectively

21   arguing both that the lawsuit was filed too late, and,

22   therefore, there's no immediate irreparable harm, but also that

23   it's filed too early because the product is not about to be

24   sold in the United States.

25        In any event, I find that the standard for immediate

22

 1    irreparable harm has been satisfied, that is, particularly so

 2    because the evidence of likely success on the merits is strong.

 3    There was a delay in filing the suit from either February to

 4    August or March to August.  It is not so undue in my opinion as

 5    to completely undercut the sense of urgency.

 6          Again, the harm is not a couple hundred sales, the

 7    harm is loss of significant market share and price

 8    undercutting, and there's no obvious unfairness, at least none

 9    that's been pointed out to me that I can see in the sense of a

11:34AM 10    laches-type defense that delay unfairly caused EOFlow to change

11    its position, so I find that the second category has been

12    satisfied.

13          The third category is balance of equities.  Here, it

14    favors the issuance of a preliminary injunction.  Again,

15    Insulet, according to the evidence, appears to have been a

16    victim of the theft of its trade secrets.  EOFlow is losing

17    potentially an opportunity to capitalize on that

18    misappropriation.

19          And as to the fourth category, the fourth factor,

11:34AM 20    public interest, I see little impact one way or the other, so,

21    in conclusion, I find that the four-part standard has been

22    satisfied under Rule 65(a) of the Federal Rules of Civil

23    Procedure.

24          I will preliminarily enjoin EOFlow essentially from

25    using or disclosing confidential information of Insulet, that

23

1   is, the actual wording of that I am still working on.  It's

2   going to issue today, but the thrust of it will be that they

3   are not to use the trade secrets defined as confidential

4   information which itself will be defined in its product, and I

5   will, as Insulet has requested, carve out the actuator process.

6          Like any preliminary injunction, there will be a

7   pending trial on the merits.  I'm not going to order a forensic

8   audit.  It may be sensible to do that, but they are complicated

9   and expensive, and I'm not going to put that in the preliminary

11:36AM 10   injunction order.  We can take that up in due course.

11          As you know, Rule 65(c) requires the posting of a bond

12   in an amount that the Court considers proper to pay any costs

13   or damages sustained by a party found to have been wrongly

14   enjoined.

15          EOFlow seeks security in the amount of $735 million,

16   which is the acquisition price.  That seems to me to be

17   obviously inflated.  If the PI is reversed, in other words, if

18   they were wrongly enjoined, EOFlow's value presumably remains

19   approximately the same.

11:36AM 20          The principal harm, as near as I can make out, is

21   legal fees on appeal.  If Medtronic decides to walk away

22   because it's concerned that EOFlow, in fact, did misappropriate

23   trade secrets, that's the way the cookie crumbles.  If

24   Medtronic decides to walk away for other reasons, the value of

25   EOFlow is certainly not zero, which is what the defense

24

1   requests.

2          So under the circumstances, I'm going to require the

3   posting of a bond in the amount of a million dollars, which I

4   think is proper to pay the reasonably likely costs and damages

5   sustained by EOFlow if they were wrongly enjoined, and, of

6   course, a preliminary injunction is an appealable order, and so

7   presumably if I am incorrect, it will not take several years to

8   reverse my ruling.

9          And I note, of course, that because this is a

11:37AM 10   preliminary injunction order, it can be modified.  I am

11   struggling a bit with the framing of it to make sure it's

12   neither over nor under-inclusive, but it can be modified in due

13   course.

14          I'm just going to touch on another couple of matters

15   and then ask counsel for questions, clarifications, or anything

16   else you want to add.

17          I want to convene a scheduling conference on fairly

18   short order to talk about further discovery and motion

19   practice.  Unless someone talks me out of it, I think it makes

11:38AM 20   sense to sever the patent claims, possibly even stay them.

21          As you know, litigating patent cases is complex with

22   claim construction proceedings and all the rest of it.  I think

23   the immediate focus ought to be on the trade secrets claim and

24   related matters.

25          If it's a trade secrets only case, I think we could

25

1   find a way to have a reasonably expedited trial in let's say

2   the late winter or early spring of next year is probably a

3   realistic date, depending on the length of the trial, but I

4   don't see that we can do things quite so fast if the patent

5   claims are included.

