# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————

INSULET CORPORATION,

*Plaintiff-Appellee,*

**v.**

EOFLOW CO., LTD., EOFLOW, INC.,

*Defendants-Appellants,*

STEVEN DIIANNI, LUIS J. MALAVE, IAN G. WELSFORD, JESSE J. KIM, FLEXTRONICS MEDICAL SALES AND MARKETING LTD.,

*Defendants.*

———————————

On Appeal from an Interlocutory Order of the United States District Court for the District of Massachusetts (No. 23-cv-11780) (Saylor, C.J.)

———————————

## APPELLEE'S PRINCIPAL BRIEF

———————————

William M. Jay
Jenny J. Zhang
Matthew Ginther
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000

Alexandra D. Valenti
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7351

Robert D. Carroll
Robert Frederickson III
Gerard J. Cedrone
William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

February 6, 2024

*Counsel for Insulet Corporation*

# CERTIFICATE OF INTEREST

Counsel for Appellee certifies the following:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Insulet Corporation

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None/Not Applicable

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

   None/Not Applicable

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   *Goodwin Procter LLP:* Scott T. Bluni, Timothy Keegan, James Breen

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   No

**6.**     **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

February 6, 2024                    /s/ *Robert D. Carroll*

# TABLE OF CONTENTS

Introduction ................................................................. 1

Statement of the Issues on Appeal .............................. 3

Statement of the Case ................................................. 4

    I.   Factual Background ............................................. 4

        A.  Insulet overcomes substantial technical challenges to pioneer a revolutionary insulin patch pump. ......................... 4

        B.  After struggling to develop a marketable patch pump, EOFlow turns to former Insulet officers. .............................. 7

        C.  EOFlow redesigns its failing product using Insulet's trade secrets. ............................................................... 9

        D.  From 2018 to 2022, Insulet representatives evaluate EOFlow's product, to the extent possible, based on public information. ................................................. 14

        E.  Insulet immediately takes action after obtaining a sample of the EOPatch 2 and learning of EOFlow's theft. ............................................................. 16

    II.  Procedural History ............................................ 17

        A.  Insulet sues and seeks a TRO and preliminary injunction in light of Medtronic's impending acquisition of EOFlow. ............................................................ 17

        B.  The district court grants a preliminary injunction. ............. 18

        C.  The district court modifies the injunction at EOFlow's request. ............................................................. 23

Summary of the Argument ........................................ 25

Standard of Review ................................................... 29

Argument .................................................................. 30

    I.   The district court did not clearly err in finding that Insulet is likely to succeed on the merits. ............... 30

A.  The district court properly rejected EOFlow's statute-of-limitations defense at this stage...........................................31

    1.  Insulet brought its misappropriation claim within the DTSA's three-year limitations period.....................31

    2.  The district court's ruling adequately addressed the timeliness of Insulet's claims. ........................................35

B.  The district court properly found that EOFlow misappropriated Insulet's trade secrets. ..............................37

C.  The district court properly found that Insulet's trade secrets are entitled to protection under the DTSA. .............41

    1.  EOFlow stole at least eight categories of paradigmatic trade secrets..............................................41

    2.  The district court did not clearly err in finding that Insulet took reasonable measures to protect its trade secrets. ..............................................................43

    3.  The district court properly rejected EOFlow's arguments about reverse engineering. ...........................47

    4.  EOFlow's remaining arguments fail to identify any error. ...............................................................52

II.  The district court did not clearly err in finding that Insulet faces imminent irreparable harm from EOFlow's actions...........56

A.  Insulet faces imminent irreparable harm absent an injunction. ...........................................................57

B.  EOFlow identifies no valid basis to second-guess the district court's assessment of harm. ....................................61

    1.  Insulet sought a preliminary injunction in a timely fashion. ...........................................................61

    2.  The types of harm that Insulet faces qualify as immediate and irreparable. .........................................63

III.  The district court did not abuse its discretion in finding that the balance of equities and public interest support an injunction. .....................................................................66

A.   The equities support the injunction. ..................................... 66

B.   The public interest supports the injunction. ........................ 70

Conclusion ............................................................................... 72

# TABLE OF AUTHORITIES

**Cases:**

*Abbott Labs. v. Andrx Pharm., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) .......................................... 64

*Abbott Labs. v. Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008) .................................. 60, 63, 67, 68, 69

*Alamar Biosciences, Inc. v. Difco Labs., Inc.*,
No. 94-cv-1856, 1995 WL 912345 (E.D. Cal. Oct. 13, 1995).............. 44

*Allstate Ins. Co. v. Fougere*,
79 F.4th 172 (1st Cir. 2023).............................43, 45, 47, 52, 53, 54, 55

*Am. Cyanamid Co. v. Capuano*,
381 F.3d 6 (1st Cir. 2004) .................................................... 34

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017) .......................................... 72

*AnywhereCommerce, Inc. v. Ingenico Inc.*,
No. 1:19-cv-11457, 2023 WL 2694043 (D. Mass. Mar. 29,
2023)........................................................................ 33

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) .......................................... 64

*Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*,
No. 8:13-cv-1880, 2018 WL 4697255 (C.D. Cal. Aug. 3,
2018)........................................................................ 49

*Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys.*,
132 F.3d 701 (Fed. Cir. 1997) ............................................ 70

*BlephEx, LLC v. Myco Indus., Inc.*,
24 F.4th 1391 (Fed. Cir. 2022).......................................... 65

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989).......................................................... 50

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*,
  996 F.3d 37 (1st Cir. 2021) ................................................................ 68

*Bourne Co. v. Tower Recs., Inc.*,
  976 F.2d 99 (2d Cir. 1992) ................................................................ 64

*Bridgeview Bank Grp. v. Meyer*,
  49 N.E.3d 916 (Ill. App. 2016) ........................................................ 65

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ................................................................ 66

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .......................................................... 60

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
  920 F.3d 560 (8th Cir. 2019) ............................................................ 33

*Corp. Techs., Inc. v. Harnett*,
  731 F.3d 6 (1st Cir. 2013) .................................................... 3, 29, 30

*EEOC v. Astra U.S.A., Inc.*,
  94 F.3d 738 (1st Cir. 1996) .............................................................. 60

*Fritz v. Arthur D. Little, Inc.*,
  944 F. Supp. 95 (D. Mass. 1996) ...................................................... 64

*Graphic Controls Corp. v. Utah Med. Prod., Inc.*,
  149 F.3d 1382 (Fed. Cir. 1998) ........................................................ 55

*Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.*,
  24 F. Supp. 2d 120 (D. Mass. 1998) ................................................ 70

*HiRel Connectors, Inc. v. United States*,
  No. 01-cv-11069, 2005 WL 4958547 (C.D. Cal. Jan. 4, 2005) ................................................................................................ 44

*ICU Med. Inc. v. Alaris Med. Sys., Inc.*,
  No. 04-cv-689, 2004 WL 1874992 (C.D. Cal. July 30, 2004) ............. 72

*IDX Sys. Corp. v. Epic Sys. Corp.*,
    285 F.3d 581 (7th Cir. 2002) ............................................ 54

*JL Powell Clothing LLC v. Powell*,
    590 F. App'x 3 (1st Cir. 2014) ......................................... 37

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) ........................................... 69

*Kewanee Oil Co. v. Bicron Corp.*,
    416 U.S. 470 (1974) ........................................................ 50

*Knights Armament Co. v. Optical Sys. Tech., Inc.*,
    654 F.3d 1179 (11th Cir. 2011) ....................................... 33

*Life Spine, Inc. v. Aegis Spine, Inc.*,
    8 F.4th 531 (7th Cir. 2021) ...................................... 48, 49

*Macchione v. Coordinator Adm'r*,
    591 F. App'x 48 (3d Cir. 2014) ....................................... 66

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*,
    No. 08-cv-788, 2008 WL 11338115 (C.D. Cal. May 14,
    2008) ................................................................................ 72

*Metalcraft of Mayville, Inc. v. Toro Co.*,
    848 F.3d 1358 (Fed. Cir. 2017) ...................................... 29

*MGA Entertainment, Inc. v. Mattel, Inc.*,
    41 Cal. App. 5th 554 (2019) ............................................ 34

*Norman v. Elkin*,
    860 F.3d 111 (3d Cir. 2017) ........................................... 33

*Oakwood Labs. LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021) ........................................... 42

*Oxford Immunotec Ltd. v. Qiagen, Inc.*,
    271 F. Supp. 3d 358 (D. Mass. 2017) ............................. 64

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
    764 F. App'x 273 (3d Cir. 2019) ..................................... 38

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ........................................... 70

*Pie Dev., LLC v. Pie Ins. Holdings, Inc.*,
    No. 21-60593, 2023 WL 2707184 (5th Cir. Mar. 30, 2023) ............... 44

*RE/MAX of New England, Inc. v. Prestige Real Est., Inc.*,
    No. 14-cv-12121, 2014 WL 3058295 (D. Mass. July 7,
    2014) ........................................................................ 70

*Respect Maine PAC v. McKee*,
    622 F.3d 13 (1st Cir. 2010) ................................................. 68

*Roton Barrier, Inc. v. Stanley Works*,
    79 F.3d 1112 (Fed. Cir. 1996) .............................................. 42

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ............................................ 69

*SEC v. Fife*,
    311 F.3d 1 (1st Cir. 2002) ................................................... 37

*Seijas v. Republic of Argentina*,
    352 F. App'x 519 (2d Cir. 2009) ........................................... 37

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) ............................................ 40

*TEC Eng'g Corp. v. Budget Molders Supply, Inc.*,
    82 F.3d 542 (1st Cir. 1996) ................................................. 37

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*,
    966 F.3d 46 (1st Cir. 2020) ................................................. 54

*United States v. Booz Allen Hamilton Inc.*,
    No. 22-cv-1603, 2022 WL 16553230 (D. Md. Oct. 31, 2022) ............. 64

*United States v. Sing*,
    No. 14-cr-212, 2016 WL 54906 (C.D. Cal. Jan. 4, 2016),
    *aff'd*, 736 F. App'x 184 (9th Cir. 2018) .................................... 49

*UPI Semiconductor Corp. v. ITC,*
   767 F.3d 1372 (Fed. Cir. 2014) ......................................................... 48

*Vaquería Tres Monjitas, Inc. v. Irizarry,*
   587 F.3d 464 (1st Cir. 2009) ............................................................. 67

*Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.,*
   984 F.2d 113 (4th Cir. 1993)............................................................. 70

*Walker Mfg., Inc. v. Hoffmann, Inc.,*
   261 F. Supp. 2d 1054 (N.D. Iowa 2003)............................................. 48

## Statutes:

18 U.S.C. §1836(d)................................................................... 25, 31

18 U.S.C. §1839(3)........................................................... 27, 41, 42, 43

18 U.S.C. §1839(3)(B) ............................................................ 27, 48, 50

18 U.S.C. §1839(6)(B) ................................................................. 27, 48

## Rules:

Fed. R. Civ. P. 65(d)(1)(A) ................................................................53

Fed. R. Civ. P. 65(d)(1)(B) ................................................................53

Fed. R. Civ. P. 65(d)(1)(C) ................................................................53

## Treatises:

Restatement (Third) of Unfair Competition §35 (1995) .........................55

Restatement (Third) of Unfair Competition §39 cmt. f..........................48

# GLOSSARY

ADA .................. American Diabetes Association

CAD .................. computer-aided design

DTSA ................ Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 130 Stat. 376 (codified at scattered provisions of Title 18, U.S. Code)

FMEA................ failure modes and effects analysis

EOFlow ............. Defendants EOFlow Co., Ltd., and EOFlow, Inc.

