# United States Court of Appeals for the Federal Circuit

---

INSULET CORPORATION,

*Plaintiff-Appellee*,

v.

EOFLOW CO., LTD .; EOFLOW, INC.,

*Defendants-Appellants,*

—and—

STEVEN DIIANNI; LUIS J. MALAVE; IAN G. WELSFORD; JESSE J. KIM; FLEXTRONICS MEDICAL SALES AND MARKETING LTD.;

*Defendants*.

---

On Appeal from the United States District Court
for the District of Massachusetts (No. 1:23-cv-11780-FDS) (Saylor, J.)

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

LOWELL D. MEAD
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304

ELIZABETH M. FLANAGAN
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402

ADAM S. GERSHENSON
KIMBERLEY A. SCIMECA
COOLEY LLP
500 Boylston Street
Boston, MA 02116
(617) 937-2300

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001

*Counsel for Defendants-Appellants EOFlow Co., Ltd. and EOFlow, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................1

ARGUMENT .................................................................................3

I.   The District Court Erred in Analyzing Likelihood of Success
     on the Merits. ....................................................................3

     A.   Insulet's DTSA Claim Is Time-Barred. ...............................3

          1.   Insulet Wrongly Contends the District Court "Adequately"
               Considered the DTSA's Statute of Limitations. .....................4

          2.   Insulet's Opposition Brief Fails to Overcome the Caselaw
               Showing Its Claim Is Time-Barred. ...............................6

     B.   The District Court Erred in Analyzing Whether Insulet's
          Information Qualifies for Trade Secret Protection. ...................11

          1.   The District Court Failed to Analyze Whether Insulet Has
               Identified Specific Trade Secrets. .................................11

          2.   The District Court Erred in Analyzing Whether Insulet
               Took "Reasonable Measures" to Protect
               Alleged Trade Secrets. ..............................................16

          3.   The District Court Committed Legal Error in Its Reverse-
               Engineering Analysis. ...............................................19

II.  Insulet Failed to Show a Significant Risk of Irreparable Harm. ..................23

III. The Balance of the Equities and the Public Interest Weigh Against
     Preliminary Injunctive Relief. ....................................................26

IV.  This Court Should Vacate the Preliminary Injunction. ..............................28

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Lab'ys v. Andrx Pharms., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) ..........................................................26

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
707 F.3d 1318 (Fed. Cir. 2013) ..........................................................21

*Alpha Pro Tech, Inc. v. VWR Int'l, LLC*,
2017 WL 3671264 (E.D. Pa. Aug. 23, 2017) ....................................20

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017) ..........................................................27

*AnywhereCommerce, Inc. v. Ingenico Inc.*,
665 F. Supp. 3d 181 (D. Mass. 2023) ...........................................6, 7, 8

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) ..........................................................25

*Automated Merch. Sys., Inc. v. Crane Co.*,
357 F. App'x 297 (Fed. Cir. 2009) .....................................................29

*Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*,
2016 WL 4472943 (D. Minn. Aug. 24, 2016) ....................................19

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of
City of Bos.*,
996 F.3d 37 (1st Cir. 2021)..................................................................27

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) .................................................................23

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
920 F.3d 560 (8th Cir. 2019) .........................................................5, 11

*Doe v. Trs. of Bos. Coll.*,
942 F.3d 527 (1st Cir. 2019)...............................................................29

*Dynamics Rsch. Corp. v. Analytic Scis. Corp.*,
  400 N.E.2d 1274 (Mass. App. Ct. 1980) ........................................................19

*Flotec, Inc. v. S. Rsch., Inc.*,
  16 F. Supp. 2d 992 (S.D. Ind. 1998) .............................................................21

*Iconics, Inc. v. Massaro*,
  266 F. Supp. 3d 449 (D. Mass. 2017) ...........................................................14

*Klevisha v. Provident Funding Assocs. L.P.*,
  128 F. Supp. 3d 399 (D. Mass. 2015) ...........................................................24

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ..........................................................................20

*Maxpower Corp. v. Abraham*,
  557 F. Supp. 2d 955 (W.D. Wis. 2008) .........................................................18

*Medtronic Minimed, Inc. v. Nova Biomedical Corp.*,
  2008 WL 11338115 (C.D. Cal. May 14, 2008)...............................................28

*MGA Entertainment, Inc. v. Mattel, Inc.*,
  41 Cal. App. 5th 554 (2019) ......................................................................9, 11

*Moore v. Marty Gilman, Inc.*,
  965 F. Supp. 203 (D. Mass. 1997) ................................................................22

*Neogen Corp. v. Innovative Reprod. Tech., LLC*,
  2022 WL 14656787 (S.D. Iowa June 14, 2022)..............................................21

*Neural Magic, Inc. v. Meta Platforms, Inc.*,
  2023 WL 2383172 (D. Mass. Mar. 6, 2023) ...................................................16

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
  287 F.3d 1 (1st Cir. 2002)..........................................................................6, 29

*Norman v. Elkin*,
  860 F.3d 111 (3d Cir. 2017) ...........................................................................9

*Olaplex, Inc. v. L'Oreal USA, Inc.*,
  855 F. App'x 701 (Fed. Cir. 2021) ................................................................22

*Oxford Immunotec Ltd. v. Qiagen, Inc.*,
  271 F. Supp. 3d 358 (D. Mass. 2017) ................................................24

*Parexel Int'l LLC v. Signant Health Holding Corp.*,
  2023 WL 2938073 (D. Mass. Apr. 13, 2023) .......................................5

*Pie Dev., LLC v. Pie Ins. Holdings, Inc.*,
  2023 WL 2707184 (5th Cir. Mar. 30, 2023) (per curiam)
  (unpublished) ........................................................................17

*Prairie Field Servs., LLC v. Welsh*,
  497 F. Supp. 3d 381 (D. Minn. 2020) .................................................19

*Respect Maine PAC v. McKee*,
  622 F.3d 13 (1st Cir. 2010) ..............................................................27