6           And, again, the specific form of the order will await

7   further tinkering and wordsmithing for me, but it will issue

8   today, and, again, I will require that a one million dollar

9   bond be posted as a condition of enforcing the preliminary

11:39AM 10   injunction.

11           All right.  That was a lot delivered at high speed,

12   and it's something of a monotone.  Let me pause.  Mr. Carroll,

13   anything from you?

14           MR. CARROLL:  Just a couple on the scope of the order,

15   your Honor.

16           THE COURT:  Yes.

17           MR. CARROLL:  I won't belabor the point, but we

18   believe that we tried in our proposed narrowed injunction and

19   our supplemental briefing to make it more narrowly tailored to

11:40AM 20   just those components sort of downstream from the actuator.  I

21   will say we said in our briefing, but I think in fairness, the

22   uncertainties -- we think that the misappropriation was

23   substantial and uncontrolled, and we feel to the extent there

24   is uncertainty about the scope of the injunction, and we've

25   cited this on page 38 of our brief, this is from the

26

1    restatement of unfair competition, uncertainties regarding the

2    scope of injunctive relief are typically resolved against the

3    wrongdoer, and we believe that our proposed injunction fairly

4    embodies that.

5          THE COURT:  And I think that's the correct principle.

6    Again, but as we get further into the case, I mean, already

7    we've learned a lot since the case was filed.  I would imagine

8    there will be more to be learned, and it may be that the PI

9    needs to be modified because things were reverse engineered or

11:41AM 10    didn't involve -- this is preliminary.

11          MR. CARROLL:  Understood, your Honor.  Another

12    technical question about the bond.

13          THE COURT:  Yes.

14          MR. CARROLL:  We had put in our proposed order that

15    the bond should be posted within seven days.  I'm not sure that

16    we need actually that much time, but we would ask for a little

17    bit of time.  I'm not sure we can do it immediately today.

18          THE COURT:  Yes.  I think that's reasonable under the

19    circumstances.  And I should add, part of the calculus from my

11:41AM 20    standpoint is if, in fact, charges or harm flows from an

21    improperly-issued injunction, Insulet is not a small company,

22    and it might have other resources from which damages could be

23    paid if it comes to that.

24          MR. CARROLL:  I think that's fair, your Honor.  And,

25    you know, finally, just on the schedule, we think that -- I

27

1    guess I don't have an answer on our position on the sever or

2    stay of patent claims, but the Court's suggestion of, you know,

3    trial, which I take to be late 2024 or early '25.

4          THE COURT:  No, I was thinking trial in early '24 on

5    trade secrets only meaning, there may be satellite claims.

6          MR. CARROLL:  To be sure, that would be a fast

7    schedule, but I think we can confer about it and put together a

8    joint --

9          THE COURT:  My plan is not to make your lives

11:42AM 10   miserable, but, you know, as with any dispute like this, the

11   faster it's resolved, the better.  I have other things on my

12   plate, God knows, but I'm throwing it out as an idea, and I

13   don't think that's doable if the patent claims are intertwined

14   with that, there's just too much to do.

15         MR. CARROLL:  Understood, your Honor.  So I would

16   propose that we confer with the defendants because we have two

17   sets of defendants and make a proposal to the Court.

18         THE COURT:  Of course, another issue, I suppose, is it

19   only against EOFlow?  What about Flex and the individual

11:43AM 20   defendants and the rest of it?  I can't make that decision now.

21   The more streamlined this is, the more we get to the core of

22   your claims, the faster we can get this resolved.

23         MR. CARROLL:  Understood, your Honor.  And just to let

24   the Court know, we may be adding Mr. Strand as a defendant, but

25   I don't think that would unduly broaden the scope of what the

28

1    Court is talking about.

2         THE COURT:  All right.

3         MR. CARROLL:  Thank you.

4         THE COURT:  Mr. Weinreb.

5         MR. WEINREB:  Your Honor, just two quick requests.

6    First, we had understood the Court to be suggesting a trial

7    either in early 2024 --

8         THE COURT:  Yes.

9         MR. WEINREB:  Not 2025?

11:43AM 10         THE COURT:  Yes.  When you get old, it's hard to

11    remember things like what year is it, the idea being that could

12    we do all this in six months, and, you know, be ready for

13    trial?