Insulet............... Plaintiff Insulet Corporation

## STATEMENT OF RELATED CASES

No other appeal from the same underlying proceeding was previously before this or any other appellate court.

No case will directly affect or be directly affected by this Court's decision in the pending case.

# INTRODUCTION

This is a case of brazen trade-secret misappropriation. Insulet's compact, wearable Omnipod device has revolutionized insulin delivery for patients with Type 1 diabetes, who previously needed to self-administer multiple shots per day or carry bulky tubed pumps. To achieve that breakthrough, Insulet invested significant resources and overcame numerous technical hurdles. Unable to match Insulet's efforts, EOFlow resorted to theft, enlisting several former Insulet employees who stole a swath of Insulet's confidential documents and using that information to develop a copycat device. After reviewing extensive evidence of EOFlow's wrongdoing, the district court enjoined EOFlow from using Insulet's trade secrets pending trial—but allowed EOFlow to continue selling its pirated product to existing patients. The record at this stage fully supported that order, and this Court should affirm it.

The district court found "strong evidence that Insulet is likely to succeed on the merits of its trade secrets claim." Appx11. The record contains proof that the individual defendants improperly retained "hundreds, if not more, of Insulet's confidential documents," and that EOFlow "knowingly" used that material to develop its imitation product. Appx5;

Appx11-12. Without an injunction, Insulet faced imminent and irreparable harm: EOFlow was poised to cash in on its theft by selling Insulet's secrets to the highest bidder and squeezing Insulet's market share. On balance, the district court explained, those facts favored an injunction. The only thing EOFlow loses is "an opportunity to capitalize on [its] misappropriation." Appx22.

EOFlow identifies no abuse of discretion. Its lead argument—with respect to both likelihood of success and irreparable harm—is that Insulet waited too long to take action. EOFlow argues that Insulet representatives should have suspected misappropriation when they saw an opaque prototype of EOFlow's device beneath a glass display case at a 2018 trade show. But all Insulet learned at the trade show was that EOFlow had employed an Insulet alumnus and developed a sample product with a similar size and color to the Omnipod. As the district court found, that was not enough to give notice of EOFlow's misappropriation.

EOFlow's remaining arguments likewise fail. EOFlow argues that it did not actually steal Insulet's trade secrets, or that those trade secrets are not legally protected, but those contentions fly in the face of the evidence and well-settled case law. The record shows that EOFlow

"knowingly" used at least eight discrete categories of protected information—including technical product specifications, manufacturing protocols, and testing procedures—to develop its product. Appx11. EOFlow also says that any harm to Insulet is not immediate or irreparable enough to warrant an injunction. But the district court correctly concluded that, left unchecked, EOFlow's unlawful conduct would undercut Insulet's business in ways that money damages cannot undo.

This Court must affirm the district court's preliminary injunction unless it identifies an abuse of discretion—*e.g.*, a "material error of law" or a "serious mistake in weighing the relevant factors." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (brackets omitted). EOFlow has not identified any such abuse.

## STATEMENT OF THE ISSUES ON APPEAL

1. Whether the district court clearly erred in finding that Insulet is likely to succeed on the merits of its claim for trade-secret misappropriation in light of substantial evidence that EOFlow knowingly used Insulet's stolen trade secrets to develop a competing product.

2. Whether the district court clearly erred in finding that, absent an injunction, Insulet faces imminent irreparable harm from EOFlow's

efforts to commercialize its pirated product and disclose Insulet's secrets to third parties.

3. Whether the district court abused its discretion in determining that the balance of equities and public interest support a limited injunction pending trial.

## STATEMENT OF THE CASE

## I. Factual Background

### A. Insulet overcomes substantial technical challenges to pioneer a revolutionary insulin patch pump.

Type 1 diabetes is a chronic condition in which the pancreas fails to produce insulin, a vital hormone that regulates blood sugar. Individuals with this condition require routine insulin administration to survive, either by self-administering multiple shots per day or by using a pump device for continuous delivery. Appx190 (¶6).

Healthcare professionals generally agree that pump devices are clinically superior. Appx190 (¶7). But traditional pumps have significant drawbacks: patients must carry the bulky device on their person (with up to several feet of external tubing) and must manually insert the device's cannula—*i.e.*, its tube—using a relatively large and painful needle. Appx190-191.

Insulet pioneered a solution to these problems. Founded in 2000 by a father seeking a better treatment alternative for his young son with diabetes, Appx190 (¶6), Insulet developed the world's first disposable, adhesive insulin "patch pump." Known as the Omnipod, Insulet's insulin-delivery device is a small, lightweight "pod" that the user fills with insulin and wears directly on the body via an adhesive patch for up to three days:



Appx98; *see* Appx191. Unlike conventional insulin pumps, the Omnipod does not require tubing or separate batteries, and it features automated and virtually pain-free cannula insertion. Appx191 (¶8). Today, the Omnipod is available in 24 countries; the FDA cleared the most recent generation of the product, the Omnipod 5, in January 2022. Appx195 (¶15).

It took Insulet years of work and hundreds of millions of dollars to bring the product to fruition. Insulet had to develop processes for assembling 72 precisely engineered components into a 1.35-cubic-inch device that can be worn on the skin while automatically storing, measuring, priming, and injecting life-sustaining insulin throughout the day. Appx201; Appx226-228. And these processes had to be profitable and scalable, so that Insulet could mass-produce a cost-effective and disposable product. The first Omnipod product to receive FDA approval in 2003 was practically impossible to make at scale and, consequently, never commercially launched. Appx224 n.1. Three years later, despite substantial investments, the first commercially available Omnipod still required entirely manual assembly and could not be cost-effectively manufactured. Appx201-202; Appx224. It took another three years to redesign the Omnipod's components in a way that allowed large-scale semi-automated assembly. Appx202; Appx225. Insulet then spent five years improving the Omnipod's mechanical design before releasing the Omnipod "Eros" in the United States in 2013. Appx202-203; Appx225-226.

With each of these iterations, Insulet redesigned, rebuilt, and retested the device's 72 individual components and numerous sub-

assemblies.  Appx229.  In the process, Insulet accumulated a significant body of information about the hundreds of ways its product could fail and how to overcome each potential failure.  Appx228.  Insulet documented these potential failure points—and the accompanying mitigation strategies—in living documents known as "failure mode and effects analyses" (FMEAs).  Appx8134-8136 (¶¶12-17).

## B.  After struggling to develop a marketable patch pump, EOFlow turns to former Insulet officers.

Where Insulet succeeded, other companies have tried and failed.  *See* Appx209-213.  Some of the largest medical-device companies in the world—including Medtronic, Becton Dickinson, and Eli Lilly—have spent years and millions of dollars to develop competing patch pumps, to no avail.  *See* Appx209-211.

EOFlow[1] is one of the many companies that tried and failed.  Founded by defendant Jesse Kim in South Korea in 2011, Appx941, EOFlow got off to a rocky start.  Its in-house engineers came from the mobile-phone industry and "did not have medical device experience."

---

[1] This brief refers to defendants EOFlow Co., Ltd. (the South Korean parent company), and EOFlow, Inc. (the American subsidiary) collectively as "EOFlow."

Appx10; *see* Appx9190 (67:1-7). So, unsurprisingly, EOFlow's initial efforts to design an insulin patch pump were plagued with problems, including a pumping mechanism that was "too slow" and a needle deployment that was "very archaic," Appx8984 (61:9-22); Appx8984 (63:1-9). By June 2017—six years after the company's founding—EOFlow's "EOPatch" product was still very much a "work in progress." Appx8979 (43:9-14). EOFlow had yet to open its first production line, and its device was still months away from receiving regulatory approval. *See* Appx751-752.

Fearing that "people were not taking him seriously in the industry," Kim invited defendant Luis Malave to join EOFlow as a consultant in June 2017. Appx8979 (42:12-43:1). Malave had worked at Insulet from 2002 to 2010, including as Senior Vice President of Research, Development, and Engineering (2003-2007) and Chief Operating Officer (2007-2010). Appx230. With Malave's help, EOFlow soon recruited other former Insulet employees, including defendants Steven DiIanni and Ian Welsford. Appx8979 (44:11-17). DiIanni had led the product development team for the Omnipod Eros and had been responsible for reviewing and approving most documentation related to mechanical research and

development.  Appx230; Appx9079 (77:3-78:18).  Welsford had also been a member of the Omnipod Eros's "core team," serving as Insulet's regulatory representative for the device.  Appx231; Appx9744 (42:6-44:3).

### C.  EOFlow redesigns its failing product using Insulet's trade secrets.

Within about six months of Malave, Welsford, and DiIanni's arrival, EOFlow completed a total redesign of the EOPatch.  Appx942-943 (¶9); Appx8555-8562; Appx8681-8688; Appx9210 (147:22-148:5); Appx9227 (215:3-6); Appx9288-9303.  Where the original EOPatch's inner workings and outer appearance differed markedly from the Omnipod, *see* Appx603, this overhauled device—the "EOPatch 2"—looks more like the Omnipod's twin.  Appx425-426.  And where the original EOPatch was foundering, the EOPatch 2 proceeded to market in a shockingly short time: EOFlow announced that Korean regulators had approved the product in July 2019, Appx451, and the product reportedly became available to consumers in Korea in 2021, Appx803.

Expedited preliminary discovery subsequently revealed how EOFlow accomplished this miraculous turnaround: surreptitious theft.

a.  DiIanni and Welsford produced thousands of confidential Insulet files that they had stolen from the company.  Appx8786 (¶34).

There is no doubt that these documents contain Insulet's proprietary information. Most were branded "Insulet Confidential." Appx8786 (¶34); *see also* Appx8096. And the rest were largely files in "native" format that do not typically contain such confidentiality markings, but that nevertheless clearly originated with Insulet. Appx8786 (¶34); *see also* Appx8096.

This trove of documents included some of Insulet's crown jewels: computer-aided design (CAD) files and technical drawings for each of the Omnipod's components, detailed instructions for manufacturing and assembling those components, various testing data, and lengthy FMEA documents spelling out Insulet's failure-mitigation strategies. Appx8096.

b.  Testimony and documents provided significant direct evidence that EOFlow knowingly used both the improperly retained documents and the former Insulet employees' broader familiarity with Insulet's trade secrets to design the EOPatch 2.

For example, meeting minutes and email traffic from 2018 show EOFlow repeatedly seeking—and receiving—DiIanni's advice on Omnipod design components. This began with the very first "EOPatch Redesign Concepts Meeting" on February 27, 2018. The minutes from that meeting reflect the following bullet points:

> **Action Item[s]**
> * * *
> 2. Soft cannula
>    1) Obtain design data (Fr. Steven): CEO, ASAP

Appx9291. In other words, Kim (the "CEO") was tasked with obtaining design data for the device's soft cannula from DiIanni ("Steven"). *See* Appx9211 (151:8-152:13). Minutes from a meeting two weeks later confirm that Kim's conversation with DiIanni took place. Appx9297. In that meeting, the team also "decided to have Steven check the . . . Omnipod design" relating to the device's sensors for detecting the amount of insulin in the reservoir. Appx9297; *see* Appx9215 (167:22-168:11).