*Roboserve, Ltd. v. Tom's Foods, Inc.*,
  940 F.2d 1441 (11th Cir. 1991) ........................................................22

*Torrens v. Lockheed Martin Servs. Grp.*,
  396 F. 3d 468 (1st Cir. 2005) ...........................................................10

*United Steelworkers of Am., AFL-CIO-CLC v. Auchter*,
  763 F.2d 728 (3d Cir. 1986) .............................................................19

*UPI Semiconductor Corp. v. Int'l Trade Comm'n*,
  767 F.3d 1372 (Fed. Cir. 2014) ........................................................21

*Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*,
  645 F.3d 26 (1st Cir. 2011) ..............................................................25

*Walker Mfg., Inc. v. Hoffmann, Inc.*,
  261 F. Supp. 2d 1054 (N.D. Iowa 2003) .......................................20, 21

*Welter v. Med. Pro. Mut. Ins. Co.*,
  2023 WL 2988627 (D. Mass. Feb. 23, 2023) ....................................15

*Winnett v. Caterpillar, Inc.*,
  609 F.3d 404 (6th Cir. 2010) ..............................................................4

# TABLE OF AUTHORITIES
(continued)

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)......................................................................26, 27

*XpertUniverse Inc. v. Cisco Sys., Inc.*,
  597 F. App'x 630 (Fed. Cir. 2015) ..................................................15

**Statutes**

18 U.S.C. § 1839 ...........................................................................14, 20

**Rules**

Federal Rule of Civil Procedure 65 .......................................................13

**Other Authorities**

Nat'l Libr. Med., *2018 Diabetes Technology Meeting Agenda*
  (Nov. 11, 2018), https://bit.ly/3UQJVzO ..........................................10

<u>**PRELIMINARY STATEMENT**</u>

EOFlow's opening brief demonstrated that this case presents three issues for decision. ***First***, did the district court commit legal error when it held Insulet's claim "likely to succeed" without even addressing that the claim was untimely? ***Second***, did the district court commit legal error when it imposed a definition of trade secrets that contravenes statutory requirements and Supreme Court law, and sweeps in (and beyond) any document Insulet ever marked confidential? ***Third***, did the district court commit legal error when it skipped the balance of harms and public interest and thus failed to analyze all four elements required to impose injunctive relief? Opening Br. 4. EOFlow's opening brief demonstrated that the answer to each question is yes.

Insulet's brief answers none of the questions. Instead, Insulet seeks to show that the district court committed no error simply *by quoting the district court*. That approach begs the question(s).

On each point, Insulet's opposition elides or ignores the essential issue. On the threshold question of whether Insulet timely brought its claim—a prerequisite for finding likelihood of success—the opposition cannot erase the district court's own pronouncement that it "express[ed] no opinion" on that dispositive issue. Appx15. As for the definition of trade secrets, Insulet's opposition cites to eight purported "categories" of trade secrets, but does not and cannot defend the actual

Order at issue, which swept far beyond any such categories. Nor does Insulet defend the district court's cursory treatment of the equities and the public interest. Instead, Insulet argues that the district court's (erroneous) finding of a likelihood of success—based not on any analysis of the technical information at issue, but instead predicated on some former employees' retention of documents a decade ago—obviates the need to weigh the balance of harms or the public's interest in keeping a working medical device on the market.

This case has never been about information. It has always been about *competition*. That is why Insulet failed to take action for years, even after learning EOFlow had hired former Insulet employees and publicly displayed a "strikingly similar" product, until it appeared EOFlow would be acquired by Medtronic. Insulet and the district court sing from the same hymnal, contending contrary to law and sensible public policy that if a competitor is relatively small, a trade secret plaintiff can wait for years without even sending a cease-and-desist, allow the defendant to invest tens of millions of dollars, then spring a lawsuit to kneecap a rival and successfully claim imminent harm. Even if this were the law, which it is not, the suit has already eradicated any such harm—the acquisition has been canceled.

Insulet's opposition signals a recognition that the Order cannot stand but contends the draconian injunction should nonetheless remain in place. Appellee's Brief ("Opp.") 37 n.7. Here and elsewhere, Insulet's argument relies on

misdirection. For example, Insulet represents that the Order allows EOFlow to "sell the device to its existing customers in Korea and the European Union." Opp. 25. But Insulet does not disclose that it has moved the district court to extinguish those rights, even in jurisdictions where Insulet does not operate, and where insulin patch pump patients—particularly children—have no alternative. EOFlow today is the same "bit player" it was during all the years that Insulet sat on its hands and saw no reason to sue. The company is not a "worldwide competitor," *id.*, mass producing as Insulet does millions of devices a month. EOFlow is a company that hand-builds life-changing devices for a few hundred patients in need. The harm to EOFlow that the district court ignored has been fully realized, and there is no imminent harm to Insulet, much less harm that could not be addressed by money damages. If the Court answers the questions presented in accordance with the law and the facts, the district court's ruling will be reversed, and its Order vacated.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN ANALYZING LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Insulet's DTSA Claim Is Time-Barred.

EOFlow's opening brief demonstrated that Insulet was on inquiry notice more than three years before filing suit. Opening Br. 21-25. The DTSA's three-year statute of limitations explicitly adopts the inquiry notice standard, and a wealth of case law holds that seeing a competitor's "strikingly similar" product at a trade show,

as Insulet *admits* it did five years before filing suit, *see* Opp. 14-15; Appx97, starts that clock. Had the district court analyzed the issue, that alone would have ended the matter because "time-barred claims necessarily have no chance of success." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). Instead, the district court declined to perform the analysis and offered "no opinion" on this dispositive point. Appx15.

Insulet does not dispute the issue is dispositive. Instead, Insulet distorts the lower court's ruling and the record, and cites *zero* cases suggesting its claim is timely. Opp. 31-37. Insulet's arguments lack both candor and merit.