14         And, look, I was a partner in a big firm.  Believe me,

15    I know both the resources you have and also the challenges you

16    face, okay, and it's easier for me to say, oh, just get this

17    all done and streamline it, but I do think it makes sense.  I

18    mean, it may be that, you know, what I am doing here certainly

19    puts EOFlow's future on hold, and I think it's fair to have

11:44AM 20    that resolved if not by the Court of Appeals then, you know, a

21    trial on the merits.  I don't want to do that so quickly that

22    it's unfair, but I don't want to have the usual three-year

23    cycle either, I guess is the point that I'm just expressing

24    preliminary thoughts here.

25         MR. WEINREB:  I just wanted to clarify what year it

29

1        was.

2                THE COURT:  Yes.

3                MR. WEINREB:  The second thing is --

4                THE COURT:  March, April, May is probably the

5        realistic time frame I'm talking about.

6                MR. WEINREB:  Okay.  With respect to the scope of the

7        order, I understand the Court is still working on it.  This is

8        a case, you know, a matter where in some respects from the

9        perspective of the EOFlow defendants, the devil is going to be

11:45AM 10       in the details of how that order is written.

11               THE COURT:  Yes.

12               MR. WEINREB:  So we'd request if the Court is open to

13       it that if we have an opportunity to take a look at the -- that

14       the Court issue a proposed order and we have perhaps overnight

15       to look at it and submit any suggested changes to it by some

16       date and time certain tomorrow so that we're not in a position

17       of having to actually file a motion to modify the PI for what

18       might potentially be some minor adjustments, and then, of

19       course --

11:46AM 20               THE COURT:  I asked for, you know, minor supplemental

21       filings.

22               MR. WEINREB:  This wouldn't be -- we wouldn't be

23       looking at, you know, big arguments really, it would just be

24       proposed changes --

25               THE COURT:  So what's your thought on that?  I would

30

1  require you to, I guess, extend the TRO?

2      MR. CARROLL:  That's what I was going to say.  We

3  don't think that's necessary.  We both briefed this and put in

4  proposed orders, so I think the parties' positions are clear.

5  If we do do that, we'd like an opportunity to respond, not to

6  make it simultaneous filings, and, of course, the TRO would

7  have to be extended for enough time for the Court to consider.

8      THE COURT:  Why don't we do this.  I will extend the

9  TRO until Friday.  I will issue a proposed form of preliminary

11:46AM 10  injunction to which EOFlow can respond by let's say mid-day

11  tomorrow and then you can respond by let's say Friday morning

12  and then whatever form it will issue will be Friday afternoon.

13  Okay.  Will that work?

14      MR. CARROLL:  Yes, your Honor.

15      MR. WEINREB:  Yes, your Honor.

16      THE COURT:  All right.  I think it's a fair comment to

17  at least give you a chance to point out my screw-ups before

18  they become effective, and it's without prejudice to later

19  modifying it as circumstances may change.

11:47AM 20      Again, Mr. Weinreb, I think -- well, there is a point

21  here is that this -- at some point, it becomes a soup where

22  it's hard to, you know, break out the individual agreements,

23  and it's all put together, and the case law is that the

24  wrongdoer, you know, has to demonstrate at some point, you

25  know, why what he did was, in fact, not wrongful conduct, I

31

1   guess, I'll put it that way, but we can take that up in due

2   course.

3          All right.  Matt, I am out next week.  I'm going to

4   call a Rule 16 scheduling conference for the week after.

5          THE CLERK:  How about Monday the 16th at 12:00?

6          THE COURT:  Monday, the 16th at 12:00 noon.  Does that

7   work?

8          MR. CARROLL:  That works for the plaintiffs, your

9   Honor.

11:48AM 10   MR. WEINREB:  It works for the defendants, your Honor.

11          THE COURT:  Okay.  I have no idea where we are on

12   initial disclosures, but I would expect to say if they haven't

13   been completed already, they should be completed by some

14   reasonable time going forward.  What I'm really looking for is

15   a schedule.  The actual expected trial date will depend on a

16   couple of things, most notably my own schedule and how long we

17   think this case will take to try.