Later, in 2021, the EOPatch design team asked DiIanni about design decisions Insulet made concerning the Omnipod, wondering "why the OmniPod chose 90 deg. [o]f the cannula insertion angle" in light of other patch products having a "relatively lower angle, typically 30~45 deg." Appx8577 (emphasis omitted). DiIanni did not hesitate to (1) correct the engineering team's misconception that Omnipod had a 90-degree angle and (2) explain to EOFlow exactly why Insulet designed its product the way it did. *See* Appx8577 ("Omnipod has a 45 degree angle. The primary reason for that is if the pod shifts during use, the cannula depth change will be less affected.").

DiIanni's invoices for his consulting services likewise show that he regularly provided advice on component design and testing, identification of potential vendors, and creation of an automated manufacturing assembly line. Appx8095. Most notably, a December 2018 invoice shows that, at EOFlow's request, he located a confidential Insulet document and repurposed it for EOFlow's use. Appx9305 ("Found a Product specification from Insulet and customized for EOFlow and sent out.").

Emails also show Welsford's involvement in using Insulet's secrets to develop and commercialize the EOPatch. In one September 2021 email, for example, Welsford sent a colleague an Insulet document entitled "Global Regulatory Reporting Procedure" that was labeled "Insulet Confidential Information" and instructed the colleague to "[r]eformat this one for" EOFlow's use. *See* Appx8861 (email instructing "[r]eformat this one for QAP-021-002"); Appx8863 (attachment to email); *see also* Appx8888-8893 (213:4-8, 229:12-22). (Welford testifying that "QAP" means "quality assurance procedure," and that "QAP-021-022" referred specifically to "work for EOFlow").

c.      In addition to this direct evidence of misappropriation, discovery also uncovered substantial circumstantial evidence of EOFlow's misappropriation.

For example, a review of the "EOFlow Patch 2 Mechanical Design Description" reveals that this document was simply a rebranded version of a confidential Insulet document entitled "Product Definition Document (PDD) – Pod." *Compare* Appx9307-9324, *with* Appx9325-9340.  The two documents have identical language throughout—right down to the same inconsistent punctuation—and the EOFlow document contains repeated reference to the "Pod," Insulet's tradename for *its* product.  *See* Appx9336-9337.

A similar side-by-side comparison shows that EOFlow copied Insulet's FMEAs.  For example, EOFlow's Software FMEA identifies 25 "modules" that are identical to and in the same sequence as the modules in Insulet's Software FMEA for the Omnipod Eros.  *See* Appx8136-8138 (¶18).  And many of the individual entries were copied wholesale from Insulet's Software FMEA.  For example, both the Insulet and EOFlow FMEAs contain the same entries under "Rotational Sensor / signal."  *See* Appx8136-8138 (¶18) ; Appx8945.  The documents report the same three

failures for this component, with the same descriptions and again the same idiosyncratic capitalization, punctuation, and abbreviation. *See* Appx8136-8138 (¶18) ; Appx8945. Other examples of copying abound. *See* Appx8134-8141 (¶¶12-23).

**D.    From 2018 to 2022, Insulet representatives evaluate EOFlow's product, to the extent possible, based on public information.**

For years, Insulet was unable to obtain a physical sample of the EOPatch 2. So from 2018 to 2022, Insulet did what it could to observe and evaluate the product based on public information.

In 2018, for example, Insulet representatives attended a conference of the American Diabetes Association (ADA). There, Insulet's head of research and development, Eric Benjamin, saw an opaque prototype of the EOPatch 2 under a glass display case:



Appx9977; *see* Appx14-15. Benjamin "recall[s] thinking that [the proto-type] looked a lot like Omnipod," but "it never came out of the case for close inspection." Appx216; *see* Appx14-15. A number of Insulet employ-ees "attempted to approach the EOFlow table and the EOFlow staff to try to obtain additional information about the product," but they were "un-successful[]." Appx216. Jason O'Connor, a senior Insulet engineer, also "saw [Malave] at the conference and learned he was working for EOFlow." Appx15; *see* Appx249. In the end, though, "Insulet had no reason to believe that the product on display at the 2018 ADA meeting was anything more than a non-functional 'look-alike.'" Appx217.

From 2019 to 2021, Insulet personnel had occasional conversations with EOFlow representatives, and Insulet performed internal reviews of the EOPatch 2 product, but there was again "no real reason for Insulet to have thought" that EOFlow was stealing its secrets. Appx17. And, because the EOPatch 2 was not yet commercially available, Insulet's analysis was based solely on publicly available information like online advertisements, patent filings, and investor presentations. Appx16-17; *see* Appx2281. Public information also raised doubts about whether EOFlow could actually market a product: EOFlow's reported R&D

spending from 2016 to 2021 was approximately $10-15 million—"a small fraction of what would be needed to develop and bring to market such a product." Appx217.

Even after the device went on sale in Korea in 2021, Insulet was unable to obtain a sample. As Welsford acknowledged, if someone had attempted to import a sample of the EOPatch 2 from Korea to the United States, "it would undoubtedly be stopped and it would not be able to get across the [border]." Appx8895 (237:21-22). Further, Insulet has no presence or commercial relationships within Korea, so Insulet had to continue relying on public information about the product. Appx218 (¶73). That information continued to raise doubts about the quality of EOFlow's product: "reports showed that even in Korea, a tech-forward market where adoption of an automated patch-pump system would seem to take off, EOFlow had fewer than a thousand users." Appx217.

### E. Insulet immediately takes action after obtaining a sample of the EOPatch 2 and learning of EOFlow's theft.

Things changed after the EOPatch 2 hit the European market. By early 2023, Insulet was finally able to obtain a sample of the product, which it immediately brought back to its Massachusetts facility. Appx18-19; Appx218; Appx233. Insulet's "tear-down" analysis revealed that the

EOPatch used the exact same design and functionalities as the Omnipod for nearly all its components, including features that were not readily discernible to anyone without inside knowledge of the Omnipod's development. Appx19; Appx233-256. Insulet sued EOFlow for patent infringement in Germany the same month as its tear-down analysis, Appx19, quickly securing a preliminary injunction there.

## II. Procedural History

### A. Insulet sues and seeks a TRO and preliminary injunction in light of Medtronic's impending acquisition of EOFlow.

Things took on a new urgency in the spring and summer of 2023, when Medtronic—one of the largest medical-device companies in the world and Insulet's primary competitor—announced its intention to acquire EOFlow for $738 million. Appx210. As the district court later explained, the acquisition would transform EOFlow from a "bit player" into "a worldwide competitor," Appx12: Medtronic would provide not only capital, but "marketing expertise, manufacturing expertise, customer support networks, the panoply of things that are required to be a real competitor." Appx21. And the acquisition would result in the transfer of Insulet's trade secrets to Medtronic and its partners, who would have

virtually unlimited resources to exploit the misappropriated technology and destroy Insulet's hard-earned market position.

Accordingly, Insulet brought suit on August 3, 2023, asserting claims for misappropriation under the Defend Trade Secrets Act of 2016 (DTSA). Appx133-135.[2] Insulet also sought a temporary restraining order and preliminary injunction. After an initial round of briefing, the district court entered a TRO barring EOFlow from "further disclosing product or manufacturing technical information related to the EOPatch or Omnipod products." Appx1254; *see* Appx1254-1256. The court also granted expedited discovery. Appx8000-8001. Over the next month, the parties exchanged thousands of pages of documents and took the depositions of defendants Kim, Malave, DiIanni, and Welsford and Insulet employees Benjamin and O'Connor.

## B.    The district court grants a preliminary injunction.

At the close of this expedited (but substantial) discovery, the parties submitted lengthy supplemental briefs that restated and expanded upon their arguments in light of the voluminous evidence. At the district

---

[2] Insulet brought other claims, including for patent infringement. *See* Appx136-142. Those claims remain pending and are not at issue in this interlocutory appeal.

court's direction, see Appx7963-7965, Insulet focused in particular on eight discrete categories of trade secrets that EOFlow had misappropriated: (1) Insulet's FMEAs, (2) the design and manufacturing process for the Omnipod's cannula seal, (3) the design and function of a discrete feature of the Omnipod's reservoir, (4) the specific method of applying silicone oil lubricant during the Omnipod's manufacturing, (5) the method and strategy for leak-testing the Omnipod's housing, (6) the algorithm for sensing when the device is full, (7) the algorithm for detecting a blockage in the Omnipod's fluid components, and (8) the function and tolerance of a physical feature of the device's clutch mechanism. *See* Appx6; Appx7816-7819.[3] After a hearing, the district court granted Insulet's motion for a preliminary injunction in a decision delivered from the bench.

1.  Beginning with likelihood of success, the district court found "very substantial, indeed, strong evidence" supporting Insulet's misappropriation claim. Appx5.

The court readily determined that EOFlow had misappropriated Insulet's legally protected trade secrets, finding that Insulet presented

---

[3] In focusing on these eight categories, Insulet did not waive other categories of misappropriation. *See* Appx7817.

"very substantial" and "specific evidence" to that effect. Appx7. This evidence, which was "[t]o a substantial extent . . . unchallenged," established that EOFlow "engaged four former Insulet employees" (Malave, Welsford, DiIanni, and another employee named Robert Strand) who "used their expertise" and "hundreds, if not more, of Insulet's confidential documents" to help develop the EOPatch 2. Appx5. The stolen information "included CAD file drawings, failure modes and effects analyses, manufacturing protocols and instructions, testing protocols, [and] algorithms." Appx5. Many of these documents "were copied verbatim or nearly verbatim." Appx7. In the end, the district court found, there was "little doubt that th[is] information falls within the statutory definition of [a] trade secret." Appx6. And "substantial evidence" indicated "that the misappropriation was [committed] knowingly." Appx11.

The court also found that "Insulet took reasonable steps to protect the information." Appx5. The evidence (once again, "not particularly challenged") showed that "[d]ocuments were marked confidential" by Insulet, "employees were required to sign nondisclosure or confidentiality agreements, [and] systems were password protected," among other things. Appx6. The court rejected EOFlow's arguments that Insulet's

trade secrets could be reverse-engineered or were discernible to anyone in possession of an Omnipod. Because the Omnipod is a "complex machine" that must "be built to rigorous standards," merely observing the device's physical features is not enough to learn how to produce a copy at commercial scale. Appx9. All this was reinforced by the fact that EOFlow, much like "other companies," was "unable to" reverse engineer the Omnipod—that is, until EOFlow "hir[ed] Insulet's former employees and" illegally "us[ed Insulet's confidential] documents." Appx9.