### 1. Insulet Wrongly Contends the District Court "Adequately" Considered the DTSA's Statute of Limitations.

While the district court "expressed no opinion about the accrual of the statute of limitations" and explicitly held it was "not the issue" decided, Appx15, Insulet now suggests the court's analysis of delay relevant to irreparable harm can somehow substitute for the dispositive statute-of-limitations analysis the district court failed to conduct, Opp. 37. But the inquiries are different—even Insulet admits "the question of diligence is distinct from the application of the statute of limitations." Opp. 35-36. The district court recognized these were distinct analyses, but performed *only* the analysis into irreparable harm, which, the court stated, does *not* weigh "inquiry notice" but instead looks only "into the immediate future." Appx12-13. The district court stated the statute of limitations was "not the issue here," Appx15, because that

analysis, essential to likelihood of success, was not one the district court performed.

Apparently aware that the district court failed to consider the DTSA's statute of limitations, Insulet pretends the district court had no opportunity to do so. *See* Opp. 35 n.6. The record stands otherwise. The very first argument in EOFlow's opposition to Insulet's injunction motion squarely addressed the fatal flaw in Insulet's case—the statute of limitations:

> **I.    INSULET HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON THE MERITS**
>
> **A.    Insulet's DTSA Claim Is Time-Barred.**

Appx809-811. EOFlow's brief below cited the very same leading, on-point cases presented to this Court. And, even in its *supplemental* brief—to which Insulet points in a footnote, Opp. 35 n.6—EOFlow not only provided an extensive summary of the facts demonstrating Insulet's delay, Appx1626-1634, but in discussing irreparable harm, *re-raised* the caselaw demonstrating parties who see a similar product at a trade show are also on "inquiry notice" for "accrual of the statute of limitation," Appx1639-1640 (collecting cases).[1] The dispositive statute-of-limitations issue was plainly raised below, and it takes no "chutzpah" to say the district court should have

---

[1] Insulet also wrongly attempts to shift the burden of proof, but plaintiffs have the burden of proving all four preliminary injunction factors, *Parexel Int'l LLC v. Signant Health Holding Corp.*, 2023 WL 2938073, at *3 (D. Mass. Apr. 13, 2023) (collecting cases), and on statutes of limitation, plaintiffs have "the burden of proving the discovery rule tolls application of the statutory bar," *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565 (8th Cir. 2019).

considered it.  Opp 35 n.6.

## 2. Insulet's Opposition Brief Fails to Overcome the Caselaw Showing Its Claim Is Time-Barred.

Insulet's opposition contends this Court should affirm even if "the district court had failed to address EOFlow's statute of limitations defense."  Opp. 37.  But the First Circuit "ordinarily *will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court*."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) (emphasis added) (vacating preliminary injunction).  Vacating the injunction is particularly appropriate here because the record makes plain that Insulet was on inquiry notice of its claim more than three years before filing suit (*i.e.*, before August 3, 2020).  As to the 2018 trade show display, Insulet does not meaningfully address the caselaw holding such displays put a party on inquiry notice.  For example, the *AnywhereCommerce, Inc. v. Ingenico Inc.* court held that a party who saw a "prototype" for an encrypted payment processing system at a "trade show . . . was on notice," even though the attendee "did not physically inspect the product himself."  665 F. Supp. 3d 181, 197, 201 (D. Mass. 2023).  This is so "[r]egardless of when [defendant's] product went on the market," because, from the moment the plaintiff saw the prototype, it "reasonably knew" the other party "had a very similar product such that [the claimant] was on notice then of the potential claim."  *Id.* at 201 (holding DTSA claim "time-barred").

This case, among others EOFlow cited, is on all fours. Insulet's Chief Product and Customer Experience Officer Eric Benjamin attended the 2018 trade show where he saw a product that, in Insulet's words, "bore a stunning resemblance to the Omnipod." Appx2059; *see also* Appx97 (admitting the products were "strikingly similar"). Insulet makes no claim that EOFlow hid anything. To the contrary, Insulet had full notice of EOFlow's "strikingly similar" product *and* that EOFlow had hired Insulet's former President and Head of R&D, Luis Malave. Insulet nowhere disputes that "many" Insulet personnel came to EOFlow's booth to look at the product, where EOFlow's CEO discussed the product with "everybody who visited the booth and got to talk to [him]." Appx1750.

Insulet's opposition argues its attendees could have believed EOFlow's product was only a "look-alike" prototype, Opp. 33, but that *aligns* with the facts of *AnywhereCommerce*; it is in no way a distinction. Insulet's opposition further insists that, contrary to testimony, the product at the trade show was "opaque," Opp. 34, and thus did not expose the actual trade secrets. Such exposure, however, is *not* required to put a party on inquiry notice, and Insulet cites no authority suggesting it is. Requiring a public dissection of a product to trigger inquiry notice would make no sense—if the secrets themselves were publicly exposed, they would no longer be secrets. Insulet's claim that it was not on inquiry notice because the product it viewed was "opaque" is particularly indefensible because Insulet claims its

product's white case is *itself* a trade secret. Appx2589 (identifying Omnipod's "white translucent top housing" as trade secret).

Indeed, case after case has held parties like Insulet are on inquiry notice when they see the similar product at a trade show, regardless of whether inner workings are displayed. Opening Br. 24-25. For example, in *Anywhere Commerce*, the alleged trade secrets concerned "schematics," "design files," and "source code" for an encrypted payment processing system, but what put the party on notice was seeing a similar prototype. 665 F. Supp. 3d at 195-96. There is no requirement that the plaintiff see the asserted secrets inside because, for a reasonable person, seeing "a very similar product" triggers a duty to inquire. *Id.* at 201.