18          At the risk of telling you what you already know, it's

19   a lot easier to find one week than two, two weeks than three

11:49AM 20   and so on, but I do think we ought to try to pick a date and

21   block it off.

22          MR. WEINREB:  Your Honor, in calculating the trial,

23   should we assume half days or full days?

24          THE COURT:  My trial schedule is 9 to 1, but as I like

25   to say, it's a Rya Zobel 9 to 1, which is I meet with the

32

1   parties at 8:00 or 8:30 in the morning in order to talk about

2   issues and avoid sidebars.  I want the witness in the box and

3   questions being asked at 9-0-0 with a stand up and stretch at

4   ten, stand up and stretch at noon and go to one.

5          I will do afternoon sessions as necessary.  For what

6   it's worth, in my experience as both a lawyer and a judge, the

7   case moves at exactly the same speed if we are disciplined

8   about it, and among the many advantages for you, the lawyer,

9   are you have time to think at the end of the day, and that

11:50AM 10   makes your presentations crisper, people start jettisoning

11   evidence if they think a point has been proved appropriately

12   and all the rest of it, so, yes, it will be a 9 to 1 schedule,

13   and, you know, we can work on the details later.  I think if

14   we're going to do this, I need to block off the time.

15          People are going to have other commitments, maybe you

16   have them already.  I will probably block out April school

17   vacation week in Massachusetts because it may affect lawyers or

18   witnesses, but it certainly affects jurors, it makes it harder

19   to impanel because people are doing whatever they're doing, but

11:51AM 20   we can also have a discontinuous trial period, if necessary.

21          And, of course, if this is a mix of legal and

22   equitable claims, we need to think about how we're going to do

23   that as well, but all that's in the future.  Right now, let's

24   just set a timetable, discovery, motion practice, something

25   that expedites this within reason recognizing that, you know,

33

1    typically you can do 90 percent of the work in about 10 percent

2    of the time.  It's the maddening details that take all the

3    time, making sure you've produced everything and all that.  All

4    right.  Anything else, Mr. Weinreb?

5            MR. WEINREB:  Not from us, your Honor.

6            THE COURT:  I should say, again, our normal Rule 16

7    process is a joint proposal.  If can do a joint proposal,

8    that's great, if you can't, you can do individual ones or

9    better yet one document with the different proposals

11:52AM 10   side-by-side.

11           THE CLERK:  In person, by video?

12           THE COURT:  Let's do it in person.   This proceeding

13   is not sealed, today's proceeding is not.  For those of you

14   with travel schedules, I will permit hybrid appearances, just

15   make sure Mr. McKillop knows that.  For what it's worth, it

16   makes absolutely no difference to me if you are communicating

17   to me, whether arguing the motion or otherwise, whether you're

18   on video or otherwise.  Don't worry about that.  If you're in

19   San Jose', if you want to appear by video, that's fine with me,

11:53AM 20   it makes no difference to me.

21           All right.  I will issue today a brief extension of

22   the TRO and a proposed form of preliminary injunction, and we

23   will reconvene on Monday, October the 16th at 12:00 noon for

24   the scheduling conference.

25           THE CLERK:  All rise.

Appx33

34

1          (Whereupon, the hearing was adjourned at 11:52 a.m.)

2

3               C E R T I F I C A T E

4

5   UNITED STATES DISTRICT COURT )

6   DISTRICT OF MASSACHUSETTS ) ss.

7   CITY OF BOSTON )

8          I do hereby certify that the foregoing transcript,

9   Pages 1 through 34 inclusive, was recorded by me

10  stenographically at the time and place aforesaid in Civil

11  Action No. 23-11780-FDS, INSULET CORPORATION vs. EOFLOW CO.,

12  LTD., et al. and thereafter by me reduced to typewriting and is

13  a true and accurate record of the proceedings.