2. The district court next rejected EOFlow's argument that Insulet had dragged its feet in suing or seeking a preliminary injunction because the 2018 ADA conference had put it on notice of EOFlow's misappropriation. As the court put it, the events of the conference at most allowed Insulet to know "[EOFlow's] product looks like ours from the outside and our former R&D head is working there," which is "certainly not enough to state a claim." Appx15. The district court questioned "what inquiry [Insulet] could have undertaken" on the basis of that knowledge. Appx16. The district court also found that Insulet lacked a reason to suspect EOFlow's widespread misappropriation over the next several years. In particular, the district court observed, Insulet's competitive

reports on EOFlow from March 2021 and December 2022 showed that Insulet believed EOFlow was not "anywhere near" becoming a significant competitor and its "production [was] in the early stages with multiple barriers to overcome." Appx17-18. Instead, the district court found that Insulet did not learn of facts supporting its claim until the first quarter of 2023, when it was able to get its hands on EOFlow's product and uncover the extent of EOFlow's piracy. Appx18-19. And, the court found, Insulet acted quickly from there. Appx19.

Having found Insulet's request for injunctive relief timely, the district court determined that Insulet faced imminent irreparable harm from EOFlow's misappropriation. If it were allowed to close the Medtronic transaction, EOFlow would get the "the panoply of things" needed to "go from making devices by hand for the Korean market to being a worldwide competitor." Appx21. As a result, Insulet would "los[e] market share and have [its] pricing undercut by a competitor who did not have to spend the same time and money on research and development" to build a rival product, something "a great deal of case law" recognizes as classic "irreparable harm." Appx21.

    3.    The district court also found that the balance of equities

"favors the issuance of a preliminary injunction." Appx22. The hardships faced by the parties were like night and day: Insulet was "a victim of the theft of its trade secrets," whereas EOFlow loses only "an opportunity to capitalize on [its] misappropriation." Appx22. And the public interest had "little impact one way or another." Appx22.

### C. The district court modifies the injunction at EOFlow's request.

After deciding to grant a preliminary injunction, the district court noted that it was "still working" on the injunction's "actual wording." Appx23. EOFlow's counsel requested the opportunity to review a draft of the order so that it could "suggest changes" before entry. Appx29. The court agreed, explaining that both parties would have a chance to comment on a draft of the order. Appx30.

A few hours after the hearing, the court issued a proposed order. Appx9864-9866. As relevant here, it read:

> EOFlow is hereby restrained from manufacturing, marketing, or selling any product that was designed, developed, or manufactured, in whole or in part, using or relying on the Trade Secrets of Insulet Corporation ("Insulet"), as defined in this Order.

Appx9864 (¶1). The proposed order likewise forbade EOFlow from "disclosing any Trade Secrets of Insulet . . . except as may be reasonably

necessary for purposes of conducting this litigation." Appx9864 (¶2). The proposed order defined "Trade Secrets" as "any and all Confidential Information of Insulet" that was "taken" improperly from Insulet, as well as anything "that contains, derives from, or incorporates such Confidential Information." Appx9865 (¶3). "Confidential Information," in turn, was defined as "any and all materials or information that were marked 'confidential' by Insulet" and "any and all CAD files, drawings, or specifications created by Insulet, whether or not they were marked 'confidential.'" Appx9865 (¶4).

Despite being given the opportunity it had requested to comment on the order, EOFlow suggested no changes to its language. Rather, EOFlow informed the court that it "object[ed] to [the order's] entry in toto" and would appeal. Appx9887. The Court accordingly entered the order—without change—on October 6, 2023. Appx35-37.

A week later, EOFlow filed a purported "emergency" motion to modify the injunction, arguing that the blanket ban on manufacturing or sales of EOFlow's device would harm the small number of patients already using the device and "likely end EOFlow as a going concern in a matter of weeks." Appx9870; Appx9872-9875. EOFlow asked that the

court "strike [paragraph 1] in its entirety" or "clarify[] that EOFlow may continue serving its existing customer base outside of the United States." Appx9870; Appx9876-9880. EOFlow made no other objections to the scope or wording of the injunction, including its definition of "Trade Secrets."

The court granted EOFlow the second form of relief, issuing an amended injunction with carveouts permitting EOFlow to manufacture and sell the device to its existing customers in Korea and the European Union. Appx40-41.

## SUMMARY OF THE ARGUMENT

I.    The district court did not clearly err in finding that Insulet is likely to succeed on the merits.

Beginning with the statute of limitations, an issue on which *it* bears the ultimate burden, EOFlow argues that Insulet's DTSA claim is untimely. But the district court properly found otherwise. A plaintiff has three years after the defendant's misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered" to sue under the DTSA. 18 U.S.C. §1836(d). Insulet indisputably lacked actual knowledge of EOFlow's misappropriation until February 2023—mere

months before filing its complaint. And the record showed that Insulet did not have constructive knowledge of EOFlow's misappropriation by August 2020. EOFlow maintains that Insulet was on inquiry notice of EOFlow's wrongdoing in 2018 because of its observations at the 2018 ADA trade show. As the district court, found, however, all that Insulet learned from the trade show was that EOFlow had hired an Insulet alumnus and created a prototype that "look[ed] like [the Omnipod] from the outside"—which "is certainly not enough to state a claim." Appx15.

Turning to Insulet's affirmative case, EOFlow briefly argues that it did not misappropriate Insulet's information. But EOFlow fails to demonstrate any clear error in the district court's factual findings. The district court reviewed extensive evidence that former Insulet employees improperly retained confidential Insulet documents and that EOFlow "knowingly" used that information "to develop the EOFlow patch pump." Appx11. Unable to seriously dispute the district court's finding that it misappropriated Insulet's information, EOFlow instead goes to great lengths to argue that the stolen information included no protected trade secrets. But the DTSA extends protection to "*all forms and types* of financial, business, scientific, technical, economic, or engineering

information" that the owner "has taken reasonable measures" to protect and that "derives independent economic value" from its confidentiality. §1839(3) (emphasis added). Insulet's preliminary-injunction motion focused on eight categories of information that fall within the heartland of that expansive definition. EOFlow fails to identify any clear error in the district court's factual findings that Insulet took adequate steps to protect that information and that the information was not "*readily* ascertainable through proper means" like "reverse engineering." 18 U.S.C. §1839(3)(B), (6)(B) (emphasis added).

II.    The district court also did not clearly err in finding that Insulet would suffer irreparable harm in the absence of injunctive relief. EOFlow had—and has—immediate plans to scale up production of its pirated product and begin head-to-head competition with Insulet. At the time the injunction entered, EOFlow had imminent plans for an acquisition by Medtronic, one of the world's largest medical-device companies, that would transform EOFlow from a "bit player" into a "worldwide competitor." Appx21. And even now that the Medtronic deal is suspended, EOFlow's CEO continues to tout "Plan[s] B and C and D" that would

allow EOFlow to "make an application for product approval" in markets where Insulet competes. Appx9948; Appx9951.

EOFlow's arguments do not overcome the district court's finding of immediate and irreparable harm. EOFlow argues that Insulet waited too long to seek a preliminary injunction, but that is just a reprise of its meritless statute-of-limitations argument. Insulet sought relief as soon as it had a valid basis to do so. EOFlow also argues that the types of harms that Insulet will suffer do not qualify as immediate or irreparable, but, as the district court recognized, there is "a great deal of case law" holding otherwise. Appx21. The types of injury at issue here—drastic damage to a company's pricing, customer base, and investor support— are classic examples of immediate and irreparable harm. *See infra*, pp. 57-66.

III. The district court did not abuse its discretion in finding that the balance of equities and the public interest support the injunction. The difference in harms the parties faced is stark. On the one hand, there is "strong" and "very substantial evidence" that Insulet was "a victim of the theft of its trade secrets," Appx5; Appx22, and that Insulet would face imminent irreparable harm absent an injunction. On the other hand,

with the injunction in place, EOFlow merely loses the opportunity "to capitalize on [its] misappropriation." Appx22. That balance tilts decisively in Insulet's favor. The strong public interest in protecting intellectual-property rights also favors Insulet (or, at best for EOFlow, favors neither party). On these facts, the district court properly entered its tailored preliminary injunction.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction using the law of the regional circuit." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1363 (Fed. Cir. 2017). The First Circuit reviews factual findings underlying the grant of a preliminary injunction for clear error and legal determinations underlying such a decision de novo. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013). Appellate courts "will disturb [the grant of a preliminary injunction] only if the court abuse[s] its discretion"—for example, if the district court commits "a material error of law," ignores "a material factor deserving significant weight," relies upon "an improper factor," or "makes a serious mistake in weighing the relevant factors." *Id.* (brackets omitted).

# ARGUMENT

In deciding whether to grant Insulet's request for a preliminary injunction, the district court carefully analyzed the relevant factors—Insulet's likelihood of success on the merits, the irreparable harm to Insulet in the absence of an injunction, the balance of hardships, and the public interest—and found that they decisively favored an order barring EOFlow from using Insulet's trade secrets pending trial.  Appx4-22; *see Corp. Techs.*, 731 F.3d at 9.  Given the "very substantial, indeed, strong evidence" of EOFlow's wrongdoing, Appx5, and the "great deal of case law" establishing irreparable harm in this context, Appx21, this Court should affirm that order.

## I.    The district court did not clearly err in finding that Insulet is likely to succeed on the merits.

EOFlow raises three challenges to the district court's finding that Insulet is likely to succeed.  It argues that Insulet's DTSA claim is untimely (Br. 21-25); that it did not misappropriate Insulet's information (Br. 42-46); and that none of Insulet's information is a trade secret (Br. 25-42).  But EOFlow can show neither clear factual error nor any abuse of discretion.

**A. The district court properly rejected EOFlow's statute-of-limitations defense at this stage.**

EOFlow argues (Br. 21-25) that the district court failed to consider its statute-of-limitations defense, but that argument is wrong twice over: Insulet's suit is timely, and the district court did not overlook the issue.

**1. Insulet brought its misappropriation claim within the DTSA's three-year limitations period.**

A plaintiff must bring a DTSA claim within three years after the defendant's misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. §1836(d). Insulet took action as soon as it became aware of EOFlow's misappropriation—well within that three-year limitations period.

Insulet indisputably lacked *actual* knowledge of EOFlow's misappropriation until February 2023—mere months before it filed its complaint. That was when Insulet first obtained a sample of the EOPatch 2. Appx218; *see supra*, pp. 16-17. Insulet "immediately brought [that sample] back to [Massachusetts] and deconstructed the product." Appx218. It was "not until th[is] February 2023 tear-down," the district court found, that Insulet learned that EOFlow had copied its trade secrets "in

multiple critical respects." Appx20; *see supra*, pp. 16-17. EOFlow does not contend otherwise. *See* EOFlow Br. 23-25.

Nor is there any basis to find that Insulet had *constructive* knowledge of EOFlow's misappropriation more than three years before bringing suit, *i.e.*, before August 3, 2020. The district court found that "events really beg[a]n at the end of March 2021," when Insulet conducted a high-level analysis comparing the EOPatch and Omnipod based on public information. Appx16. Even then, the district court found, there was "no real reason for Insulet to have thought" EOFlow stole its secrets. Appx17; *see infra*, pp. 62-63. Until the EOPatch 2 launched in Europe, Insulet had to base its analysis on public information without the benefit of a physical sample, because it was not possible to import one from Korea. Appx16; *see* Appx2273-2289; Appx8895 (237:21-22).