Courts across the country have held likewise. *See* Opening Br. 24 (citing, *inter alia*, *CMI Roadbuilding*, 920 F.3d at 563, 565-66 (affirming claim was time-barred where defendant "advertised at prominent [industry] trade shows" because arguing that a party "could not have discovered that its trade secrets were being misappropriated" ignores "inquiry notice"); *Alamar Biosciences, Inc. v. Difco Lab'ys, Inc.*, 1995 WL 912345, at *4 (E.D. Cal. Oct. 13, 1995) (holding claim time-barred because inquiry notice attached as soon as plaintiff saw defendant's bacterial testing kit at a trade show, even though plaintiff did not know whether defendant was using the trade secret chemical agent, because the kit "looked very much like" plaintiff's approach); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d

1179, 1184, 1186 (11th Cir. 2011) (affirming trade secret claim over manufacturing "tolerances" was time-barred where even the claimant admitted it was on inquiry notice as soon as "first viewed" the defendant's "device at a trade show")).

Insulet attempts to sweep all these cases under the rug by indicating that in those cases the plaintiff's suspicion "generally *predated* the relevant trade show." Opp. 33 & n.4. Insulet nowhere explains why its seeing the "strikingly similar" product (alongside its former Head of R&D, now working for a competitor) *sooner*, rather than later, would lessen its obligation to inquire.[2] The only decision Insulet cites (Opp. 33) in the body of its argument is *Norman v. Elkin*, 860 F.3d 111 (3d Cir. 2017), a nonbinding decision that has nothing to do with this case—it concerns contract, conversion, and fraud claims, not trade secrets or trade shows. Insulet has not pointed to *any* case where a party saw a competitor's strikingly similar product or prototype at a trade show and was deemed *not* to be on inquiry notice.

Following the 2018 trade show, Insulet admits it "constantly watched distributors [and] press releases" with "increased attention" to EOFlow's activities.

---

[2] Insulet's attempt to distinguish *MGA Entertainment, Inc. v. Mattel, Inc.*, 41 Cal. App. 5th 554 (2019), fails. The *MGA* court held that the mere presence of a defendant's representatives at plaintiff's toy fair triggered inquiry notice. When simply seeing a competitor's representatives inspect one's own products is sufficient to trigger inquiry notice, there is no reasonable argument that seeing a competitor's "strikingly similar" product is insufficient. *Id.* at 563-64 (affirming summary judgment that trade secret claim was time-barred).

Appx217.  That "increased attention" reasonably revealed an abundant public record wherein the lookalike EOPatch device received the FDA's January 2019 "Breakthrough Device Designation."  Appx1039.  In addition to EOFlow's awards, announcements, and hiring of Insulet personnel, the two companies made public, side-by-side presentations on their products as early as 2018.  *See, e.g.*, Nat'l Libr. Med., *2018 Diabetes Technology Meeting Agenda* (Nov. 11, 2018), https://bit.ly/3UQJVzO (listing back-to-back presentations on Insulet's "Novel Digital Tubeless Patch Pump" system and EOFlow's "Novel Patch Pump").[3]  Here again, everything was in the open.  EOFlow's presenter was Insulet's former employee that Insulet, five years later, describes as part of "Omnipod Eros's 'core team.'"  Opp. 9.  By any measure, Insulet was on inquiry notice far more than three years before filing suit.

Remarkably, throughout these events, Insulet took none of the basic steps a reasonable party would have pursued.  For example, despite now claiming that its former employees "stole a swath of Insulet's confidential documents," Opp. 1, Insulet does not dispute that it never even asked for the return of company material from DiIanni, Opening Br. 35-36, even though that ostensible breach would have provided ample grounds for a claim years before Insulet filed suit.  Nor did Insulet

---

[3] This "official website of the United States government" is subject to judicial notice. *Torrens v. Lockheed Martin Servs. Grp.*, 396 F. 3d 468, 473 (1st Cir. 2005).

ever ask EOFlow for a sample device. Appx1627-1628 (citing Appx2069); *infra* pp. 16-17. Insulet's decision to forego a meaningful inquiry does not toll the statute of limitations because "[o]nce a plaintiff is on inquiry notice, he is charged with knowledge that a reasonably diligent investigation would have disclosed." *CMI Roadbuilding*, 920 F.3d at 565; *see also MGA*, 41 Cal. App. 5th at 563 (parties "cannot don blinders to avoid the accrual of the statute of limitation").

It is past time to remove the blinders. Insulet's contention that the district court "adequately" addressed the statute of limitations cannot be squared with the district court's colloquy, which did not even state the actual limitations period at issue but instead indicated, "you have three or four or five years, whatever the statutory period is." Appx13. The Court reached "no opinion" on the question of inquiry notice or the statute of limitations, Appx15, and that was legal error.

### B. The District Court Erred in Analyzing Whether Insulet's Information Qualifies for Trade Secret Protection.

#### 1. The District Court Failed to Analyze Whether Insulet Has Identified Specific Trade Secrets.

EOFlow's opening brief demonstrated the district court's Order failed to identify the trade secrets at issue with the requisite specificity. Opening Br. 26-32. The Order was breathtaking in its sweep. Appx36 ¶¶ 3-4 (defining "Trade Secrets" as "any and all Confidential Information of Insulet" taken by defendants "or any other present or former employee or agent of Insulet," or "any information that

contains, derives from, or incorporates such Confidential Information," including "any and all information or materials marked 'confidential' and . . . 'any and all CAD filings, drawings, or specifications, whether or not there were marked 'confidential'"). In other words, the district court held that any information ever retained by anyone across the company's decades of existence, if it were either marked confidential or in any way technical, *and* any information in any way derived from that information, constituted a protectable "trade secret." This was deemed so even though Insulet published widely, put millions of copies of its device in circulation with no restrictions whatsoever, and never sought return of any documents from any individual defendant.

Apparently aware that this ruling is indefensible, Insulet engages in misdirection. The entire focus of Insulet's opposition—that EOFlow is somehow liable for "brazen trade-secret misappropriation" because Insulet let its former employees retain decade-old documents—puts the cart before the horse by presuming, as the district court did, that "any and all" such materials qualified as protectable trade secrets in the first place. Opp. 1. From there, Insulet tries to save its injunction by rewriting the Order, arguing it reached only "eight discrete categories of information." Opp. 41. This revisionist history fails to erase the district court's legal error for three primary reasons.