14          Dated October 5, 2023.

15                    s/s Valerie A. O'Hara

16                    _____

17                    VALERIE A. O'HARA
                       OFFICIAL COURT REPORTER
18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **INSULET CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **23-11780-FDS** |
| **EOFLOW CO., LTD.; EOFLOW, INC.;** ) | |
| **FLEX, LTD.; FLEXTRONICS** ) | |
| **CORPORATION; FLEXTRONICS** ) | |
| **MEDICAL SALES AND MARKETING,** ) | |
| **LTD.; LUIS J. MALAVE; STEVEN** ) | |
| **DIIANNI; and IAN G. WELSFORD,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PRELIMINARY INJUNCTION

**SAYLOR, C.J.**

After a hearing, and after careful consideration of the pleadings and record evidence, for good cause shown, and pursuant to Fed. R. Civ. P. 65, the Court hereby preliminarily enjoins defendants EOFlow Co., Ltd. and EOFlow, Inc., (collectively, "EOFlow"), pending trial on the merits in this action, as follows:

1.  EOFlow is hereby restrained from manufacturing, marketing, or selling any product that was designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet Corporation ("Insulet"), as defined in this Order.

2.  EOFlow is hereby restrained from disclosing any Trade Secrets of Insulet, as defined in this Order, to any third party, except as may be reasonably necessary for purposes of conducting this litigation, and in accordance with any applicable protective order

of this Court.

3.  For purposes of this Order, the term "Trade Secrets" shall mean any and all Confidential Information of Insulet, as defined in this Order, (a) that was copied, downloaded, removed, or otherwise taken from Insulet by Luis J. Malave, Steven DiIanni, Ian Welsford, or Robert Strand, or any other present or former employee or agent of Insulet, or (b) any information that contains, derives from, or incorporates such Confidential Information.

4.  For purposes of this Order, the term "Confidential Information" shall mean (a) any and all information or materials that were marked "confidential" by Insulet and (b) any and all CAD files, drawings, or specifications created by Insulet, whether or not they were marked "confidential."

5.  This Order shall specifically apply to the following items relating to EOPatch version 2, among others, to the extent that the Trade Secrets of Insulet were used in their design, development, or creation:

    (a) design drawings and specifications for each physical component and subassembly;

    (b) manufacturing and quality-control instructions for each component and subassembly;

    (c) revision histories and failure modes for each component design;

    (d) bills of materials and lists of vendor pricing and capabilities for sourcing of components and raw materials;

    (e) process-validation procedures;

    (f) specifications for device software, including but not limited to the occlusion

2

detection algorithm; and

    (g) Failure Modes Effects Analyses and Safety Assurance Case.

6.    The foregoing restrictions do not apply to (a) any product, manufacturing, or technical information relating to the operation of EOFlow's electric osmotic actuator or (b) any aspect of the EOPatch version 2 that was designed before August 1, 2017; provided, however, that such information does not contain, derive from, or incorporate any Trade Secrets of Insulet.

7.    EOFlow shall preserve all Confidential Information of Insulet located on any EOFlow computer system and any computer systems maintained or possessed by Luis Malave, Steven DiIanni, Ian Welsford, or Robert Strand to which EOFlow has reasonable access.

8.    Pursuant to Fed. R. Civ. P. 65(d)(2), the restrictions set forth in paragraph 1 apply to any officers, agents, servants, employees, or attorneys of EOFlow, as well as any other persons who are in active concert or participation with any of them.

9.    Within seven days of issuance of this order, Insulet shall post a bond in the amount of $1,000,000.

**So Ordered.**

                        /s/ F. Dennis Saylor IV
                        F. Dennis Saylor IV
                        Chief Judge, United States District Court

Dated:  October 6, 2023, at 10:40 a.m., in Boston, Massachusetts

Appx37

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **INSULET CORPORATION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **23-11780-FDS** |
| **EOFLOW CO., LTD.; EOFLOW, INC.;** ) | |
| **FLEX, LTD.; FLEXTRONICS** ) | |
| **CORPORATION; FLEXTRONICS** ) | |
| **MEDICAL SALES AND MARKETING,** ) | |
| **LTD.; LUIS J. MALAVE; STEVEN** ) | |
| **DIIANNI; and IAN G. WELSFORD,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**<u>AMENDED PRELIMINARY INJUNCTION</u>**

**SAYLOR, C.J.**

After a hearing, and after careful consideration of the pleadings and record evidence, for

good cause shown, and pursuant to Fed. R. Civ. P. 65, the Court hereby preliminarily enjoins

defendants EOFlow Co., Ltd. and EOFlow, Inc., (collectively, "EOFlow"), pending trial on the

merits in this action, as follows:

1. EOFlow is hereby restrained from manufacturing, marketing, or selling any product

   that was designed, developed, or manufactured, in whole or in part, using or relying

   on the Trade Secrets of Insulet Corporation ("Insulet"), as defined in this Order.