EOFlow maintains (Br. 23) that Insulet was on inquiry notice of EOFlow's wrongdoing in 2018 because Eric Benjamin "saw the EOPatch device at the ADA trade show." But EOFlow glosses over the relevant facts. As discussed above (at pp. 2, 14), what was actually visible at the trade show was the exterior of an opaque device under a glass display case. Appx15. "Insulet had no reason to believe that the product on

display . . . was anything more than a non-functional look-alike."
Appx217.  Rather, it learned only that EOFlow had a "product [that]
looks like ours from the outside"—which, the district court correctly
found, "is certainly not enough to state a claim."  Appx15.

The nonbinding cases that EOFlow cites do not point to a different
result.  EOFlow claims (Br. 24) these cases reflect a general legal princi-
ple that "seeing a potentially infringing product at a trade show . . . starts
the clock on a DTSA claim," but that misstates the law.  Proving inquiry
notice is a "fact-intensive" endeavor.  *E.g.*, *Norman v. Elkin*, 860 F.3d
111, 127 (3d Cir. 2017).  And the facts of EOFlow's cases are materially
different from the facts of this case.  In those cases, the plaintiff's suspi-
cions of misappropriation generally *predated* the relevant trade show—
in other words, what the plaintiff saw at the trade show merely confirmed
what it already suspected.[4]  Here, by contrast, Insulet had no reason to
suspect misappropriation at the time of the ADA conference.

_____

[4] *See AnywhereCommerce, Inc. v. Ingenico Inc.*, No. 1:19-cv-11457,
2023 WL 2694043 (D. Mass. Mar. 29, 2023) (plaintiff's founder said in
2012—*i.e.*, well before 2014 trade show—that he "believe[d] that the de-
fendant [had stolen] my IP"); *Knights Armament Co. v. Optical Sys. Tech.,
Inc.*, 654 F.3d 1179, 1184 (11th Cir. 2011) (similar); *CMI Roadbuilding,
Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019) (similar).  The

EOFlow also argues in passing (Br. 9) that there was "a transparent version of the EOPatch 2" at the ADA conference, but the district court was not required to accept that unsubstantiated contention. The image in the record plainly shows an opaque product. *See* Appx2039. As the district court found, there was "no photo of [the supposed transparent version] in the record," "no actual transparent cover" entered into evidence, and conflicting testimony about whether Insulet was able to obtain information from EOFlow at the trade show, Appx15; *see* Appx216. The district court did not clearly err in resolving this evidentiary dispute in Insulet's favor. *See Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 21 (1st Cir. 2004) (selecting between "two permissible views of the evidence . . . cannot be clearly erroneous").

EOFlow points to nothing else in the record to suggest Insulet was on inquiry notice of potential misappropriation before August 3, 2020.[5]

---

only case with somewhat different facts is *MGA Entertainment, Inc. v. Mattel, Inc.*, 41 Cal. App. 5th 554 (2019), but that case is even further afield. There, the *plaintiff* was the one presenting at the trade show; the court held that it was on inquiry of potential theft after it caught the *defendants'* representative sneaking into its private showroom. *See id.* at 557, 563-564.

[5] EOFlow mentions some events that occurred in 2021 and 2022 (Br. 10-13, 23), too late to be relevant.

EOFlow refers (Br. 9, 23) to a 2019 email exchange in which an Insulet vice president requested "a *non-confidential* overview of EO Flow." Appx1065 (emphasis added). But EOFlow fails to explain how any conversations about "non-confidential" information would have alerted Insulet to EOFlow's behind-the-scenes wrongdoing.

### 2. The district court's ruling adequately addressed the timeliness of Insulet's claims.

Unable to meaningfully dispute the evidentiary record, EOFlow attacks the district court's opinion, arguing (Br. 20) that it "failed to analyze the statute of limitations altogether." That is not accurate.[6]

The district court's oral decision leaves no doubt about what the court thought of EOFlow's statute-of-limitations defense. The court unequivocally "f[ou]nd that the first requirement, reasonable likelihood of success on the merits, ha[d] been satisfied." Appx12. And it offered ample analysis of facts relevant to the timeliness of Insulet's claim. Most notably, the court considered and rejected EOFlow's argument that the

---

[6] EOFlow's suggestion that the district court overlooked the statute of limitations takes particular chutzpah given that EOFlow, too, treated this issue as overlapping with diligence: in the 69-page supplemental brief it submitted after expedited discovery, EOFlow's statute-of-limitations argument occupied just a single footnote, even though it bore the burden on this factual issue. Appx8041 n.4.

2018 ADA conference put Insulet on inquiry notice of any wrongdoing, instead finding that "events really begin at the end of March 2021" and the conference was entitled to "very little weight, if any." Appx14-16. In light of these factual findings, EOFlow cannot seriously contend that the district court failed to consider the timeliness of Insulet's claim.

EOFlow's contrary argument takes a single line from the district court's oral order out of context. In a section of its opinion discussing Insulet's diligence, the district court said it "express[ed] no opinion about the accrual of the statute of limitations" because "[t]hat's not the issue here." Appx15. As EOFlow itself has recognized, however, the question of diligence is distinct from the application of the statute of limitations: the former relates to irreparable harm, the latter to likelihood of success on the merits. *See* Appx12-13; Appx1636-1645; Appx1649 n.4 (EOFlow's brief drawing this distinction). In context, therefore, it is clear that the district court was not "declin[ing] to analyze whether th[e] statute of limitations had run," as EOFlow suggests (Br. 22). Instead, the district court was explaining that it did not need to identify a precise date on which Insulet's claim accrued *in order to resolve the diligence question*.

Regardless, even if EOFlow were correct that the district court had failed to address EOFlow's statute-of-limitations defense, this Court "may affirm the district court's grant of a preliminary injunction . . . on any grounds supported by the record." *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002) (affirming even though "the district court failed to consider irreparable harm" because "[t]he record sufficiently establishe[d]" the harm element (quotation marks omitted)). As explained, the district court's findings (Appx16-17) are irreconcilable with EOFlow's suggestion that Insulet was on inquiry notice by August 2020. This Court can—and should—affirm on that basis.[7]

## B. The district court properly found that EOFlow misappropriated Insulet's trade secrets.

As the district court explained, Insulet "established that a very substantial number of trade secrets were, in fact, misappropriated and were, in fact, used to develop the EOFlow patch pump." Appx11. That factual

---

[7] Even if the Court concludes that the district court did not adequately explain some aspects of its decision, the Court should remand for further explanation *without* vacating the injunction, rather than allowing EOFlow's misappropriation to resume. *See, e.g., TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 545-546 (1st Cir. 1996); *JL Powell Clothing LLC v. Powell*, 590 F. App'x 3, 6 (1st Cir. 2014); *Seijas v. Republic of Argentina*, 352 F. App'x 519, 522 (2d Cir. 2009).

finding is supported by ample evidence, and EOFlow does not meaningfully contest it. EOFlow claims (Br. 43-46) that the district court "assumed" bad conduct and "ignored" product differences, but its arguments attack straw men.

The district court based its finding on extensive and often direct evidence that former Insulet employees improperly retained confidential Insulet documents and that EOFlow "t[ook] the information . . . to develop the EOFlow patch pump." Appx11; *see also* Appx9961-9999. For example, portions of the EOPatch's FMEA document "were copied verbatim or nearly verbatim" from Insulet's confidential FMEA document—right down to idiosyncratic capitalization, punctuation, and abbreviations. Appx7; *see Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 278 (3d Cir. 2019) (affirming preliminary injunction where, among other things, "portions of QuVa's APS Plan are a verbatim copy of Par's APS Plan, up to and including at least one typographical error."). Various email exchanges, meanwhile, showed defendant DiIanni acknowledging the use of Insulet's confidential product specifications as a starting point for EOFlow design work, Appx9305, and defendant Welsford asking a subordinate to "[r]eformat" confidential Insulet documents for

EOFlow's use, Appx8861; Appx8863. These are just some of the examples of the evidence of misappropriation before the district court. *See supra*, pp. 9-14.

Given this evidence, EOFlow's suggestion that the district court "fail[ed] to determine whether EOFlow relied upon—or even knew about—the confidential documents" (Br. 44) is indefensible. So is its insistence that the district court merely assumed misappropriation from the hiring of former employees or those employees' retention of Insulet's documents. EOFlow completely ignores the express finding that Insulet's secrets "were, in fact, used to develop the EOFlow patch pump." Appx11; *see* Appx10.

As for supposed differences between the EOPatch and Omnipod, most of the differences that EOFlow references (Br. 46) relate to the few aspects of the device that EOFlow did *not* steal. *Compare* Appx802-803; Appx1621-1624 (discussing the actuator and battery requirements), *with* Appx40 (¶6) (exempting the actuator from the preliminary injunction). The remaining differences that EOFlow cites do not undermine the district court's misappropriation finding in light of the *direct* evidence of misappropriation. For example, while EOFlow argued below that its

cannula design differs from that of the Omnipod, Appx1665, Insulet identified direct evidence that EOFlow needed and requested information about the Omnipod cannula from defendant DiIanni, who was critically involved in the development of EOFlow's soft cannula. Appx8141-8148 (¶¶25-35).

As a last-ditch effort to overcome the district court's misappropriation finding, EOFlow argues (Br. 39 n.2) that it reverse-engineered the Omnipod. As the district court explained, however, EOFlow provided "relatively little" evidence "that any of this was *actually* reverse engineered," and "certainly that is not true as to a number of critical components." Appx9 (emphasis added). EOFlow's unadorned string-cite—relegated to a footnote—fails to explain EOFlow's theory of actual reverse engineering, much less articulate why the district court's finding was clearly erroneous. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[A]rguments raised in footnotes are not preserved.").

For all these reasons, there can be no serious question that EOFlow misappropriated Insulet's trade secrets.

**C. The district court properly found that Insulet's trade secrets are entitled to protection under the DTSA.**

Unable to seriously dispute the district court's finding that it misappropriated Insulet's trade secrets, EOFlow instead goes to great lengths to argue (Br. 25-42) that the stolen information does not fall within the DTSA's ambit. But the district court found that EOFlow misappropriated eight discrete categories of information that satisfy the DTSA's expansive definition of a trade secret. 18 U.S.C. §1839(3). EOFlow fails to identify any error in that determination.

**1. EOFlow stole at least eight categories of paradigmatic trade secrets.**

Insulet "focused [its request for a preliminary injunction] on eight categories" of trade secrets, including the Omnipod's confidential FMEAs, design and manufacturing information for discrete components of the Omnipod, and certain confidential algorithms. Appx6; *see supra*, p. 19 (listing all eight categories). EOFlow makes no genuine effort to challenge the status of any of these categories of information as protectible trade secrets.

Nor could it. The DTSA extends protection to "*all forms and types* of financial, business, scientific, technical, economic, or engineering

information" that the owner "has taken reasonable measures" to protect and that "derives independent economic value" from its confidentiality. §1839(3) (emphasis added). The eight discrete categories of information that Insulet focused on are within the heartland of this protection. Insulet's expert and its internal engineer described at length both the value of this information and the difficulty of discerning it from public sources. *See* Appx239-245; Appx1286-1290; Appx8143-8148 (¶¶28-35); Appx8148-8157 (¶¶36-58); Appx81588164 (¶¶60-74).