***First***, "every Order granting an injunction . . . must . . . state its terms

specifically; and describe in reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d). The Order does *not* describe in detail the purported eight categories of information, unless Insulet contends its eight categories match the Order's seven enumerated categories *and* additionally encompass every other purportedly confidential document the company ever had. But even this fails because Insulet's "eight categories" (as briefed) do not correspond to the seven categories listed in the much broader Order. *Compare, e.g.*, Appx6 (specifying that "[t]he eight categories are failure modes and effects analyses; cannulus seal design and manufacturing; reservoir; bubble channel; spin coating of the silicon or a lubricant; leak testing of the housing; field sensing occlusion algorithm; and exterior surface finish of the tube nut"), *with* Appx35-37 (enjoining all "design drawings," "manufacturing and quality-control instructions," "revision histories and failure modes for each component design," "bills of materials and lists of vendor pricing and capabilities," "process-validation procedures," "specifications for device software," and "Failure Modes Effects Analyses and Safety Assurance Case," in addition to "any and all" of the information described above).

The district court's overreach stemmed from another fundamental legal error—the decision to award this all-encompassing injunction while *declining* to define the trade secrets at issue. The district court explicitly and erroneously held it would not find "the precise the number or contours of the trade secrets at issue,"

Appx6, a prerequisite to issuing any injunction.

**Second**, the district court legally erred by conflating the types of materials that *can be* trade secrets—"all forms and types of financial, business, scientific, technical, economic, or engineering information"—with a conclusion that any such materials *are* trade secrets. 18 U.S.C. § 1839(3); *see* Opening Br. 26-32. Insulet doubles down on this error, arguing the Order should be affirmed because Insulet named "categories" of information that "fall within the DTSA's ambit." Opp. 41. That is not the law. *See, e.g.*, *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 452 (D. Mass. 2017) (holding that even if "any formula, pattern, [or] device" could be a trade secret, that is insufficient to justify protection because "a trade secret must be a secret; '[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret'" (quoting *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 260 N.E.2d 723, 729 (Mass. 1970))).

The DTSA does not blindly and expansively "extend[] protection to *all forms and types*" of information as Insulet emphasizes in defending the decision below. Opp. 41 (quotations omitted). Instead, the statute codifies the bedrock requirement that, to be protectable, information cannot be "generally known" or "readily ascertainable." 18 U.S.C. § 1839. Insulet's opposition includes one sentence claiming its expert and "internal engineer" described purported secrets, Opp. 42, but ignores that the district court had, and never addressed, 153 pages of expert

declarations demonstrating how every "trade secret" was publicly known through patents, the unprotected product itself, scores of publications, and publicly available Omnipod "tear down" videos. Appx822-887; Appx1360-1454; *see also* Appx1661-1677.

The court never analyzed these public disclosures and instead wrongly held it need not find, or even examine, "the number and contours of the trade secrets at issue," so long as the categories Insulet invoked fell within the "ambit" of the DTSA. Opp. 41, 52. While the district court was understandably pressed for time, this Court should not create a dangerous precedent by affirming an injunction in a trade secret case that never adequately defined the trade secrets. *See, e.g.*, *XpertUniverse Inc. v. Cisco Sys., Inc.*, 597 F. App'x 630, 640 (Fed. Cir. 2015) ("The trade secret must be described with sufficient particularity to separate it from matters of general knowledge in the trade.")

*Third*, Insulet's opposition nowhere addresses the many cases holding that "the mere fact that information is pertinent to someone's trade or business and that it may also be 'confidential,' or 'secret,' does not mean it constitutes a 'trade secret' [under] the . . . DTSA." *Welter v. Med. Pro. Mut. Ins. Co.*, 2023 WL 2988627, at *15 (D. Mass. Feb. 23, 2023) (dismissing DTSA claim); *see* Opening Br. 28-29 (collecting cases). Unable to distinguish these cases, Insulet proclaims them somehow "irrelevant" in a footnote, Opp. 53 n.10, and provides *no* cases whatsoever

blessing the district court's approach of issuing an order that wrongly defines "Trade Secrets" as "any and all Confidential Information." Appx36. Insulet fails to explain why this Court should nonetheless affirm. It should not.

### 2. The District Court Erred in Analyzing Whether Insulet Took "Reasonable Measures" to Protect Alleged Trade Secrets.

EOFlow's opening brief demonstrated that the district court erred in analyzing whether Insulet took the necessary reasonable measures required by law to assert trade secret protection. Opening Br. 32-37. Insulet's opposition brief parrots back the district court's conclusion on this point, but that is not the same as demonstrating the opinion was right. It was not.

It is well settled that "actions taken after the alleged misappropriation are relevant to whether information can be properly categorized as a trade secret and whether it was ever valued to begin with." *Neural Magic, Inc. v. Meta Platforms, Inc.*, 2023 WL 2383172, at *22 (D. Mass. Mar. 6, 2023). The district court did not consider *any* of Insulet's actions—or inactions—after the alleged misappropriation. And Insulet's opposition brief does not address, much less cure, this legal error.

The record shows that Insulet did *nothing* after its employees allegedly left the company with documents in 2010 and 2015. Appx102-103. After seeing EOFlow's "strikingly similar" device and tracking EOFlow's hiring of Insulet personnel, regulatory approvals, and distribution agreements, Insulet still did nothing. For example, Insulet took no measures whatsoever, including sending a

cease-and-desist, after it received an EOFlow investor presentation in May 2021 from Malave, which (a) announced EOFLow "is the sole competitor to Insulet in the wearable disposable insulin pump market"; (b) showed the products' nearly identical dimensions; (c) highlighted the roles of Malave and Welsford; and (d) showed the inner workings of EOPatch2, with images showing not only the "actuator," but also elements that Insulet now claims are "trade secret." Appx1011-1041; *see Pie Dev., LLC v. Pie Ins. Holdings, Inc.*, 2023 WL 2707184, at *3 (5th Cir. Mar. 30, 2023) (per curiam) (unpublished) (affirming that where defendant promoted its business at a trade show," a plaintiff who "waited two years without sending any cease-and-desist letter . . . cannot now assert a claim"). The district court did not analyze Insulet's failure to take reasonable measures after the alleged misappropriation, and Insulet has offered no defense of that legal error.