2. EOFlow is hereby restrained from disclosing any Trade Secrets of Insulet, as defined

   in this Order, to any third party, except as may be reasonably necessary for purposes

   of conducting this litigation, and in accordance with any applicable protective order

of this Court.

3.  For purposes of this Order, the term "Trade Secrets" shall mean any and all
    Confidential Information of Insulet, as defined in this Order, (a) that was copied,
    downloaded, removed, or otherwise taken from Insulet by Luis J. Malave, Steven
    DiIanni, Ian Welsford, or Robert Strand, or any other present or former employee or
    agent of Insulet, or (b) any information that contains, derives from, or incorporates
    such Confidential Information.

4.  For purposes of this Order, the term "Confidential Information" shall mean (a) any
    and all information or materials that were marked "confidential" by Insulet and (b)
    any and all CAD files, drawings, or specifications created by Insulet, whether or not
    they were marked "confidential."

5.  This Order shall specifically apply to the following items relating to EOPatch
    version 2, among others, to the extent that the Trade Secrets of Insulet were used in
    their design, development, or creation:

    (a) design drawings and specifications for each physical component and
        subassembly;

    (b) manufacturing and quality-control instructions for each component and
        subassembly;

    (c) revision histories and failure modes for each component design;

    (d) bills of materials and lists of vendor pricing and capabilities for sourcing of
        components and raw materials;

    (e) process-validation procedures;

    (f) specifications for device software, including but not limited to the occlusion

2

Appx39

detection algorithm; and

(g) Failure Modes Effects Analyses and Safety Assurance Case.

6.    The foregoing restrictions do not apply to (a) any product, manufacturing, or technical information relating to the operation of EOFlow's electric osmotic actuator or (b) any aspect of the EOPatch version 2 that was designed before August 1, 2017; provided, however, that such information does not contain, derive from, or incorporate any Trade Secrets of Insulet.

7.    EOFlow shall preserve all Confidential Information of Insulet located on any EOFlow computer system and any computer systems maintained or possessed by Luis Malave, Steven DiIanni, Ian Welsford, or Robert Strand to which EOFlow has reasonable access.

8.    Pursuant to Fed. R. Civ. P. 65(d)(2), the restrictions set forth in paragraph 1 apply to any officers, agents, servants, employees, or attorneys of EOFlow, as well as any other persons who are in active concert or participation with any of them.

9.    Within seven days of issuance of this Order, Insulet shall post a bond in the amount of $1,000,000.

10.   Notwithstanding the foregoing, Paragraph 1 of this Order shall not apply to the manufacture, sale, or distribution in the Republic of Korea of EOFlow products designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet; provided, however, that EOFlow (a) may not export such products from the Republic of Korea and (b) may not market or promote such products to prospective or new patients in the Republic of Korea or elsewhere.

11.   Notwithstanding the foregoing, and in order to provide a reasonable period of

transition for existing patients, Paragraph 1 of this Order shall not apply to the sale or distribution of EOFlow products designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet to patients residing in the European Union who were using such products as of October 6, 2023, pursuant to a written prescription or other written order from a physician or other licensed health-care provider. This exception to Paragraph 1 shall expire on May 1, 2024, unless extended by the Court.

12. Notwithstanding the foregoing, Paragraph 1 of this Order shall not apply to distribution or use of EOFlow products designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet, in clinical trials taking place in the United Arab Emirates that began on or before October 5, 2023, in order to permit the completion of such clinical trials, and not for any other purpose.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated: October 24, 2023, at 5:40 p.m., in Boston, Massachusetts

4

Appx41

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1137

**Short Case Caption:** Insulet Corp. v. Eoflow, Co. Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,613 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/04/2023

Signature: /s/ Adam S. Gershenson

Name: Adam S. Gershenson

Save for Filing