Courts have routinely recognized design and manufacturing information like the eight categories at issue here as qualifying for trade-secret protection. *See, e.g.*, *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1117 (Fed. Cir. 1996) (protected trade secrets included "machine and hinge fixturing methods" and "lubrication information"); *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 907 (3d Cir. 2021) (protected trade secrets included information about "design, research and development, test methods and results, manufacturing processes, quality assurance, marketing strategies, and regulatory compliance"). Consistent with this precedent, the district court rightly had "little doubt" that Insulet's stolen information "falls within the statutory definition of trade secret." Appx6.

**2.    The district court did not clearly err in finding that Insulet took reasonable measures to protect its trade secrets.**

Information can be protected under the DTSA only if "the owner thereof has taken reasonable measures to keep such information secret." §1839(3).  Courts consider a number of factors in "determin[ing] whether a company" took such measures, including "the existence or absence of a confidentiality agreement" and "the nature and extent of precautions taken." *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 192 (1st Cir. 2023).

Here, those factors show that "Insulet took reasonable steps to protect [its] information."  Appx6.  As the district court explained, "[d]ocuments were marked confidential, employees were required to sign non-disclosure or confidentiality agreements, systems were password protected, and the like."  Appx5-6.  EOFlow identifies no clear error in that determination.[8]

a.    EOFlow primarily argues (Br. 33) that events from 2018 to 2022 show that Insulet failed to take reasonable measures "after

---

[8] EOFlow relegated its argument on this issue (like its argument on the statute of limitations) to a single footnote in its 69-page supplemental brief below, Appx1678 n.15, leading the district court to note that the issue was "not particularly challenged," Appx6.

discovering potential misappropriation" of its trade secrets.  But EOFlow just points back to the same events underlying its statute-of-limitations argument.  As discussed above (at pp. 25-26), Insulet did *not* have a reason to take any further measures based on what it knew in 2022 or before.[9]  Nor did the district court "ignore" this issue, as EOFlow suggests (Br. 33).  Again, the district court's opinion contains an extensive discussion of the events of 2018 to 2022 and why they were "not enough to state a claim," Appx15, and provided "no real reason for Insulet to have" suspected misappropriation, Appx17.

b.    EOFlow misrepresents several other aspects of the district court's opinion as well.

For example, EOFlow argues (Br. 35) that the district court found only that Insulet took measures to protect "some unidentified 'set of information.'"  Reading the full sentence, however, makes plain that the

---

[9] For these reasons, the nonbinding cases that EOFlow cites (Br. 34) are inapposite.  In two of the cases, the alleged trade secrets were published online *years* before the plaintiffs took action.  *See  Pie Dev., LLC v. Pie Ins. Holdings, Inc.*, No. 21-60593, 2023 WL 2707184, at *2-3 (5th Cir. Mar. 30, 2023); *HiRel Connectors, Inc. v. United States*, No. 01-cv-11069, 2005 WL 4958547,  at *5 (C.D. Cal. Jan. 4, 2005).  And in the other case, the plaintiff had actual knowledge of misappropriation for more than four years before taking action.  *See Alamar Biosciences, Inc. v. Difco Labs., Inc.*, No. 94-cv-1856, 1995 WL 912345, at *5-6 (E.D. Cal. Oct. 13, 1995).

finding that Insulet took adequate protective measures related to the eight specific categories of information that the district court discussed later in its opinion. *See* Appx5 ("There is a dispute as to what precisely are the trade secrets, *which I'll return to in a moment*, but at least as to some substantial set of information, Insulet took reasonable measures to protect the information." (emphasis added)).

EOFlow is also wrong (Br. 35) that the district court conflated the existence of nondisclosure agreements with the existence of trade secrets. The case law required the district law to consider multiple factors—including "the existence or absence of a confidentiality agreement," and the use of access restrictions and passwords. *Allstate*, 79 F.4th at 192-193. The district court's opinion shows that it did just that: the use of "nondisclosure or confidentiality agreements" was just one factor in assessing whether the DTSA covers the asserted trade secrets. Appx5-6.

c.      Finally, EOFlow fails to identify any clear error in the other factual findings underpinning the district court's conclusion that Insulet took adequate protective measures.

For example, EOFlow argues (Br. 35) that some Insulet documents are not confidential because they "were *not* marked confidential." As

EOFlow knows, however, a number of the computer files at issue—such as three-dimensional CAD files—are not text-based documents, and so cannot be branded with confidentiality markings. *See* Appx7810-7811; Appx8786 (¶34). That does not mean the documents are subject to lesser protections.

The record also does not support EOFlow's contention (Br. 35-36) that Insulet "allowed" DiIanni to maintain confidential materials on his personal laptop or to keep them after he left the company. DiIanni's separation agreement expressly required him to "promptly return to the Company all the Company documents (and any copies) and property." Appx9646; *see* Appx9644-9648; Appx9634-9641; *see also* Appx9024 (222:17-21); Appx9750-9752 (66:3-74:11) (testimony from other Insulet employees confirming that they understood the need to return confidential documents when leaving the company). There is no evidence that Insulet knew about—much less condoned—DiIanni's practice of emailing documents to himself for use on his personal computer or DiIanni's retention of those documents after he left. *See* Appx1915.

Nor is there any clear error in the district court's factual finding that Insulet's systems were password-protected. The very testimony that

EOFlow cites makes clear that Insulet used "log-ins." Appx2139. Insulet's Chief Information Security Officer confirmed that Insulet's systems were password-protected, Insulet's physical premises required badge access, and Insulet took multiple steps to ensure a former employee could no longer access confidential information after separation from the company. Appx8751-8753 (¶¶6-11). The district court did not clearly err in crediting this testimony.

### 3. The district court properly rejected EOFlow's arguments about reverse engineering.

As discussed above, EOFlow does not meaningfully argue that it *actually* reverse-engineered the Omnipod, which goes to the element of misappropriation (*i.e.*, whether EOFlow "used improper means" to obtain Insulet's information, *Allstate*, 79 F.4th at 187). *See supra*, p. 40. Instead, EOFlow focuses a great deal of attention (Br. 37-39) on whether it *could have* reverse-engineered the stolen information, which goes to whether the information qualifies as a trade secret under the DTSA. For the reasons that follow, the district court correctly found that, under well-settled legal principles, Insulet's stolen information was not ascertainable through reverse engineering.

a.     Information does not qualify for trade-secret protection if it is "*readily* ascertainable through proper means," including "reverse engineering." 18 U.S.C. §1839(3)(B), (6)(B) (emphasis added). As that statutory language makes clear—and as the district court explained—"the *mere possibility* that something could be reverse engineered without more is not enough to defeat a trade secret claim." Appx8-9 (emphasis added); *accord, e.g.*, *UPI Semiconductor Corp. v. ITC*, 767 F.3d 1372, 1382 (Fed. Cir. 2014) ("The possibility of reverse engineering or independent development does not excuse one who obtains trade secrets wrongfully." (quotation marks omitted)). In other words, "[i]f acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming, the trade secret owner retains protection against an improper acquisition, disclosure, or use." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 541 (7th Cir. 2021) (brackets omitted) (quoting Restatement (Third) of Unfair Competition §39 cmt. f); *accord, e.g.*, *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054, 1082 (N.D. Iowa 2003) (holding that "the ease with which the device can be 'reverse engineered'" is relevant to "whether the device remains a trade secret").

Applying these principles, courts reject "readily ascertainable" arguments where successfully reverse engineering the product would have been difficult. For example, in *United States v. Sing*, No. 14-cr-212, 2016 WL 54906 (C.D. Cal. Jan. 4, 2016), *aff'd*, 736 F. App'x 184 (9th Cir. 2018), the court found that "connections between the [plaintiff's product's] parts" were not "readily ascertainable" without trade-secret schematics because, although someone could "theoretically use [tools] to determine the connections," "the task would be incredibly tedious and time consuming." *Id.* at *7. Other courts have reached similar conclusions. *See, e.g.*, *Life Spine*, 8 F.4th at 542 (rejecting "speculative" reverse-engineering argument with respect to a medical device); *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, No. 8:13-cv-1880, 2018 WL 4697255, at *5 (C.D. Cal. Aug. 3, 2018) (holding that evidence "that certain elements could or probably could be reverse engineered is insufficient to show that the design solutions are not trade secrets.").

EOFlow argues (Br. 38) that the district court's articulation of the law contradicted the DTSA and applicable precedent, but it fails to identify any legal error. EOFlow emphasizes, for example, that the DTSA asks whether the information is readily "ascertain<u>able</u>" through proper

means rather than whether it was "ascertain<u>ed</u> through proper means." EOFlow Br. 38-39 (quoting §1839(3)(B)) (emphasis in original). But nothing in the district court's opinion conflicts with that undisputed principle. As the cases and Restatement discussed above show, the statutory term "readily ascertainable" does not suggest that any hypothetical possibility of reverse engineering—no matter how difficult—defeats trade-secret protection.

The cases that EOFlow cites also fail to show any legal error. Its two lead cases—*Bonito Boats* and *Kewanee Oil*—recognize that state law cannot prohibit actual reverse engineering of products in the public domain. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974). That principle is doubly inapposite: EOFlow did not actually reverse-engineer the Omnipod, and Insulet's DTSA claim arises under federal law. Appx9.

b. In light of the statutory language and case law discussed above, the district court had little trouble finding that Insulet's information qualified for trade-secret protection because "[r]everse engineering is difficult for a sophisticated product such as [the Omnipod]." Appx9. As the district court explained, EOFlow took Insulet's information

because it was not able to replicate Insulet's discoveries on its own. Appx11; *see also* Appx10 ("One might ask[:] if it was not valuable, why was it stolen[?]"). EOFlow identifies no clear error in those factual conclusions.

EOFlow primarily relies (Br. 37-38) on testimony in which one of Insulet's customer-facing executives agreed with EOFlow's counsel that "given enough time and money," it was "possible to deconstruct an Omnipod and eventually build a protype copy of the Omnipod." Appx2087 (187:9-15). But EOFlow is selectively quoting the witness's answer: the witness clarified that "*with enough time and money*, it's possible that one could produce a *single article* Omnipod that *may or may not function* but that would *look a lot like a prototype*." Appx2087 (187:2-7) (emphasis added). As just discussed, however, the law requires more.

EOFlow also says (Br. 37) that Insulet "admitted to the district court" that "the Omnipod 'can be broken down and to some extent reverse engineered.'" In fact, EOFlow is quoting *the district court*—and selectively. The court's full statement was that "[i]t's true that [the final product] can be broken down and to some extent reverse engineered, but *there*

51

*is much more to the product than that, more than mere dimensions.*"

Appx8 (emphasis added).

Insulet's repeated mischaracterizations cannot change what the law requires, or what the district court found. "EOFlow appears to have taken the information because it needed it"—*i.e.*, because it could not readily reverse engineer the Omnipod. Appx11. Insulet's stolen information qualifies for trade-secret protection under the DTSA.

### 4. EOFlow's remaining arguments fail to identify any error.

EOFlow's remaining arguments about the protectability of Insulet's trade secrets are a hodgepodge of meritless attacks on the district court's reasoning and factual findings.

First, the district court did not "refuse[]" to specify "the number and contours of the trade secrets at issue." EOFlow Br. 27. What the district court actually said is that, because "[d]iscovery ha[d] only been preliminary," "it would be unfair to require at this stage *perfection* as to the precise number and contours of the trade secrets at issue." Appx6 (emphasis added). The DTSA does not require perfection: "adequate specificity" is enough, *Allstate*, 79 F.4th at 197, especially on a motion for a preliminary injunction.