Even as to measures taken *before* the alleged misappropriation, Insulet merely recites the district court's offhand statement that "[d]ocuments were marked confidential, employees were required to sign nondisclosure or confidentiality agreements, systems were password protected, and the like." Opp. 43 (quoting Appx5-6).[4] This is insufficient, including because the district court did not tie the

---

[4] Insulet again misrepresents the record by claiming EOFlow did not adequately address "reasonable measures" below. Opp. 43 n.8. Insulet once again points to supplemental briefing, but even there, EOFlow's brief argued that "Insulet Has Not Used Reasonable Measures to Protect Its Trade Secrets." Appx1677-1678. And in

measures to the asserted trade secrets, finding only that boilerplate steps were taken "as to some substantial set of information." Appx5. Insulet claims the district court saved this error by stating it would "return . . . in a moment" to what the trade secrets are. Opp. 4. But when it returned to the issue, the district court held it would *not* find the "number and contours of the trade secret," and thus did not link the measures Insulet had purportedly taken with the trade secrets at issue. Appx6; *see Maxpower Corp. v. Abraham*, 557 F. Supp. 2d 955, 961 (W.D. Wis. 2008) ("It is not enough simply to restrict access to the facility and require passwords; these are normal business practices in any business. An employer must use additional measures to protect the confidentiality of information he considers to be a trade secret.").

Nor does the mere invocation of a confidentiality agreement suffice when the record shows that, in practice, Insulet's materials were not protected. Insulet does not dispute that its former employee, DiIanni, was able to keep hundreds of "confidential" Insulet documents, *see* Appx1915, Appx1921, or that Insulet never reminded DiIanni of his confidentiality obligations or asked that he return or destroy any documents retained when he left the company, Opening Br. 35-36; *see* Opp. 46. Indeed, while Insulet contends that DiIanni had a duty to return company documents—on the basis of an *unsigned* separation agreement, Opp. 46 (citing

---

its opening brief opposing Insulet's motion, EOFlow also argued at length that "Insulet Has Not Taken the Required Reasonable Measures." Appx816-817.

Appx9644-9648)—Insulet identifies no evidence it took any measures to enforce

such requirements at all.  *See, e.g.*, *Berkley Risk Adm'rs Co., LLC v. Accident Fund*

*Holdings, Inc.*, 2016 WL 4472943, at *3 (D. Minn. Aug. 24, 2016) (denying

injunction for lack of reasonable measures because "routinely disregarded" security

policies reveal a "trade secret" claim as merely a "post hoc" litigation strategy);

*Dynamics Rsch. Corp. v. Analytic Scis. Corp.*, 400 N.E.2d 1274, 1287 (Mass. App.

Ct. 1980) (affirming denial of injunction under precedents that "inadequate

precautions did not warrant relief and none was granted, though the defendant had

signed an agreement not to disclose trade secrets").

Finally, Insulet attempts to treat its mere use of log-ins with passwords as a

sufficient measure to protect "years of work and hundreds of millions of dollars."

Opp. 6, 47.  But "[i]f a basic computer-login password were enough, then every

document stored on a company device would potentially be protectable." *Prairie*

*Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 397 (D. Minn. 2020).  That is not

the law, but it is what the district court erroneously ordered, and what Insulet asks

this Court to affirm.

### 3. The District Court Committed Legal Error in Its Reverse-Engineering Analysis.

EOFlow's opening brief demonstrated that under Supreme Court law and the

DTSA, information that "is determinable by reverse engineering" is not entitled to

trade secret protection. *United Steelworkers of Am., AFL-CIO-CLC v. Auchter*, 763

F.2d 728, 740 (3d Cir. 1986); *see* 18 U.S.C. § 1839(3)(B), 6(B) (providing that information cannot qualify for trade secret protection if it is "readily ascertainable through proper means," including "reverse engineering"); *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 WL 3671264, at *8 (E.D. Pa. Aug. 23, 2017) (holding it "dispositive" that "[a product] is not entitled to trade secret protection if it is susceptible to reverse engineering, regardless of whether [defendants] in fact went through such an exercise."); *Walker Mfg., Inc. v. Hoffmann, Inc.*, 261 F. Supp. 2d 1054, 1082 (N.D. Iowa 2003) (granting summary judgement that "drawings and computer files" were not trade secrets because they were incorporated in crop sprayers "sold to the public," and thus were "readily ascertainable" and "could be" reverse engineered even where the defendant did "not contend" it did so).

Here, there is no dispute that (a) Insulet admitted that its publicly sold product *can* be reverse engineered, Appx2087, and (b) EOFlow *did* take steps to reverse engineer the product, performing teardowns every year from 2014, Appx8015-16. Insulet contends that if it would be "difficult" to reverse engineer, then even its publicly sold, widely exposed features are not "readily ascertainable." Opp. 48-49 (emphasis omitted). While the ease or difficulty of accessing the information may be relevant, Insulet's cited cases do not stand for the broad principle that visible features of a publicly available device are somehow not "readily ascertainable." *Cf. Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540, 542 (7th Cir. 2021) (affording

trade secret protection to a surgical implant because the public never had "unfettered access" and the product was then hidden inside the patient, but recognizing "a company may not publicly sell or display a product and then claim trade secret protection in information that is 'readily ascertainable' upon examination"). Insulet is not selling an implant that no one can see; it is selling millions of disposal patch pumps to any purchaser, with no restrictions.[5]