Second, nothing in the district court's opinion "improperly conflated 'confidential' information with trade secrets." EOFlow Br. 28-29.[10] To be sure, the district court observed that many of the relevant "[d]ocuments were *marked* confidential." Appx5-6 (emphasis added). As already discussed, however, the law required the district court to evaluate "the nature and extent of precautions taken." *Allstate*, 79 F.4th at 192; *see supra*, p. 43. EOFlow also observes (Br. 27-28) that the text of the injunction defines the materials that EOFlow may not use in part by referring to "materials that were marked 'confidential' by Insulet." Appx36. But EOFlow conflates two unrelated issues: the identification of Insulet's protected secrets (*i.e.*, the eight categories discussed above) and the crafting of a remedial order that "describe[s] in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(A)-(C). There was nothing improper about the district court identifying information that EOFlow was precluded from using by identifying the documents they came from.

---

[10] For this reason, the cases that EOFlow cites (Br. 29) for the proposition that "trade secret claims are *not* commensurate with claims that a party breached a confidentiality agreement" are simply irrelevant.

Third, the district court did not identify the trade secrets at such a level of generality as "to encompass virtually all of [Insulet's] product." EOFlow Br. 29-31. The cases EOFlow relies on for this argument involve situations in which the plaintiff "assert[ed] that *all information* in or about its software is a trade secret," *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (emphasis added), or else "could not articulate what aspects of [its product] qualified as a trade secret," *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 53-54 (1st Cir. 2020). That is a far cry from this case, where, again, Insulet submitted extensive evidence identifying eight separate categories of trade secrets. *See supra*, pp. 19, 41-42.

Fourth, Insulet was not required to assign a dollar value to each category of trade secrets it identified. EOFlow Br. 30. EOFlow once more jumbles the issues—identifying the trade secrets is separate from establishing that they "have independent economic value," as required by the DTSA. *Compare Allstate*, 79 F.4th at 190-192, *with id.* at 197-198. In any event, the law does not require Insulet to enumerate (or even claim) "tangible damages" for each of the eight categories of trade secrets it identified; instead, Insulet simply had to show that disclosure of those secrets

"would cause irreparable damage," *id.* at 190-192, which is precisely what it did. *See infra*, pp. 63-65.

Fifth, the district court did not somehow shift the burden for identifying the trade secrets onto EOFlow. EOFlow Br. 31-32. The language that EOFlow quotes—that "the wrongdoer" must "demonstrate at some point . . . why what he did was, in fact, not wrongful conduct" (Appx30)—came *after* the court granted Insulet's motion in response to EOFlow's request for a chance to "suggest change[s]" to the injunction's wording before it entered. Appx29-30. The court was simply making a commonplace observation: any arguments to modify the injunction would be subject to the usual rule that "[u]ncertanties regarding the scope of injunctive relief are typically resolved against the wrongdoer." Restatement (Third) of Unfair Competition §35 (1995).

Sixth, and finally, Insulet's trade secrets were not publicly known. EOFlow's appellate argument on this issue merely incorporates its arguments in the appendix by reference (*see* Br. 40), which is not enough to preserve this issue for review. *See Graphic Controls Corp. v. Utah Med. Prod., Inc.*, 149 F.3d 1382, 1385 (Fed. Cir. 1998). Regardless, EOFlow is wrong to argue (Br. 41-42) that the district court "waved off" this issue or

failed to address relevant evidence. The district court acknowledged that intentional disclosure of trade secrets in a patent application might destroy the information's secrecy, but it found *as a matter of fact* that the patents that EOFlow cited did not contain any of the trade secrets at issue here. *See* Appx9; *see also* Appx1581-1587 (112:15-118:23) (discussing this issue at the hearing). That finding was supported by substantial evidence showing that the patents on which EOFlow relied related to technologies that were distinct from Insulet's trade secrets. Appx1286-1292; Appx8143 (¶27)

## II. The district court did not clearly err in finding that Insulet faces imminent irreparable harm from EOFlow's actions.

The record also leaves no doubt about EOFlow's immediate plans to scale up production of its pirated product and begin head-to-head competition with Insulet. This competition would permanently undo decades of work that made Insulet the market leader for patch pumps, damaging the Omnipod's price, customer base, and reputation and eroding Insulet's ability to attract critical investment. The district court recognized that this was classic evidence of irreparable harm, and so properly concluded this factor favors an injunction as well. Appx21. EOFlow's disagreements with that determination lack merit.

### A. Insulet faces imminent irreparable harm absent an injunction.

1. By stealing Insulet's trade secrets, EOFlow was able to do "in months and [with] a relatively small amount of money" what "Insulet took 20 years and spen[t] . . . approximately a billion dollars to develop." Appx5. There is no mystery about what comes next: EOFlow has told the world it is trying to attract deep-pocketed commercial partners who can fund global competition with Insulet.

At the time the district court entered the preliminary injunction, the most obvious manifestation of this strategy was EOFlow's imminent merger with Medtronic. *See supra*, pp. 17-18, 22. Medtronic, of course, is one of the world's largest medical-device companies, with a $2.7 billion research-and-development budget and more than 74 million customers spread across the globe. Appx500-501. The district court understood the threat this transaction posed: EOFlow had an immediate path to securing the "money," "regulatory expertise," "marketing expertise," "manufacturing expertise," and "customer support networks" that were "necessary to take" EOFlow from being a "bit player" to being a "worldwide competitor." Appx21; *see also* Appx281-221; Appx499-507.

That threat remains just as live now that the Medtronic merger is suspended. EOFlow's CEO, Jesse Kim, removed any doubt about this during public remarks to investors on December 11, 2023. Kim maintains that Medtronic and EOFlow "remain interested in each other." Appx9946. And even if EOFlow does not consummate a deal with Medtronic, Kim insists that EOFlow has "backup plans"—"Plan B and C and D"—to quickly begin competing with Insulet. Appx9944; Appx9951; *see also* Appx9956-9960. Kim pointed in particular to EOFlow's numerous joint ventures in China, Europe, and the Middle East; EOFlow's partnership with a company called Changsha Sinocare, for example, is apparently "proceeding according to plan" and will allow EOFlow to "make an application for product approval in China soon." Appx9948. The bottom line is that Insulet continues to face the same imminent threat: EOFlow will use commercial partnerships to "go from making devices by hand for the Korean market to being a worldwide competitor." Appx21.

2. Insulet submitted extensive evidence that, if EOFlow's efforts continued unchecked, Insulet would suffer incalculable harm. Indeed, the record before the district court showed that the harm had already begun. Insulet's stock lost nearly a quarter of its value within months of

Medtronic and EOFlow announcing their deal, because analysts pre-dicted that Insulet would face serious headwinds from their competing patch pump. Appx502-503.

The evidence showed that the harm would soon have become irrep-arable. If allowed to "enter[] the market to compete with" Insulet using "Insulet's intellectual property," EOFlow would "have effectively snapped a chalk line just months behind where Insulet stands today as opposed to twenty years back." Appx219. That "entrance of a competitor that can price its product without the burden of prior investment and indebted-ness w[ould] act as a one-way ratchet on pricing that Insulet can de-mand." Appx219. And while Insulet is poised to take market share away from Medtronic's existing "laggard" product, a replacement product that copies the Omnipod's success would foil "Insulet's unique present position to win customers." Appx220-221.

Insulet would also face steep challenges attracting investor support at the very moment competitive pressure would be drastically increased, a harm that is "particularly severe and heightened due to the fact that Insulet is, essentially, a one-product company." Appx503-505. This squeeze on Insulet's access to additional capital would come at a critical

moment: after years of reinvesting in the company and developing its single product (while shouldering debts that remain well over $1 billion), the company has only recently begun to turn a profit. Appx219-220; Appx505. No dollar figure could erase these harms and restore the current status quo, under which Insulet is a market leader with an unrivaled product. Appx220-221; Appx502-504; Appx507.

3.    The district court correctly determined that this showing satisfied the standard for irreparable harm, "particularly" given "the evidence of likely success on the merits is strong." Appx21; *see EEOC v. Astra U.S.A., Inc.*, 94 F.3d 738, 743 (1st Cir. 1996) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm[.]"). The harms Insulet identified to the district court—"likelihood of price erosion and loss of market position," "loss of revenue, goodwill, and research and development," and "loss of market opportunities"—are classic forms of irreparable harm. *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-1362 (Fed. Cir. 2008) (collecting authority). And the case for irreparable harm is even stronger when the threat is against a company's "flagship[] product." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

### B. EOFlow identifies no valid basis to second-guess the district court's assessment of harm.

#### 1. Insulet sought a preliminary injunction in a timely fashion.

EOFlow argues (Br. 47-50) that the district court should have discounted Insulet's evidence of harm because, EOFlow says, "Insulet waited *over five years* to assert its trade secrets." As discussed above, however, once Insulet had cause for suspicion, it moved quickly. *See supra*, pp. 16-18.

The district court found, based on substantial evidence, that the "first indication" of Insulet's "suspicion of copying" appeared in a competitive intelligence report that Insulet prepared in December 2022. Appx18; *see* Appx2465. Following that report, Insulet worked diligently to obtain a physical sample of the EOPatch. *See supra*, pp. 14-16. After Insulet secured the product and conducted a tear-down analysis, litigation immediately followed: Insulet sued EOFlow in Germany in February 2023, quickly obtaining a preliminary injunction. *See supra*, p. 17. Then, when it became clear that EOFlow was poised to divulge Insulet's secrets to Medtronic, Insulet brought this suit and sought the emergency relief now at issue. *See supra*, pp. 17-18.

Like its statute-of-limitations argument, EOFlow's diligence argument turns primarily on events surrounding the 2018 trade show. *See* EOFlow Br. 48-49. But the district court correctly rejected EOFlow's characterization of events:

> [C]ould Insulet at that point have filed for a preliminary injunction? I think the answer to that is no. What would it say? This product looks like ours from the outside and our former R & D head is working there? That is certainly not enough to state a claim. One wonders what inquiry could it have undertaken? The product was not for sale, it was likely a prototype.

Appx15-16 (paragraph break omitted). EOFlow identifies no clear error in these findings.

EOFlow's discussion of the events of 2019 to 2022 is similarly flawed. EOFlow says (Br. 49) that Insulet "recei[ved]" an "overview" of EOFlow's product in 2019. But the evidence shows only that Insulet *requested* such an overview. *See* Appx1065-1068. And there is no reason why "a non-confidential overview of EO Flow" (Appx1065) would have tipped Insulet off to EOFlow's wrongful conduct in any event. EOFlow also points (Br. 49) to an "internal review" of EOFlow that Insulet prepared in March 2021. Again, though, there was "nothing in the document" reflecting "an awareness o[r] even a suspicion that Insulet's trade secrets were being used," and there was "no real reason for Insulet to

have thought otherwise" at the time. Appx17; *see supra* pp. 15, 32.

EOFlow's discussion (Br. 49) of a "2021 Investor Relations presentation"

fails for similar reasons: no one reading the presentation would have a

reason to suspect EOFlow of misappropriation. EOFlow argues (Br. 10-

11) that the presentation "reveal[ed] EOPatch 2's internal components,"

but the only component discussed—the device's actuator—is the main

component that *differs* from Insulet's product. *See* Appx16; *see supra*, pp.