Such sales disclose "readily ascertainable" features and dimensions that can be reverse-engineered—and are thus ineligible for trade secret protection. *See, e.g.*, *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1329 (Fed. Cir. 2013) ("specifications and tolerances" not trade secrets, even if treated as confidential by producing company, where they could be determined by examining the device); *Flotec, Inc. v. S. Rsch., Inc.*, 16 F. Supp. 2d 992, 1000 (S.D. Ind. 1998) (denying preliminary injunction because the product's "functions . . . can readily be understood by engineers" in the field); *Neogen Corp. v. Innovative Reprod. Tech., LLC*, 2022 WL 14656787, at *8-10 (S.D. Iowa June 14, 2022) (dimensions and design specifications for a catheter's "tight junction" not protectible trade secrets

---

[5] Insulet's remaining cases, Opp. 48-49, are equally unavailing. *See UPI Semiconductor Corp. v. Int'l Trade Comm'n*, 767 F.3d 1372 (Fed. Cir. 2014) (not addressing whether the asserted secrets were protectable but rather whether, following consent order finding misappropriation, defendant established "clean room" practices for its new product); *Walker Mfg.*, 261 F. Supp. 2d at 1060, 1081 (affirming that "drawing and specifications" were not trade secrets where the resulting product was publicly sold).

because they were measurable with a caliper, and the presence of non-measurable manufacturing tolerances did not render the overall design non-ascertainable); *see also Roboserve, Ltd. v. Tom's Foods, Inc.*, 940 F.2d 1441, 1454-55 (11th Cir. 1991) (sale of plaintiff's product to the general public "destroyed any reasonable expectation of secrecy by placing the machines in the public domain"). As these cases demonstrate, Insulet cannot make millions of unrestricted sales of physical products with readily ascertainable features and dimensions that permit reverse-engineering, and still claim they are "secret."

This is because "[a]ll the information they say is a trade secret (size, weight, one-piece construction, non-slick surface) would have been evident to the market the moment the [product] was introduced." *Moore v. Marty Gilman, Inc.*, 965 F. Supp. 203, 217 (D. Mass. 1997). Evidence shows the dimensions at issue were measurable and thus "readily ascertainable," *see* Appx1652 (citing Appx822; Appx2106); and indeed both Insulet and the district court acknowledge the Omnipod *could* be reverse-engineered, Appx8; Appx2087. The district court erred in holding that the information was nonetheless trade secret because EOFlow's years of reverse engineering, which are not even required by law, were somehow not enough. Omnipod's features and dimensions are "readily ascertainable," capable of being reverse-engineered, and not "trade secret." *Olaplex, Inc. v. L'Oreal USA, Inc.*, 855

F. App'x 701, 706, 712 (Fed. Cir. 2021) (reversing jury verdict because asserted secrets were "readily ascertainable").

## II. INSULET FAILED TO SHOW A SIGNIFICANT RISK OF IRREPARABLE HARM.

The entire premise for Insulet seeking an injunction was that imminent, irreparable harm would flow from Medtronic's then-pending acquisition of EOFlow—a deal that has since been killed. Insulet told the district court that this transaction, and *not* the long-standing alleged breach of its confidential information, was the emergency. Appx7963 (arguing "[i]t is one thing for EOFlow to have misappropriated Insulet's trade secrets . . . . It is quite another to have that in the hands of Medtronic" and admitting "the transaction" was "[t]he reason" for seeking expedited relief). The district court agreed. *See* Appx21 ("What is immediate . . . is the acquisition by Medtronic . . . .").

Now that the deal is dead, none of the purported rationales for the injunction articulated by the district court and repeated in Insulet's brief—Medtronic's "money," "regulatory . . . marketing [and] manufacturing expertise," and "customer networks" "necessary" to make EOFlow a "competitor"—remains. Opp. 57. What's more, the very same corporate presentation that Insulet's opposition invokes confirmed that the Medtronic "deal fell through" and the "agreement [was] called off" and "terminated." Appx9942-9943. EOFlow's indisputably "withdrawn" FDA application, Opp. 66, similarly qualifies as at best "dormant," *Campbell Soup Co. v.*

*ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992).

All those "necessary" elements to make EOFlow a competitor to Insulet are thus gone, with the Medtronic deal and FDA application history. Yet Insulet contends this Court should keep the injunction in place, even if it reverses the district court's erroneous order.

To do so, Insulet's opposition attempts to conjure a new threat, citing speculations about far-off "Plans B and C and D," like a potential joint venture that has not even filed an application for approval in China. Opp. 58. None is actually "imminent," much less "the same imminent threat" posed by the canceled deal with Medtronic. *Id.* These far-off hypotheticals cannot substitute for the "clear showing" of "immediate irreparable harm" required for a preliminary injunction. *Oxford Immunotec Ltd. v. Qiagen, Inc.*, 271 F. Supp. 3d 358, 367 (D. Mass. 2017). Where, as here, "the potential for irreparable harm has . . . shifted," the injunction should not remain in place. *Klevisha v. Provident Funding Assocs. L.P.*, 128 F. Supp. 3d 399, 400 (D. Mass. 2015) (dissolving preliminary injunction in light of higher court's ruling).

The change in circumstances is particularly weighty because Insulet's initial excuse for its delay was weak. Insulet's undue delay—five years from seeing EOFlow's product; two years from receiving the presentation that announced EOFlow as its "sole competitor" helmed by former Insulet employees, and showed

the devices' identical dimensions and common parts; and at least eight months after tearing down the EOPatch—undermines its claim of irreparable harm. It is hard to fathom why Insulet's presumption that EOFlow would always remain "a bit player" excuses these lengthy delays, or why EOFlow's return to that status does not now favor vacating the injunction.

The district court acknowledged what Insulet now denies—"the lawsuit [could] have been filed more quickly." Appx20. Having made that finding, the district court did not follow the relevant case law, under which Insulet's delays "suggest[] that there is, in fact, no irreparable injury." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 35 (1st Cir. 2011); *see also Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (affirming plaintiff failed to show irreparable harm, given its "delay in [suing] and seeking a preliminary injunction").