39-40. In short, the district court did not clearly err in rejecting EOFlow's

assertions of unreasonable delay.

## 2. The types of harm that Insulet faces qualify as immediate and irreparable.

EOFlow next argues (Br. 51-54) that Insulet does not face the types

of immediate and irreparable harm that can justify a preliminary injunc-

tion. But EOFlow's arguments misapply the case law and minimize the

likely consequences of its wrongful conduct.

As the district court explained, there is "a great deal of case law"

recognizing that the sorts of harms at issue here—drastic damage to its

pricing, customer base, and investor support—qualify as irreparable.

Appx21; *Abbott Labs.*, 544 F.3d at 1361-1362 (citing cases); *see supra*, pp.

57-60. EOFlow does not attempt to address that case law or to show how

the district court's decision to credit Insulet's evidence amounted to clear error. Instead, EOFlow cites cases (Br. 51-52) where the evidence suggested that the plaintiff "might lose some insubstantial market share" or where there was an outright "lack of evidence" of irreparable harm. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324-1325 (Fed. Cir. 2012); *see also Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1344-1348 (Fed. Cir. 2006); *Oxford Immunotec Ltd. v. Qiagen, Inc.*, 271 F. Supp. 3d 358, 368 (D. Mass. 2017). The facts of this case are a far cry from those instances of "insubstantial" harm.[11]

EOFlow also makes the remarkable argument (Br. 52-53) that because it inflicted *past* harm on Insulet, it cannot be enjoined from inflicting even greater *future* harm. That is obviously wrong. The cases that EOFlow cites show that when a harm is *entirely* past, an injunction may be inappropriate. *See United States v. Booz Allen Hamilton Inc.*, No. 22-cv-1603, 2022 WL 16553230, at *2 (D. Md. Oct. 31, 2022) (declining to

---

[11] EOFlow also relies (Br. 52) on copyright cases in which the plaintiff knew of infringing competition for years but only asked for an injunction after the defendant was acquired and there was some increase in competition. *See Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996); *Bourne Co. v. Tower Recs., Inc.*, 976 F.2d 99, 100 (2d Cir. 1992). As discussed above, however, Insulet did not delay in bringing suit or seeking an injunction. *See supra*, pp. 31-35, 61-63.

enjoin merger after it had closed); *Bridgeview Bank Grp. v. Meyer*, 49 N.E.3d 916, 923 (Ill. App. 2016) (denying injunction because there was no "indication that the threat of [the defendant's] use or disclosure of confidential information was ongoing"). But it does not follow that, because Medtronic may have already seen some of Insulet's trade secrets in diligence, the district court was powerless to prevent EOFlow from sharing that information with others or bringing its stolen product into the global markets. To the contrary, because the complained-of conduct is "ongoing," evidence that Insulet has already suffered harm *supports* a finding that more will follow absent an injunction. *E.g.*, *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1405 (Fed. Cir. 2022).

Reversing course, EOFlow argues (Br. 53-54) that the threatened harms are too far out in the future because, EOFlow says, it is not "close to marketing a product in the United States." But according to the company's CEO, EOFlow's preparations to launch in other major markets are "proceeding according to plan," and the company is publicly touting multiple pathways to commercialize its product globally. *See supra*, p. 58. Even in the United States, EOFlow applied for regulatory clearance in December 2022. Appx100-101 (¶11). Although it has withdrawn that

application for the time being, Appx1750, that hardly suggests that the threat of future harm is "dormant" or "indefinite," as it was in the cases that EOFlow cites (Br. 53-54). *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992) (no imminent harm given unrebutted testimony that defendant's plans were completely "dormant"); *Macchione v. Coordinator Adm'r*, 591 F. App'x 48, 50 (3d Cir. 2014) (plaintiff "provided no detailed factual allegations whatsoever" of imminent harm and "conceded" facts undercutting any such assertion).

## III. The district court did not abuse its discretion in finding that the balance of equities and public interest support an injunction.

Insulet faces destruction of its hard-earned market position; EOFlow faces a limitation on its ability to profit from theft. The district court did not abuse its discretion in finding that the former hardship easily trumps the latter.

### A. The equities support the injunction.

1. As the district court recognized, the difference in harms the parties faced is stark. On the one hand, there is "strong" and "very substantial evidence" that Insulet was "a victim of the theft of its trade secrets," Appx5; Appx22; *see supra*, pp. 37-56, and will face imminent

irreparable harm in the absence of an injunction, *see supra*, pp. 56-66, 28.[12]  On the other hand, if an injunction issued, EOFlow would lose only the "opportunity to capitalize on [its] misappropriation."  Appx22.  The district court weighed these hardships and readily found that the equities "favor[] the issuance of a preliminary injunction."  Appx22.  That "balancing of equities" is "afford[ed] considerable deference," *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 486 (1st Cir. 2009), and there is nothing to suggest an abuse of discretion here.

To the contrary, the district court's balance-of-equities determination flows directly from precedent.  As this Court has recognized, where the plaintiff faces "erosion of markets, customers, and prices" that "is rarely reversible," and the defendant's purported "harms were almost entirely preventable and were the result of its own calculated" violation of property rights, the proper course is to "preserv[e] the status quo" and thereby "preserve[] the current market structure" until the claim is

_____

[12] EOFlow complains (Br. 55) that this finding of harm is tied to the likelihood-of-success determination, but courts *always* balance the equities "in view of the likelihood that [the plaintiff] will succeed" and evidence of irreparable harm.  *Abbott Labs.*, 544 F.3d at 1362.

resolved. *Abbott Labs.*, 544 F.3d at 1362 (quotation marks omitted). That is what the district court did here.

2. EOFlow's efforts to re-weigh the balance of equities in its favor fail.

EOFlow starts by taking one last shot at its timing argument, claiming (Br. 56) that "the district court failed to consider Insulet's delay in acting to protect its alleged trade secrets when considering the equities." As discussed above, however, the district court considered EOFlow's delay argument at length when analyzing irreparable harm and properly concluded it lacked merit. Appx12-22; *see supra*, pp. 35-37.[13]

EOFlow next complains (Br. 56-57) that "the district court consistently and expressly disregarded harm to EOFlow" and speculates that the injunction will drive it out of business. In fact, the district court

_____

[13] EOFlow's citations on this point only confirm that there was no delay affecting the equities. In the cases EOFlow cites (Br. 56), the plaintiffs waited to move for an injunction until just before government services were to be administered—even though the services were critical to the public and the plaintiffs knew they had been scheduled long ago. *See Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021); *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010).

*listened* to EOFlow when it argued that the original injunction's blanket ban on manufacturing and sales would "likely send EOFlow into bankruptcy within weeks": the court modified the injunction to permit continued sales of the EOPatch to existing patients. Appx9879 (emphasis omitted); *see* Appx40-41 (¶¶10-12). EOFlow represented that maintaining the revenue stream it has from "operating at current volumes" would be enough to keep it afloat. Appx9880. EOFlow's argument now that the *entire* injunction must be vacated for it to survive is implausible.

Regardless, the district court was right not to give any further weight to EOFlow's complaints. The case law is clear that "harms" like these that are "almost entirely preventable and [a]re the result of [the defendant's] own calculated" violation of the law should not significantly affect the equities. *Abbott Labs.*, 544 F.3d at 1362; *see Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 916 (1st Cir. 1989). Similarly, "[s]mall parties have no special right to" misappropriate intellectual property "simply because they are small," and "the fact that" a defendant may be "small and could be put out of business if a preliminary injunction issues does not insulate it from the issuance of a preliminary injunction if the

other three preliminary injunction factors are sufficient to tip the scale in [the plaintiff's] favor." *Bell & Howell Document Mgmt. Prod. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997) (quotation marks omitted). Given Insulet's powerful showing on the other preliminary-injunction factors, threats to EOFlow's future arising directly from its own brazen theft of trade secrets cannot change the analysis.[14]

## B.     The public interest supports the injunction.

The district court reasoned that the public interest cuts in neither party's favor. Appx22. That was, if anything, too solicitous to EOFlow. An injunction here vindicates the public's strong interests in protecting intellectual-property rights. *See, e.g.*, *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Accordingly, like the others, this factor supports the injunction.

---

[14] The authorities EOFlow cites (Br. 56-57) are consistent with this conclusion. In those cases, the plaintiff made a weak showing on other preliminary-injunction factors, so the threat of insolvency to the defendant reinforced the impropriety of injunctive relief. *See Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113 (4th Cir. 1993); *RE/MAX of New England, Inc. v. Prestige Real Est., Inc.*, No. 14-cv-12121, 2014 WL 3058295, at *4 (D. Mass. July 7, 2014); *Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.*, 24 F. Supp. 2d 120, 125 (D. Mass. 1998).

At the very least, EOFlow has no basis to argue that the public interest weighs *against* an injunction. EOFlow suggests (Br. 57-58) that, because the restrictions on manufacturing and sales went beyond what Insulet originally requested, there was no chance for the parties to focus their briefing on "the public's interest in having a choice of medical devices." That is wrong. From its very first opposition brief, EOFlow argued that an injunction would harm "the public health" by restricting access to patch pumps. Appx819. When the district court previewed the language of the injunction, EOFlow turned down the opportunity to comment on it. Then, after the district court entered the injunction, EOFlow moved to modify it, arguing that an across-the-board restriction on sales and manufacturing would harm existing patients. Appx9876; Appx9878-9879. The district court responded by permitting continued sales of EOFlow's device to those patients. Appx40-41 (¶¶10-12). In short, the court decided that the public interest justified allowing continued access for EOFlow's current patients, who are largely in Korea (where Insulet does not currently operate), but blocking EOFlow from entering new markets and competing directly against Insulet. "[E]liminating a choice of drugs is not, by itself, sufficient to disserve the public interest"; if it were,

"courts could never enjoin a drug." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017). More is required: a demonstration that the other factors generally do not support an injunction, together with evidence that the public health is *under threat* without access to the *specific* product being enjoined.[15] EOFlow has not made that showing.

## CONCLUSION

The Court should affirm the preliminary injunction.

---

[15] Once again, EOFlow's own cases (Br. 58) make that clear. *See, e.g.*, *ICU Med. Inc. v. Alaris Med. Sys., Inc.*, No. 04-cv-689, 2004 WL 1874992, at *26 (C.D. Cal. July 30, 2004) (weak showing on other injunction factors and finding that "sudden withdrawal of [the allegedly infringing] devices from the hospitals that rely upon them could seriously disrupt the surgical practices at those hospitals"); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, No. 08-cv-788, 2008 WL 11338115, at *4 (C.D. Cal. May 14, 2008) (weak showing on injunction and finding that the "supply [of the product] is limited and patients may need a replacement").

February 6, 2024

Respectfully submitted.

/s/ *Robert D. Carroll*

William M. Jay
Jenny J. Zhang
Matthew Ginther
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000

Robert D. Carroll
Robert Frederickson III
Gerard J. Cedrone
William E. Evans
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Alexandra D. Valenti
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 459-7351

*Counsel for Insulet Corporation*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b), it contains 13,802 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Office 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

February 6, 2024                    /s/ *Robert D. Carroll*