Nor were the district court's findings sufficiently robust to overcome this delay. A "mere showing that [plaintiff] might lose some insubstantial market share as a result of [defendant's] infringement is not enough." *Apple*, 678 F.3d at 1324-25. The district court also referenced an unsupported theory that Insulet might have to lower "pricing" to compete with Medtronic. Opp. 63. But Insulet has no legal right to enjoy monopoly pricing *ad infinitum*, and even then, any lost sales "could be remedied by monetary compensation," and *even then*, if "potential lost sales"

qualified as "irreparable harm," nearly every case would qualify. *Abbott Lab'ys v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1347 (Fed. Cir. 2006) (vacating preliminary injunction). The district court failed even to consider the legal requirement that a "plaintiff must establish that monetary damages would be insufficient" to establish irreparable harm. Opening Br. 54-55 (quoting *Kerrissey v. Com. Credit Grp.*, 359 F. Supp. 3d 151, 156 (D. Mass. 2019)). Insulet in no way contests this point, responds to the argument, or disputes that expert testimony established its harm was quantifiable. Insulet has conceded this legal error, which alone is sufficient to overturn the district court's injunction.

## III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST PRELIMINARY INJUNCTIVE RELIEF.

The district court effectively bypassed two of the four preliminary injunction factors, providing the most "cursory" two-line balancing of the harms and a single-phrase equivocation that the public interest was not impacted "one way or the other." Appx22; *see also* Opening Br. 55; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008) (reversing injunction due to a "cursory" approach to the equities consisting of "one [long] sentence").

Insulet's attempt to recast this cursory approach as a careful "weighing" of the harms, entitled to "considerable deference" Opp. 67, fails for three reasons.

***First***, rather than balance the equities, the district court simply restated its (erroneous) view on the likelihood of success on the claim of "theft of . . . trade

secrets." Appx22. That approach constitutes legal error. Every factor must be analyzed because an injunction "does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32-33. Here the balance was especially necessary given the punishing sweep of the district court's order, which terminated an exit event years in the making and left the defendant's company on life support.

***Second***, Insulet fails to meaningfully address binding First Circuit authority that requires weighing Insulet's delays in considering the equities. Insulet nowhere explains why such precedents should apply only to the government, such that Insulet may "sit[] on its collective hands . . . wait over four months," *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021), and then demand extraordinary relief for a "'emergency' . . . largely . . . of [its] own making." *Respect Maine PAC v. McKee*, 622 F.3d 13, 16 (1st Cir. 2010). Insulet's delays are particularly relevant to the equities here because they led EOFlow to invest years of labor and tens of millions of dollars in developing its own product, which it told Insulet years ago would be the "sole competitor" to Insulet. *See* Appx1039.

***Third***, because the district court did not find the public interest implicated "one way or the other," Insulet tries to claim this tie-goes-to-the-plaintiff. Opp. 72. To the contrary, "[i]f a *plaintiff* fails to show 'that the public interest would not be disserved, . . .' then the district court *may not* issue an injunction." *Amgen Inc. v.*

27

*Sanofi*, 872 F.3d 1367, 1381 (Fed. Cir. 2017) (emphasis added) (analyzing same four factors for a permanent injunction).

Insulet argues—with emphasis but without authority—that EOFlow has the burden of (a) proving that it prevails on the other injunction factors, which would obviate the public interest factor, and (b) demonstrating "with evidence that the public health is *under threat* without access to the *specific* product being enjoined." Opp. 72. Lacking support of its own, Insulet mines EOFlow's cases for such a principle; these cases set forth no such requirement and instead underscore the public interest where "patients may need a replacement." *Medtronic Minimed, Inc. v. Nova Biomedical Corp.*, 2008 WL 11338115, at *1, *4 (C.D. Cal. May 14, 2008) (denying injunctive relief over "medical devices for persons with diabetes"). EOFlow did not argue that a court can never enjoin a drug or medical device, but where Insulet's product is "unrivaled" in the United States and *unavailable* in many jurisdictions where EOFlow provides an option, particularly for sick children, maintaining the district court's injunction would contravene the public interest.

## IV. THIS COURT SHOULD VACATE THE PRELIMINARY INJUNCTION.

Neither side truly believes the district court's Order can, or should, stand as written. That is why Insulet lobbies this Court to "remand for further explanation without vacating the injunction." Opp. 37 n.7. But that would simply perpetuate, rather than cure, the problem. The district court made legal errors on the likelihood

of success, irreparable harm, balance of the harms, and public interest. The likelihood-of-success errors in and of themselves "require[]" this Court "to vacate the injunction." *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019); *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 302 (Fed. Cir. 2009) (holding that the district court's treatment of an affirmative defense was "so abbreviated" that the remedy was to "vacate the injunction"); *see also New Comm Wireless Servs.*, 287 F.3d at 13-14 (holding that "the court of appeals ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court," and concluding "the preliminary injunction must be vacated"). The injunction was improperly issued, and is in any event no longer needed, as the basis for its award is gone.

## CONCLUSION

For the foregoing reasons and those expressed in EOFlow's opening brief, this Court should reverse and vacate the amended preliminary injunction.

Dated:   February 27, 2024

COOLEY LLP

*/s/ Adam S. Gershenson*
ADAM S. GERSHENSON
KIMBERLEY A. SCIMECA
500 Boylston Street
Boston, MA 02116
(617) 937-2300
agershenson@cooley.com
kscimeca@cooley.com

LOWELL D. MEAD

3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000
lmead@cooley.com

ELIZABETH M. FLANAGAN
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383
bflanagan@cooley.com

PATRICK J. HAYDEN
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com

*Counsel for Defendants-Appellants*
*EOFlow Co., Ltd. and EOFlow, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1137

**Short Case Caption:** Insulet Corp. v. EOFlow Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  6,978  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 02/27/2024

Signature: /s/ Adam S. Gershenson

Name: Adam S. Gershenson